UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| _____ x | | |
| In re JPMORGAN CHASE & CO. SECURITIES LITIGATION | : : | Master File No. 1:20-cv-05124-ENV-RML |
| _____ | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : : | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL |
| ALL ACTIONS. | : : | SECURITIES LAWS |
| _____ x | | |

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................. 2

JURISDICTION AND VENUE ............................................................................ 9

PARTIES ............................................................................................................... 10

SUBSTANTIVE ALLEGATIONS ...................................................................... 15

    JPMorgan's Prolific Recent History of Criminal Financial Activity .............................. 15

    The Dodd-Frank Act Criminalizes Spoofing in 2010 ...................................... 18

    JPMorgan Spends Billions to Overhaul Its Compliance Function by
    January 2016 ............................................................................................... 19

    JPMorgan's Precious Metals Trading Desk ...................................................... 21

    The Rise of Algorithmic Trading Threatened the Precious Metals
    Trading Desk ............................................................................................... 24

    JPMorgan Acquires Bear Stearns in May 2008 and Retains Defendants
    Smith and Trunz ............................................................................................ 25

    JPMorgan Admits that the Company and the Trader Defendants
    Orchestrated a Criminal Spoofing Conspiracy Scheme ................................... 26

    JPMorgan and the Executive Defendants Recklessly Disregarded that the
    Precious Metals Trading Desk Was Engaged in an Illegal Spoofing Conspiracy
    Because of the Near-Constant Government Investigations and Investor Lawsuits
    Since Defendant Nowak Assumed Control of the Desk in 2006 ....................... 33

    JPMorgan and the Executive Defendants Had the Access and Capability to
    Uncover the Criminal Spoofing Scheme Orchestrated by the Precious
    Metals Trading Desk ...................................................................................... 44

MATERIALLY FALSE AND MISLEADING STATEMENTS ............................... 49

    Materially False and Misleading Statements Made During the Class Period .................. 49

    JPMorgan and the Trader Defendants' False and Misleading Statements ....................... 50

    JPMorgan and the Executive Defendants' False and Misleading Statements and
    Omissions ...................................................................................................... 52

**Page**

Omissions Based on Violations of Item 303 by JPMorgan and the
Executive Defendants ................................................................................ 57

The Criminal Conspiracy Scheme Orchestrated by JPMorgan's
Precious Metals Trading Desk is Publicly Exposed ...................................... 60

JPMorgan Enters into the DPA to Resolve the Government Investigations
into the Precious Metals Trading Desk's Criminal Spoofing Scheme .................... 66

Additional Scienter Allegations ...................................................... 76

Loss Causation/Economic Loss ........................................................ 78

Fraudulent Scheme and Course of Business .......................................... 80

Applicability of Presumption of Reliance:
Fraud on the Market Doctrine and *Affiliated Ute* Presumptions ..................... 80

No Safe Harbor .................................................................... 82

CLASS ACTION ALLEGATIONS ............................................................ 83

COUNT I ............................................................................... 84

Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants ............................................................ 84

COUNT II .............................................................................. 85

Violations of Section 20(a) of the Exchange Act
Against the Executive Defendants and Defendant Nowak .............................. 85

JURY TRIAL DEMANDED ................................................................ 86

Lead plaintiffs City of Ann Arbor Employees' Retirement System and Julius Pappas ("Lead Plaintiffs"), together with Michiana Area Electrical Workers' Pension Fund (with Lead Plaintiffs, "Plaintiffs"), allege the following based upon the investigation of Plaintiffs' counsel, which included a review of, among other things:

(i)   filings made by JPMorgan Chase & Co. (referred to with its subsidiaries as "JPMorgan" or the "Company") with the United States Securities and Exchange Commission ("SEC");

(ii)   JPMorgan's press releases and other public statements;

(iii)   information posted on JPMorgan's corporate website;

(iv)   conference calls on which the Executive Defendants (defined below) participated;

(v)   securities analysts' reports and advisories about the Company;

(vi)   media reports about the Company;

(vii)   information from documents filed in *U.S. v. Edmonds*, No. 3:18-cr-239-RNC (D. Conn.);

(viii)   information from documents filed in *In the Matter of: John Edmonds*, Commodity Futures Trading Commission ("CFTC") Docket No. 19-16;

(ix)   information from documents filed in *U.S. v. Trunz*, No. 1:19-cr-00375-SJ (E.D.N.Y.);

(x)   information from documents filed in *In the Matter of: Christian Trunz*, CFTC Docket No. 19-26;

(xi)   information from documents filed in *U.S. v. Smith, et al.*, No. 1:19-cr-669-EEC (N.D. Ill.) (the "*Smith* Litigation"), including the superseding indictment filed by the DOJ on November 14, 2019 (the "Superseding Indictment");

(xii)   information from documents filed in *CFTC v. Michael Thomas Nowak & Gregg Francis Smith*, No. 1:19-cv-06163-FUV (N.D. Ill.);

(xiii)   information from documents filed in *U.S. v. JPMorgan Chase & Co.*, 3:20-cr-00175-RNC (D. Conn.), including the statement of facts incorporated into the September 29, 2020 deferred prosecution agreement ("DPA") between JPMorgan and the DOJ (the "DOJ Statement of Facts"), which JPMorgan has admitted is true and accurate;

(xiv)   information from documents filed in *In the Matter of: JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC*, CFTC Docket No. 20-69;

(xv)    information from documents filed in *In the Matter of J.P. Morgan Securities LLC*, SEC Administrative Proceeding File No. 3-20094;

(xvi)   information from documents filed in *Shak v. JPMorgan Chase & Co.*, 1:15-cv-00992 (LJL) (S.D.N.Y.) (the "*Shak* Litigation"); and

(xvii)  information from documents filed in *In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.*, No. 11 Md. 2213 (RPP) (S.D.N.Y.) (the "Silver Litigation").

While the investigation of Plaintiffs' attorneys is continuing, certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of the common stock of JPMorgan between February 23, 2016 and September 23, 2020, inclusive (the "Class Period"). Plaintiffs assert claims against JPMorgan and certain of its executives, management, traders, and directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

2.      Starting in late 2013, JPMorgan – America's largest investment bank – began facing an avalanche of U.S. criminal prosecutions for misconduct that has taken place at the Company since defendant Dimon became JPMorgan's CEO in December 2005.[1]

---

[1]   Capitalized terms used in this section are defined later in this Complaint.

3.      In addition to forcing JPMorgan to pay criminal penalties totaling over $15.5 billion between 2013 and 2015, the DOJ and CFTC required the Company in 2015 to, among other things, implement monitoring systems to detect and deter manipulative trading and to enhance the Company's supervision of its trading desks.  As part of that effort, JPMorgan and the Executive Defendants – defendants Dimon and Lake, JPMorgan's former CFO who was responsible during the Class Period for overseeing the Company's risk and control governance – assured investors that by 2015 the Company had, among other things, hired over 21,000 additional regulatory and compliance employees and spent over $2 billion addressing regulatory, compliance, and controls shortcomings so the Company could detect and stop illegal conduct at JPMorgan.

4.      This class action centers on yet another instance of JPMorgan engaging in criminal activity under the auspices of defendant Dimon.  According to the DOJ Statement of Facts, which JPMorgan entered into in September 2020 to resolve the DOJ's investigation into spoofing by precious metals traders at the Company and which ***JPMorgan has admitted is true and accurate***, from March 2008 until August 2016, JPMorgan's Precious Metals Trading Desk – *i.e.*, the Trader Defendants (meaning defendant Nowak, the head of the Precious Metals Trading Desk, and defendants Smith and Trunz, traders on the Precious Metals Trading Desk), and other traders on this desk, including Edmonds, Ruffo, Jordan, Trader 1, Trader 2, Trader 3, and Trader 4 – engaged in a continuing criminal conspiracy scheme of "spoofing" to defraud market participants in the precious metals futures markets.[2]  The illegal conspiracy scheme of spoofing overseen by defendant Nowak involved tens of thousands of illegal spoofed trades, and caused at least $200 million in losses to market participants that illegally benefited JPMorgan's bottom line.

---

[2]      The DOJ Statements of Facts is attached hereto as Exhibit A.

5.      Spoofing is a simplistic fraud.  Essentially, the illegal spoofing scheme perpetrated by the Precious Metals Trading Desk worked as follows: (i) a trader places a genuine order for a precious metals futures contract; (ii) the trader then quickly places spoofed orders (*i.e.*, fake orders they do not intend to execute) on the opposite side of the market from the genuine order; (iii) the market price moves in response to the spoofed orders, allowing the genuine order to be filled; and (iv) the trader quickly cancels the spoofed orders before they can be filled.  Because most trading of precious metals futures contracts is done using computers, these spoofing sequences took place in a matter of seconds.

6.      As detailed herein, by the start of the Class Period, Defendants knew about, or recklessly disregarded, the illegal spoofing scheme perpetrated by the Precious Metals Trading Desk.

7.      Indeed, JPMorgan's illegal spoofing scheme was very easy to detect.  Once the government obtained the same technological and analytical tools that JPMorgan has possessed since at least 2015 (as a result of the significant compliance upgrades JPMorgan made), it took just one DOJ lawyer and one FBI investigator in 2018 to figure out that JPMorgan had been engaged in a massive illegal spoofing scheme from at least March 2008 to August 2016.

8.       Until approximately 2018, however, the government lacked these technological capabilities.  This allowed JPMorgan to successfully evade charges in earlier government investigations (most notably the 2008 CFTC Investigation) and liability in an earlier investor lawsuit (the Silver Litigation).

9.      Specifically, the 2008 CFTC Investigation into spoofing in the silver futures market by the Precious Metals Trading Desk concluded in September 2013 without the filing of any charges.  As later explained by the CFTC in 2020, the 2008 CFTC Investigation failed because the CFTC lacked the technology needed to properly analyze the trading data underlying JPMorgan's

illegal spoofing scheme.   But even though JPMorgan escaped charges in the 2008 CFTC Investigation, the Company knew about problematic trading on the Precious Metals Trading Desk.  Shortly after the conclusion of the 2008 CFTC Investigation, Trader 4 – one of the unnamed co-conspirators described in the DOJ Statement of Facts – was terminated by JPMorgan in June 2014 following an internal inquiry into Trader 4's trading practices on the Precious Metals Trading Desk.

10.   The 2008 CFTC Investigation led to the Silver Litigation, which was a class action lawsuit against JPMorgan by retail silver futures investors that centered on alleged spoofing by the Precious Metals Trading Desk.  As in the 2008 CFTC Investigation, JPMorgan evaded liability in the Silver Litigation (which was affirmed on appeal) by arguing, among other things, that no charges were ever filed in the 2008 CFTC Investigation, *i.e.*, that no spoofing had occurred at JPMorgan.

11.   JPMorgan was less successful, however, in the *Shak* Litigation, which was brought on an individual basis in 2015 by a silver trader who alleged that the Precious Metals Trading Desk was spoofing the silver futures market.  After surviving a motion to dismiss, the *Shak* Litigation proceeded to fact and expert discovery.  JPMorgan made substantial document productions on behalf of the Trader Defendants and Edmonds in 2017 and 2018 regarding their silver market trading in 2010 and 2011.  In addition, in 2018, defendant Nowak was deposed as JPMorgan's Federal Rule of Civil Procedure 30(b)(6) witness and as a fact witness, and was proffered by the Company as a non-retained expert witness.  Likewise, Edmonds was deposed as a fact witness in 2018.  The *Shak* Litigation reached a confidential settlement in August 2020 after the Superseding Indictment against defendants Nowak and Smith, described more fully below, became public in November 2019.[3]

---

[3]   The Superseding Indictment is attached hereto as Exhibit B.

12.     By 2019, the once "implausible theories" of spoofing, as JPMorgan repeatedly described them in the Silver Litigation, quickly became an admitted reality.  Specifically, the DOJ has secured guilty pleas from defendant Trunz (in August 2019) and from Edmonds (in November 2018) – former traders on the Precious Metals Trading Desk who were supervised by defendant Nowak – and admissions that the Precious Metals Trading Desk had been engaged in illegal spoofing with the knowledge and consent of defendant Nowak.  Both continue to cooperate with the government and are awaiting sentencing.

13.     In September 2020, the DOJ secured JPMorgan's entry into the DPA and its agreement to pay a $920 million penalty for engaging in spoofing, the largest such penalty in history.  As part of the DPA, JPMorgan admitted responsibility for the acts of its employees – including the Trader Defendants – for engaging in spoofing and consented to the truth and accuracy of the lengthy DOJ Statement of Facts.  Among other things, the DOJ Statement of Facts explains that the Precious Metals Trading Desk repeatedly used the word "spoof" in electronic chats – communications that JPMorgan was required by the DOJ to monitor because JPMorgan was under criminal corporate probation during the Class Period due to earlier misconduct.  The DPA was the result of a multi-year investigation by the DOJ, CFTC, and SEC.

14.     The only individuals that have not settled with the DOJ are defendants Nowak and Smith (and Jordan and Ruffo), who were charged in the Superseding Indictment filed by the DOJ in the *Smith* Litigation in November 2019 with, among other things, engaging in a RICO conspiracy by facilitating the illegal spoofing scheme at JPMorgan.[4]  The DOJ, which can only file RICO charges

---

[4]   The criminal trial in the *Smith* Litigation is set to take place between October 18, 2021 and November 19, 2021.  If this criminal trial results in the public disclosure of additional facts or information that support Plaintiffs' allegations, or broaden the scope of this Complaint, Plaintiffs

in the most egregious instances and only with the approval of the DOJ's Organized Crime unit, has not filed RICO charges against a trader at an investment bank since the mid-1980s other than here.

15.     In other words, the DOJ has not levied RICO charges against a single Wall Street trading desk during ***any*** of the financial calamities that have occurred since the 1980s – *i.e.*, the savings and loans crisis of the late 1980s, Black Monday in 1987, the 1990-91 U.S. recession, the dot-com bubble burst of 2001, Enron, Worldcom, the 2008 financial crisis, or the fallout from Bernie Madoff's fraud – but found JPMorgan's illegal spoofing misconduct to be so egregious that it warranted RICO conspiracy charges.  This fact alone underscores the outrageous and serious nature of Defendants' fraud.

16.     Against this backdrop, Plaintiffs challenge three sets of materially false and misleading statements and omissions made by Defendants.  First, from the beginning of the Class Period on February 23, 2016 until August 2016, JPMorgan and the Trader Defendants – *i.e.*, defendants Nowak, Smith, and Trunz – made numerous spoofed orders that were designed to materially misrepresent to investors JPMorgan's actual belief regarding the value of the precious metals being artificially manipulated in order to materially benefit JPMorgan's bottom line. JPMorgan and defendant Trunz have both accepted responsibility for this misconduct and concede that Defendants intended to inject false and misleading information about the genuine supply and demand for precious metals future contracts into the markets during the Class Period in order to benefit the Company.  By engaging in material, illegal spoofing, JPMorgan and the Trader Defendants orchestrated a scheme or artifice to defraud the precious metals markets and, ultimately, the Company's investors.

---

intend to amend this Complaint pursuant to Federal Rule of Civil Procedure 15(a) within a reasonable period of time.

17.     Second, in the Company's 2015, 2016, 2017, 2018, and 2019 Forms 10-K, JPMorgan and the Executive Defendants made false and misleading statements and omissions regarding the Company's methods for valuing physical commodities like precious metals.  Among other things, these Forms 10-K falsely state that JPMorgan valued precious metals using observable market prices or data.  As JPMorgan admitted in the DOJ Statement of Facts, that was untrue.  The Precious Metals Trading Desk was spoofing precious metals trades to materially benefit JPMorgan's bottom line and did not rely on observable market prices or data.

18.     Third, the Company's 2015, 2016, 2017, 2018, and 2019 Forms 10-K violated Item 303 of Regulation S-K, which required JPMorgan to disclose known trends, events, and uncertainties.  Specifically, these Forms 10-K failed to disclose that JPMorgan's criminal conspiracy – its scheme or artifice to defraud by means of spoofing – was a known uncertainty or event that could materially impact JPMorgan's revenues by exposing the Company to enhanced regulatory scrutiny and significant criminal liability and penalties.

19.     Investors learned about Defendants' materially false and misleading statements and omissions through a series of disclosures.

20.     First, on February 26, 2019, the Company's 2018 Form 10-K disclosed to investors for the first time that there were government investigations into trading practices in the precious metals markets generally.

21.     Next, on August 20, 2019, the DOJ announced that defendant Trunz had pleaded guilty to engaging in a criminal conspiracy of spoofing while employed as a trader on the Precious Metals Trading Desk.  This announcement disclosed to investors for the first time that the DOJ's investigation was focused on the Precious Metals Trading Desk, that it had secured the cooperation of defendant Trunz, and that it involved spoofing misconduct that lasted until August 2016.

22.     Then, on September 16, 2019, the DOJ announced that it had indicted defendants Nowak and Smith (and Jordan) for, among other things, RICO conspiracy charges relating to JPMorgan's illegal spoofing scheme.  This announcement revealed to investors for the first time that JPMorgan's spoofing misconduct amounted to criminal racketeering activity more commonly associated with mafia and drug gangs, and that the head of the Precious Metals Trading Desk, defendant Nowak, was the ringleader of this criminal RICO conspiracy scheme.

23.     Finally, on September 23, 2020, *Bloomberg* reported to investors for the first time that JPMorgan was close to paying almost $1 billion in criminal penalties to settle with the DOJ to resolve criminal spoofing charges, a record criminal penalty for spoofing.

24.     On each occasion, disclosure of JPMorgan's illegal conduct caused its stock price to decline materially, damaging Plaintiffs and the Class.  In total, these declines caused JPMorgan to lose over $15 billion in market capitalization.

### JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

28.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

29.     Lead Plaintiff City of Ann Arbor Employees' Retirement System, as set forth in its certification previously filed in this Action and incorporated by reference herein, purchased JPMorgan common stock during the Class Period and has been damaged thereby.

30.     Lead Plaintiff Julius Pappas, as set forth in his certification previously filed in this Action and incorporated by reference herein, purchased JPMorgan common stock during the Class Period and has been damaged thereby.

31.     Plaintiff Michiana Area Electrical Workers' Pension Fund purchased JPMorgan common stock during the Class Period as set forth in the attached certification, which is incorporated by reference herein, and has been damaged thereby.

32.     Defendant JPMorgan purports to operate as a financial services company worldwide. The Company operates in four segments: (i) Corporate & Investment Bank; (ii) Commercial Banking; (iii) Consumer & Community Banking; and (iv) Asset & Wealth Management.  According to the Company's Form 10-K for the fiscal year ended December 31, 2015, filed with the SEC on February 23, 2016 (the "2015 Form 10-K"), JPMorgan's commodities business, which includes the Precious Metals Trading Desk, is part of the Company's Corporate & Investment Bank division. JPMorgan is incorporated in Delaware with headquarters at 383 Madison Avenue, New York, New York.  JPMorgan's common stock trades on the NYSE under the ticker symbol "JPM."  References to "JPMorgan" or the "Company" are intended to incorporate all JPMorgan subsidiaries involved in the illegal spoofing scheme, including, but not limited to, JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC.

33. Defendant James Dimon ("Dimon") has been the Company's Chief Executive Officer ("CEO") since December 31, 2005. Defendant Dimon has also been the Chairman of the Company's board of directors since December 31, 2006.

34. Defendant Marianne Lake ("Lake") served as the Company's Chief Financial Officer ("CFO") from 2013 until April 30, 2019. Defendant Lake currently serves as the CEO of JPMorgan's Consumer Lending business and, together with defendant Dimon, remains a member of the Company's operating committee.

35. Defendant Michael Nowak ("Nowak") was the head and supervisor of the Company's Precious Metals Trading Desk from 2006 until his criminal indictment in September 2019.

36. Defendant Gregg Smith ("Smith") was a precious metals trader at JPMorgan from May 2008 until his criminal indictment in September 2019. Defendant Smith's last title with JPMorgan was Executive Director. Before working for JPMorgan, defendant Smith was employed as a precious metals trader at Bear Stearns (defined below) beginning in May 2007.

37. Defendant Christian Trunz ("Trunz"), also known as Christiaan Trunz, was a precious metals trader at JPMorgan from May 2008 until he pleaded guilty to conspiracy and spoofing charges on August 20, 2019. Defendant Trunz's last title with JPMorgan was Executive Director. Before working for JPMorgan, defendant Trunz was employed as a precious metals trader at Bear Stearns beginning in July 2007.

38. Defendants Dimon and Lake are collectively referred to herein as the "Executive Defendants."

39. During the Class Period, the Executive Defendants, as senior executive officers and/or directors of JPMorgan, were privy to confidential and proprietary information concerning JPMorgan, its operations, finances, financial condition and present and future business prospects.

The Executive Defendants also had access to material adverse non-public information concerning JPMorgan, as discussed in detail below.  Because of their positions with JPMorgan, the Executive Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Executive Defendants recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

40.     The Executive Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Executive Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Executive Defendants were able to and did, directly or indirectly, control the conduct of JPMorgan's business.

41.     The Executive Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Executive Defendants had the opportunity to commit the fraudulent acts alleged herein.

42.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Executive Defendants had a duty to promptly disseminate accurate, full and truthful information with respect to JPMorgan's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of JPMorgan's common stock would be based upon truthful and accurate information.  The Executive Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

43.     The Executive Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of JPMorgan common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JPMorgan's business, operations and management and the intrinsic value of JPMorgan's common stock; and (ii) caused Plaintiffs and members of the Class to purchase JPMorgan common stock at artificially inflated prices.

44.     Defendants Nowak, Smith, and Trunz are collectively referred to herein as the "Trader Defendants."

45.     From at least 2008 until August 2016, as detailed below, the Trader Defendants facilitated a criminal conspiracy by engaging in a scheme to defraud in connection with the purchase and sale of precious metals futures contracts on the NYMEX (defined below) and COMEX (defined below).  As part of this criminal conspiracy scheme, the Trader Defendants made tens of thousands of buy or sell orders for precious metals futures contracts with the intent to cancel those orders

before execution to deceive, and profit from, other market participants by misrepresenting JPMorgan's genuine belief about the value of precious metals.  Because the Trader Defendants illegally made and/or directed tens of thousands of spoofed trades, the Trader Defendants are liable as direct participants in the wrongs complained of herein.

46.     In addition, defendant Nowak, by reason of his status as the head and supervisor of the Precious Metals Trading Desk, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of his position of control, defendant Nowak was able to and did, directly or indirectly, control the conduct of JPMorgan's trading in precious metals. Thus, defendant Nowak had the opportunity to commit the fraudulent acts alleged herein.

47.     The Trader Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of JPMorgan common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JPMorgan's business, operations and management and the intrinsic value of JPMorgan's common stock; and (ii) caused Plaintiffs and members of the Class to purchase JPMorgan common stock at artificially inflated prices.

48.     The Executive Defendants and the Trader Defendants are collectively referred to herein as the "Individual Defendants."

49.     JPMorgan, the Executive Defendants, and the Trader Defendants are collectively referred to herein as "Defendants."

- 14 -

## SUBSTANTIVE ALLEGATIONS

### JPMorgan's Prolific Recent History of Criminal Financial Activity

50.     JPMorgan's criminal spoofing in the precious metals market by JPMorgan is the latest scheme in a string of troubling criminal activity committed by the Company during the tenure of defendant Dimon.

51.     Since 2013, JPMorgan has admitted to the DOJ to engaging in a wide variety of financial crimes and related misconduct, all of which has occurred since defendant Dimon began his tenure as CEO in 2005.

52.     First, on November 19, 2013, the Company entered into a settlement with the DOJ for $13 billion to resolve federal and state civil claims relating to JPMorgan's marketing and sale of residential mortgage-backed securities between 2005 and 2008 (the "RMBS Settlement Agreement").  According to the DOJ press release issued in connection with the RMBS Settlement Agreement, the $13 billion penalty was "the largest settlement with a single entity in American history[.]"

53.     No RICO conspiracy charges were included or mentioned in the RMBS Settlement Agreement.

54.     Next, on January 7, 2014, JPMorgan entered into a deferred prosecution agreement with the DOJ to resolve two felony violations of the Bank Secrecy Act in connection with the Company's relationship with Bernard L. Madoff Investment Securities (the "Madoff DPA").  As part of the Madoff DPA, JPMorgan was required to, among other things, pay a $1.7 billion penalty to victims of the Madoff fraud and reform its compliance program.

55.     According to the Madoff DPA, JPMorgan was required "to implement significant remedial changes to its . . . compliance program, ***prior to*** the entry of this Agreement." [5]  Further, the Madoff DPA required the Company to submit quarterly reports to the DOJ for a period of two years to describe the status of the remedial changes made to JPMorgan's compliance program.

56.     No RICO conspiracy charges were included or mentioned in the Madoff DPA.

57.     On April 9, 2014, defendant Dimon issued his annual letter to shareholders (the "2014 Letter"), in which he acknowledged the "tough" year JPMorgan experienced on account of the intense government scrutiny of the Company.

58.     Specifically, defendant Dimon stated in the 2014 Letter that "the company was under constant and intense pressure" and "[t]he bad news was bad."  Leaving no doubt that he was personally involved in resolving these legal issues, defendant Dimon further stated that "[t]he most painful, difficult and nerve-wracking experience that I have ever dealt with professionally was trying to resolve the legal issues we had this past year with multiple government agencies and regulators as we tried to get many large and risky legal issues behind us[.]"

59.     Notwithstanding the 2014 Letter's acknowledgement of previous widespread wrongdoing at the Company, JPMorgan's legal issues continued in 2015.  Specifically, on May 20, 2015, JPMorgan pleaded guilty to a felony charge of conspiring to manipulate the price of U.S. dollars and euros in the foreign currency exchange ("FX") spot market (the "FX Plea Agreement").  Pursuant to the FX Plea Agreement, JPMorgan agreed to pay a criminal fine of $550 million and serve a three-year term of corporate probation.

---

[5]     Unless stated otherwise, all emphasis is added.

60.     According to the FX Plea Agreement, which comprises JPMorgan's factual admissions of guilt, between July 2010 and January 2013, euro-dollar traders at JPMorgan – self-described members of "The Cartel" or "The Mafia" with euro-dollar traders at other major banks – used an exclusive electronic chat room and coded language to manipulate FX rates.  The purpose of "The Cartel" or "The Mafia" was to eliminate competition in the purchase and sale of the euro-dollar currency pair through various illicit methods.

61.     The FX Plea Agreement states, in pertinent part, that: "[JPMorgan] understands that during the term of probation it shall . . . report to the [DOJ] Criminal Division, Fraud Section all credible information regarding criminal violations of U.S. law concerning fraud, including securities or commodities fraud by [JPMorgan] *or any of its employees* as to which the defendant's Board of Directors, *management (that is, all supervisors within the bank)*, or legal and compliance personnel are aware[.]"

62.     Furthermore, according to the FX Plea Agreement, as part of JPMorgan's term of corporate probation, the Company agreed to, among other things, enhance its internal controls and procedures as required by the CFTC.

63.     According to the CFTC, which issued an order on November 12, 2014 filing and settling charges against JPMorgan for manipulating FX benchmark rates, JPMorgan was required to, among other things, enhance its internal controls and procedures relating to: (i) measures to enhance detection and deterrence of trader misconduct; (ii) monitoring systems designed to enhance the detection and deterrence of manipulative trading; and (iii) enhanced supervision of trading desks.

64.     In commenting on the CFTC's order against JPMorgan, Aitan Goelman ("Goelman"), the CFTC's Director of Enforcement at the time, stated that "[t]he market only works if people have

- 17 -

confidence that the process of setting these benchmarks is fair, not corrupted by manipulation by some of the biggest banks in the world."

65.     According to JPMorgan's 2018 Form 10-K (defined below), although the FX Plea Agreement was signed in May 2015, it was not judicially approved until January 2017.  Thus, the corporate probation period for the FX Plea Agreement began in January 2017 and ran through January 2020.  In other words, JPMorgan was on criminal corporate probation during the Class Period and was required to report to the DOJ all instances of fraud, including illegal spoofing.

66.     Despite that the conduct in the FX Plea Agreement was described as being effectuated by "The Cartel" or "The Mafia," no RICO conspiracy charges were included or mentioned in the FX Plea Agreement.

67.     Finally, on January 20, 2017, JPMorgan entered into a settlement with the DOJ to resolve a federal civil rights lawsuit for approximately $53 million (the "Consent Order"). According to the Consent Order, which included a stipulation of facts agreed to by JPMorgan, from 2006 to 2009, the Company sold thousands of mortgages to African American and Hispanic borrowers who were charged higher rates and fees compared to those by similarly situated white borrowers.

68.     No RICO conspiracy charges were included or mentioned in the Consent Order.

**The Dodd-Frank Act Criminalizes Spoofing in 2010**

69.     This case centers on yet another criminal conspiracy scheme that took place under defendant Dimon's watch and resulted in substantial government scrutiny, a near billion dollar fine, and a deferred prosecution agreement.  This time, it was JPMorgan's Precious Metals Trading Desk engaging in tens of thousands of instances of spoofing from May 2008 to August 2016 in order to materially and artificially benefit JPMorgan's bottom line.

70.    According to the CFTC, spoofing is conduct that includes, but is not limited to, submitting or cancelling multiple false buy or sell orders to create artificial price movements upwards or downwards and/or misrepresent market depth.

71.    Before 2010, spoofing was prohibited only by general fraud statutes, including Rule 10b-5 and Section 10(b) of the Exchange Act.

72.    Spoofing was specifically outlawed with the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") in July 2010.  Section 747 of Dodd-Frank amended Section 4c(a)(5)(C) of the Commodity Exchange Act ("CEA") to specifically prohibit spoofing and make it a criminal offense.  *See* 7 U.S.C. §6c(a)(5)(C).  The CEA mentions spoofing by name, and defines it as "bidding or offering with the intent to cancel the bid or offer before execution[.]"

73.    The crime of spoofing carries a sentence of up to ten years in prison for each instance of spoofing.  *See* 7 U.S.C. §13(a)(2).

74.    According to the CFTC, "a CEA section 4c(a)(5)(C) violation requires a market participant ***to act with some degree of intent, or scienter, beyond recklessness*** to engage in the 'spoofing' trading practices prohibited by CEA section 4c(a)(5)(C). Because CEA section 4c(a)(5)(C) requires that a person intend to cancel a bid or offer before execution, ***the Commission believes that reckless trading, practices, or conduct will not constitute a 'spoofing' violation***."  In other words, JPMorgan's entry into the DPA means that its illegal spoofing scheme constituted intentional conduct far above recklessness.

**JPMorgan Spends Billions to Overhaul Its Compliance Function by January 2016**

75.    In response to the passage of Dodd-Frank, and in light of the Company's remedial obligations in the Madoff DPA and the FX Plea Agreement, JPMorgan took numerous steps to significantly enhance its compliance function by the start of the Class Period.  For example,

according to the 2014 Letter, defendant Dimon detailed the steps taken by 2014 to respond to, among other new laws, Dodd-Frank, including hiring 13,000 employees in regulatory and compliance functions.

76.     Further, in the 2014 Letter, defendant Dimon explained that the Company had spent over $600 million on technology to support JPMorgan's regulatory and compliance functions.  The crown jewel of this effort was the Company's "buil[ding of] a state-of-the art control room in our corporate headquarters to provide streamlined data analysis and reporting capabilities of control and operational risk data across the firm."  In addition, the 2014 Letter states that the Company had spent over $2 billion to improve JPMorgan's controls from 2012 through 2014.

77.     Likewise, in the April 8, 2015 letter issued by defendant Dimon to shareholders (the "2015 Letter"), defendant Dimon stated that the Company again "strengthened compliance" by adding "approximately 8,000 people across the firm with a mission to strengthen our compliance capabilities."  Thus, by the start of the Class Period, JPMorgan had hired at least 21,000 new compliance employees to, among other things, effectuate the remediation efforts required by the Madoff DPA and the FX Plea Agreement.

78.     In the 2015 Letter, defendant Dimon further stated that JPMorgan had centralized its risk functions because regulators demanded it "in order to improve the consistency of controls[.]"  According to defendant Dimon, among other functions, JPMorgan's compliance function was "given huge amounts of additional authority . . . at our corporate headquarters."

79.     In addition, according to the April 6, 2016 letter issued by defendant Dimon to shareholders (the "2016 Letter"), by early 2016 the Company's overhaul of its compliance function provided JPMorgan with unfettered capabilities to identify fraudulent conduct within the Company,

which would include the illegal spoofing scheme on the Precious Metals Trading Desk. Specifically, the 2016 Letter states, in pertinent part, that:

> The intense efforts over the last few years across our operating businesses – Risk, Finance, Compliance, Legal and Audit – are now yielding real results that will protect the company in the future. We have reinforced a culture of accountability for assuming risk and have come a long way in self-identifying and fixing shortcomings. **_Many new permanent organizational structures have been put in place to ensure constant review and continuous improvement_**. For example, we now have a permanent Oversight & Control Group. **_The group is charged with enhancing the firm's control environment by looking within and across the lines of business and corporate functions to identify and remediate control issues. This function enables us to detect control problems more quickly, escalate issues promptly and engage other stakeholders to understand common themes across the firm_**. We have strengthened the Audit Department and risk assessment throughout the firm, enhanced data quality and controls, and also strengthened permanent standing committees that review new clients, new products and all reputational issues.

80.     According to JPMorgan's Form DEF 14A filed on April 7, 2016, defendant Lake, JPMorgan's CFO during the Class Period, was responsible for "improving and solidifying our Global Finance organization to help the Firm navigate the changing financial/regulatory landscape more effectively; **_enhancing our overall risk and control governance_**; [and] improving relationships with our regulators, particularly with regards to reporting[.]" In other words, defendant Lake was the JPMorgan executive primarily responsible for implementing JPMorgan's compliance reforms before and during the Class Period.

81.     According to *The New York Times*, defendant Lake acknowledged that, by February 2015, the Company had spent **_$35 billion_** in legal and compliance costs since 2010.

### JPMorgan's Precious Metals Trading Desk

82.     Before and during the Class Period, JPMorgan ran one of the world's largest precious metals trading desks that had offices in New York, London, and Singapore, but operated as part of a single, cohesive global desk (the "Precious Metals Trading Desk").

83.     According to *Bloomberg*, the Precious Metals Trading Desk at JPMorgan "brings in as much as $250 million in annual profit[.]"

84.     According to the DOJ Statement of Facts, ***which JPMorgan has admitted is true and accurate***, from 2008 until his indictment, defendant Nowak was the head and supervisor of the Precious Metals Trading Desk and worked out of New York and London.  DOJ ¶8.  This means that defendant Nowak was responsible for supervising all of the traders on the Precious Metals Trading Desk during this time period.  In addition to supervising the Precious Metals Trading Desk, defendant Nowak also personally made thousands of illegal spoofed trades.

85.     According to the DOJ Statement of Facts, defendant Smith was an Executive Director and trader on the Precious Metals Trading Desk in New York from May 2008 until his indictment. DOJ ¶7.

86.     According to the DOJ Statement of Facts, defendant Trunz was an Executive Director and trader on the Precious Metals Trading Desk at various times in New York, London, and Singapore from May 2008 until his guilty plea in August 2019.  DOJ ¶12.

87.     According to the DOJ Statement of Facts, John Edmonds ("Edmonds") was a Vice President and trader on the Precious Metals Trading Desk from May 2009 until leaving JPMorgan in August 2017.  DOJ ¶11.

88.     According to the DOJ Statement of Facts, Christopher Jordan ("Jordan") was an Executive Director and trader on the Precious Metals Trading Desk in New York from March 2006 until leaving JPMorgan in December 2009.  DOJ ¶10.

89.     According to the DOJ Statement of Facts, Jeffrey Ruffo ("Ruffo") was an Executive Director and salesperson on the Precious Metals Trading Desk in New York from May 2008 until leaving JPMorgan in August 2017.  DOJ ¶9.

90.      According to the DOJ Statement of Facts, four additional unnamed traders were part of the criminal conspiracy scheme orchestrated by the Precious Metals Trading Desk, as follows: (i) Trader 1, who was a Managing Director and trader at the Company in New York from May 2008 until July 2014; (ii) Trader 2, who was a Managing Director and trader at the Company in London from 2003 until July 2017; (iii) Trader 3, who was a Managing Director and Global Head of Precious Metals Trading at the Company in New York and London from July 2005 until October 2019; and (iv) Trader 4, who was an Executive Director and trader at the Company in London from 2004 until June 2014.  DOJ ¶¶13-16.

91.      A trading desk is a sector of an investment bank that trades a specific type of security, such as FX rates, equities, or commodities.  Among other things, commodities include precious metals.  The most commonly traded precious metals are gold, silver, platinum, and palladium.

92.      Investment banks trade in commodities by buying and selling futures contracts.  A futures contract is an agreement to buy or sell a specific precious metal at a fixed price today that would be delivered and paid for at a later date.  Thus, the buyer and seller agree at the time they enter into the contract on a price for a precious metal to be delivered by the seller in exchange for money from the buyer at a later date.

93.      Gold and silver futures contracts are traded on the Commodities Exchange, Inc. ("COMEX").

94.      Platinum and palladium futures contracts are traded on the New York Mercantile Exchange, Inc. ("NYMEX").

95.      Both COMEX and NYMEX are owned and operated by the CME Group, Inc. ("CME").  Futures contract trading on COMEX and NYMEX can be done through an electronic

trading system called "Globex" that allows traders to make buy or sell offers on futures contracts on those exchanges from anywhere in the world.

96.     Precious metals traders using Globex to trade precious metals futures contracts, like the Trader Defendants, place orders in the form of "bids" to buy or "offers" to sell.  An order is "filled" or "executed" when a buyer's bid price and a seller's offer price match for a particular futures contract.

97.     In addition, COMEX and NYMEX allow precious metals traders to place "iceberg" orders, which are buy or sell orders that do not display the order's full size to the other public market participants.  In other words, only a pre-set portion of an iceberg order is visible at any given time. Once the visible portion is filled, the next pre-set portion of the order becomes visible, and so forth, until the entirety of the iceberg order is filled.

98.     The Precious Metals Trading Desk also traded options contracts in precious metals. An option contract offers the purchaser of the option the right (but not the obligation) to buy or sell the underlying asset at an agreed-upon price during a certain period of time or on a specific date.

99.     "Barrier" options are a type of option whose value depends on whether or not the underlying asset reaches or exceeds a pre-determined price during the lifetime of the option.

**The Rise of Algorithmic Trading Threatened the Precious Metals Trading Desk**

100.     Before the mid-2000s, trading futures contracts in precious metals and other commodities was done by brokers who physically sat on the trading floor in what was colloquially known as the "pit."

101.     With the advance of computer technology, the process of trading futures contracts in precious metals changed dramatically.  By 2010, although the pit was still operational, most traders used Globex to trade in commodities futures contracts.

102.     The rise of Globex allowed traders to begin using proprietary algorithmic trading programs that rely on complex mathematical formulas to process market information and place orders at extraordinary speeds.  Such algorithmic traders, or "algos," could place hundreds of buy and/or sell orders within a single second.

103.     According to *Bloomberg*, the algos stymied manual traders, like those on the Precious Metals Trading Desk, because "within a second of placing a bid, [the manual traders'] price was often countered by high-frequency traders who would match and close a position before the traders had a chance to complete their deal.  These algos not only snapped up trades but also created momentum in the market that pushed prices away from the traders' targets."

104.     To combat the algos and maintain relevance in the digital era, some manual traders of futures contracts in precious metals – *i.e.*, the Precious Metals Trading Desk – illegally used spoofing to, in their view, level the playing field against the algos.

105.     Specifically, manual traders can spoof futures contracts by using a high-speed computer to place numerous buy or sell orders to distort the supply and demand in the market.  The manual trader does not intend to actually complete the buy or sell orders, but instead artificially moves the price in favor of the trader or its clients and to the detriment of the algos.

106.     In other words, the Precious Metals Trading Desk – led by defendant Nowak – devised their criminal conspiracy scheme of spoofing to gain an illegal edge over the algos in order to maintain their ability to generate hundreds of millions in annual profits for JPMorgan.  In so doing, the Trader Defendants misrepresented to JPMorgan's investors the Company's genuine belief of the value of precious metals in order to artificially benefit JPMorgan's bottom line.

**JPMorgan Acquires Bear Stearns in May 2008 and Retains Defendants Smith and Trunz**

107.     In early 2007, The Bear Stearns Companies Inc. ("Bear Stearns") was the fifth largest investment bank in the world and had never posted a loss since its founding in 1923.  That all rapidly

changed during the course of 2007 after two hedge funds overseen by Bear Stearns collapsed from holding billions of dollars of worthless mortgage-backed securities.  This led to a cascade of events that revealed Bear Stearns had outsized exposure to toxic mortgage-backed securities products.

108.    By March 2008, Bear Stearns had lost over 85% of its market value, causing billions in losses to investors.  Sensing an opportunity, defendant Dimon offered $2 per share to purchase Bear Stearns on March 16, 2008.  Bear Stearns had been trading at approximately $57 per share on March 14, 2008.

109.    After investor and regulator outrage to the low-ball price offered by defendant Dimon, JPMorgan was forced to up its bid to $10 per share.  On May 29, 2008, JPMorgan acquired Bear Stearns for approximately $10 per share.

110.    In connection with JPMorgan's acquisition of Bear Stearns, certain precious metals traders formerly employed by Bear Stearns were retained by JPMorgan.

111.    Specifically, according to the DOJ Statement of Facts, defendants Smith and Trunz, and Trader 1, were Bear Stearns precious metals traders who were retained by defendant Nowak when JPMorgan acquired Bear Stearns in May 2008.  DOJ ¶¶7, 12-13.  Likewise, Ruffo was a Bear Stearns salesperson who was retained by defendant Nowak when the Company acquired Bear Stearns.  DOJ ¶9.

### JPMorgan Admits that the Company and the Trader Defendants Orchestrated a Criminal Spoofing Conspiracy Scheme

112.    JPMorgan admits that it intentionally orchestrated a criminal spoofing scheme from at least March 2008 to August 2016.  Specifically, in September 2020, JPMorgan resolved government investigations into spoofing on the Precious Metals Trading Desk, paying a $920 million spoofing fine (the largest ever) and entering into the DPA, in which the Company agreed that the DOJ Statement of Facts "*are true and accurate*."

113.     Before JPMorgan entered into the DPA, the Company was aware of numerous DOJ actions that demonstrated that the Company had intentionally engaged in an illegal spoofing scheme. In November 2018, Edmonds pleaded guilty to one count of commodities fraud and one count of engaging in a spoofing conspiracy.  In August 2019, defendant Trunz pleaded guilty to one count of spoofing and one count of engaging in a spoofing conspiracy.  In September 2019, the DOJ filed an indictment against defendants Nowak and Smith, and Jordan, in the *Smith* Litigation charging, among other things, that the Precious Metals Trading Desk had been engaged in RICO conspiracy scheme of spoofing.  In November 2019, the DOJ filed the Superseding Indictment in the *Smith* Litigation, adding Ruffo as a defendant.

114.     According to the DOJ Statement of Facts, "from at least March 2008 until August 2016" the Precious Metals Trading Desk – *i.e.*, the Trader Defendants, Edmonds, Ruffo, Jordan, Trader 1, Trader 2, Trader 3, and Trader 4 – "engaged in a scheme to defraud in connection with the purchase and sale of precious metal futures contracts on and subject to the rules of a registered entity, specifically NYMEX and COMEX."  DOJ ¶¶6, 18.

115.     According to the DOJ Statement of Facts, the Precious Metals Trading Desk "***knowingly and intentionally*** placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution . . . including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts."  DOJ ¶19.  This conduct took place "[i]n ***tens of thousands of trading sequences***" between March 2007 and August 2016.  DOJ ¶20.

116.     According to the DOJ Statement of Facts, the illegal spoofing scheme generally followed the same pattern: (i) a trader would place an order for a precious metals futures contract

that they intended to execute; (ii) the trader would then quickly place spoofed orders on the opposite side of the market from the genuine order; (iii) the market price would move in response to the spoofed orders and allow the genuine order to be fulfilled; and (iv) the trader would then quickly cancel the spoofed orders before they could be filled.  DOJ ¶¶20-30.

117.    According to the DOJ Statement of Facts, by placing the spoofed orders, the Precious Metals Trading Desk "***intended to inject false and misleading information*** about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand."  DOJ ¶25.

118.    According to the DOJ Statement of Facts, by orchestrating this illegal criminal conspiracy scheme, the Precious Metals Trading Desk was able "***to generate trading profits and avoid losses for themselves and other members of the Precious Metals [Trading] Desk, the Precious Metals [Trading] Desk itself, and ultimately, [JPMorgan]***."  DOJ ¶29.  Specifically, from March 2008 until August 2016, this scheme "resulted in at least $200,847,102 in losses to other participants in the markets for precious metals futures contracts."  DOJ ¶32.

119.    According to the DOJ Statement of Facts, "[i]n executing the scheme to defraud in connection with the purchase and sale of precious metals futures contracts" the Trader Defendants and other members of the Precious Metals Trading Desk – "were acting within the scope of their employment as employees of [JPMorgan] and its affiliates, and as agents of the Company***, and with the intent, at least in part, to benefit the Company***."  DOJ ¶34.

120.    According to the DOJ Statement of Facts, the illegal spoofing scheme on the Precious Metals Trading Desk was ongoing at the time that JPMorgan purchased Bear Stearns in May 2008.  DOJ ¶23.  After the acquisition, however, the scheme expanded in scope and complexity due to

defendants Smith and Trunz teaching their new colleagues at JPMorgan a more advanced style of spoofing.  DOJ ¶24.

121.    Specifically, according to the DOJ Statement of Facts, defendants Smith and Trunz used layering to engage in spoofing, which involved making multiple spoofed orders at different prices in rapid succession that in the aggregate (as opposed to individually) were substantially larger than the genuine order.  *Id.*  "This new style of 'layering,' which was more difficult both to execute and to detect than placing a single, large [spoof order], took hold on the Precious Metals [Trading] Desk and was adopted by, among others, [defendant] Nowak, Edmonds, Trader 2, Trader 3, and Trader 4."  *Id.*

122.    According to the DOJ Statement of Facts, the Precious Metals Trading Desk openly discussed their illegal criminal conspiracy scheme of spoofing in electronic chats.  DOJ ¶¶35-45. For example, on September 24, 2009, Trader 1 stated in an electronic chat that he "[s]poofed locals" in trading silver futures contracts.  DOJ ¶38.

123.    Further, according to the DOJ Statement of Facts, on January 30, 2012, defendant Nowak stated in an electronic chat that he understood spoofing was illegal, stating that spoofing involved "'showing huge bids and cancelling // ie – what's totally not allowed to do these days.'" DOJ ¶42.  Despite acknowledging the illegality of this conduct, on February 6, 2012, defendant Nowak engaged in the following spoof: (i) at 8:47:41.128 a.m., defendant Nowak placed a genuine order to sell five gold futures contracts at $1,717.80; (ii) 2.281 seconds later, defendant Nowak placed 11 layered spoof orders to buy gold futures contracts at prices from $1,716.90 to $1,717.60 "with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher"' (iii) 1.940 seconds later, all five of defendant Nowak's genuine gold

futures contracts were filled by other market participants; and (iv) 866 milliseconds after the last genuine contract was filled, defendant Nowak cancelled all of the spoof orders. *Id.*

124. The DOJ Statement of Facts provides sample instances among the tens of thousands of spoofs illegally made by the Precious Metals Trading Desk, including: (i) by defendant Smith on May 27, 2008; (ii) by defendant Smith on February 24, 2009; (iii) by Jordan on April 1, 2009; (iv) on September 24, 2009 by Trader 1; (v) by Jordan on October 15, 2009; (vi) by Trader 2 (with defendant Nowak's knowledge) on November 18, 2009; (vii) by defendant Smith (with Ruffo's knowledge) on January 18, 2012; (viii) by defendant Nowak on February 6, 2012; (ix) by Trader 3 on August 14, 2013; (x) by Trader 4 on January 14, 2014; and (xi) by defendant Trunz on June 22, 2016. DOJ ¶¶35-45.

125. According to the DOJ Statement of Facts, the criminal conspiracy scheme of spoofing perpetrated by the Precious Metals Trading Desk was also undertaken to deliberately trigger or defend barrier options held by JPMorgan. DOJ ¶46. This aspect of Defendants' illegal scheme allowed the Company to "avoid losses of at least $5,145,000." DOJ ¶¶46-53.

126. On November 14, 2019, the DOJ filed the Superseding Indictment in the *Smith* Litigation bringing criminal charges against the following members of the Precious Metals Trading Desk: (i) charging defendant Nowak with RICO conspiracy, conspiracy to commit wire fraud, bank fraud, commodities fraud, price manipulation and spoofing, bank fraud, wire fraud, attempted price manipulation, commodities fraud, and spoofing; (ii) charging defendant Smith with RICO conspiracy, conspiracy to commit wire fraud, bank fraud, commodities fraud, price manipulation and spoofing, bank fraud, wire fraud, attempted price manipulation, commodities fraud, and spoofing; (iii) charging Jordan with RICO conspiracy, conspiracy to commit wire fraud, bank fraud, commodities fraud, price manipulation and spoofing, bank fraud, and wire fraud; and (iv) charging

Ruffo with RICO conspiracy and conspiracy to commit wire fraud, bank fraud, commodities fraud, price manipulation and spoofing.

127. According to *The New York Times*, federal prosecutors had not filed a RICO charge against Wall Street traders since the investment firm Princeton Newport Partners was indicted in the mid-1980s. According to *Bloomberg*, "[t]he Justice Department has famously used the RICO statute to bring down mafia bosses and drug gangs. It has used other statutes to extract penalties and guilty pleas from big banks accused of market manipulation. But it's been decades since the government has attempted to apply the [RICO] law to members of a major bank's trading desk, ***placing [defendant] Nowak and others in crosshairs once trained on the likes of the Latin Kings and the Gambino crime family.***" In other words, the RICO charges against defendants Nowak and Smith are virtually unprecedented.

128. Indeed, the inclusion of a RICO charge against defendants Nowak and Smith (and Jordan and Ruffo) demonstrates the unusually severe and extreme nature of their fraudulent conduct. According to the *Justice Manual*, Section 9.110.200, Organized Crime and Racketeering, "it is the policy of the Criminal Division ***that RICO be selectively and uniformly used***. It is the purpose of these guidelines to make it clear that ***not every proposed RICO charge that meets the technical requirements of a RICO violation will be approved***. Further, the Criminal Division will not approve 'imaginative' prosecutions under RICO which are far afield from the congressional purpose of the RICO statute."

129. For this reason, the *Justice Manual* requires that before any RICO charges can be filed, they must be reviewed and approved by the Organized Crime and Gang Section of the DOJ's Criminal Division. According to a brief filed by the DOJ in the *Smith* Litigation on June 29, 2020, "the Court can have confidence that the prosecution team is familiar with the Justice Manual,

including the requirement that all RICO prosecutions must be approved by the Organized Crime and Gang Section in the Criminal Division of the Department of Justice." This confirms that the RICO charges included in the Superseding Indictment were made after complying with the policy outlined in the *Justice Manual*.

130.    According to *The Wall Street Journal*, "the indictment charged [defendants Nowak and Smith] with racketeering, a claim that is more typically found in cases against organized crime entities. Authorities said it represents the first time that defendants accused of spoofing electronic derivatives markets have been charged with racketeering."

131.    In support of the RICO charge, the Superseding Indictment includes additional instances of spoofing beyond those detailed in the DOJ Statement of Facts, including spoofed trades by: (i) defendant Smith on May 27, 2008, October 20, 2008, February 24, 2009, May 21, 2009, November 10, 2009, February 11, 2010, January 5, 2011, November 29, 2011, December 12, 2011, January 18, 2012, May 10, 2012, July 13, 2012, March 5, 2013, May 14, 2013, June 26, 2013, March 4, 2014, March 7, 2014, October 15, 2014, November 26, 2014, December 1, 2014, December 5, 2014, January 9, 2015, February 23, 2015, March 19, 2015, and April 17, 2015; (ii) defendant Nowak on September 22, 2009, September 25, 2009, November 4, 2010, December 27, 2010, April 13, 2011, February 6, 2012, September 18, 2012, October 15, 2012, November 1, 2013, October 1, 2013, February 7, 2014, and March 3, 2014; and (iii) Jordan on September 29, 2009, October 15, 2009, October 19, 2009, October 26, 2009, and November 10, 2009.

132.    According to *Bloomberg*, "[p]rosecutors say [defendant] Nowak's trading desk was a criminal racketeering operation within the confines of America's biggest bank. Traders on [defendant] Nowak's desk engaged in spoofing as a core business practice, doing it more than 50,000 times over nearly a decade[.]"

133.   According to *Bloomberg*, defendant Smith executed approximately 38,000 spoofed trades from May 2008 to August 2016, or approximately 20 spoofs per day.

134.   According to *Bloomberg*, defendant Nowak executed approximately 3,600 spoofed trades from May 2008 to August 2016, or approximately at least 1 spoof per day.

135.   According to *Bloomberg*, "Edmonds was notable even among the JPMorgan traders. At times he had placed orders with as many as 400 contracts on the opposite side of a genuine one."

136.   Thus, by the start of the Class Period, JPMorgan and the Trader Defendants knew, or recklessly disregarded, that the Precious Metals Trading Desk had facilitated and was continuing to operate a criminal conspiracy scheme of spoofing to deceive, and profit from, other market participants by misrepresenting JPMorgan's genuine belief about the value of precious metals.

### JPMorgan and the Executive Defendants Recklessly Disregarded that the Precious Metals Trading Desk Was Engaged in an Illegal Spoofing Conspiracy Because of the Near-Constant Government Investigations and Investor Lawsuits Since Defendant Nowak Assumed Control of the Desk in 2006

137.   By the start of the Class Period, and continuing throughout the Class Period, JPMorgan and the Executive Defendants recklessly disregarded numerous credible spoofing and market manipulation allegations made against the Precious Metals Trading Desk since defendant Nowak began supervising and managing the desk in 2006.

138.   According to *Bloomberg*, "[f]or as long as [defendant] Nowak was on the [Precious Metals Trading D]esk, scrutiny was a constant."  Indeed, "three times, starting in 2004, the [CFTC] looked into allegations of market manipulation of the silver market by JPMorgan."

139.   The last of those investigations began in 2008.  Specifically, in September 2008 the CFTC confirmed that its Division of Enforcement was investigating misconduct in the silver market for futures contracts on COMEX after having received hundreds of complaints from retail investors of market manipulation (the "2008 CFTC Investigation").

140.     By May 2010, news reports had confirmed that JPMorgan and the Precious Metals Trading Desk were the prime target of the 2008 CFTC Investigation.  According to *The Wall Street Journal*, as of October 2010, "[i]n recent months, CFTC lawyers have interviewed employees of J.P. Morgan in its metals-trading business as well as industry traders, [and] commodity executives[.]"

141.     On October 26, 2010, CFTC Commissioner Bart Chilton ("Chilton") released a statement concerning the 2008 CFTC Investigation, stating, in pertinent part, that:

> I believe that there have been repeated attempts to influence prices in the silver markets. There have been fraudulent efforts to persuade and deviously control that price. Based on what I have been told by members of the public, and reviewed in publicly available documents, I believe violations to the Commodity Exchange Act (CEA) have taken place in silver markets and that any such violation of the law in this regard should be prosecuted.

142.     Defendant Nowak and Jordan were interviewed by the CFTC as part of the 2008 CFTC Investigation.  Specifically, according the Superseding Indictment, defendant Nowak was interviewed by CFTC investigators on August 3 and 4, 2010, in connection with the 2008 CFTC Investigation.  Superseding Indictment ¶40.  Defendant Nowak was specifically asked whether the Precious Metals Trading Desk was engaged in spoofing and falsely stated that it was not.  *Id.* Specifically:

| Question | NOWAK's False Answer |
|---|---|
| "To your knowledge, have traders at [Bank A] in the metals group put up bids or offers to the market which they didn't intend to execute and then pulled them before they got hit or lifted?" | "No." |

143.     Likewise, according to the Superseding Indictment, on September 15 and 16, 2010, Jordan was interviewed by CFTC investigators in connection with the 2008 CFTC Investigation.

Superseding Indictment ¶41.  Jordan was also specifically asked whether he was engaged in spoofing on the Precious Metals Trading Desk and falsely stated that he was not.  *Id.*  Specifically:

| Question | JORDAN's False Answer |
| --- | --- |
| "While you were working at [Bank A], did you ever engage in trading for the purpose of influencing the price on COMEX?" | "No." |
| "Did you ever show a bid or offer on Globex that you didn't intend to execute?" | "Only if it, I would only cancel something if I changed my mind or if it was put in in error, but, no." |

144.    According to a brief filed by the DOJ in the *Smith* Litigation on January 10, 2020, the 2008 CFTC Investigation and the Trader Defendants' criminal conspiracy scheme of spoofing are part of the same overall market manipulation scheme by JPMorgan of the precious metals market that the CFTC has been investigating all along.  Specifically, citing the CFTC's questioning of defendant Nowak and Jordan in 2010, the DOJ's position is that "even though the CFTC's was a civil investigation and this is a criminal case" both investigations "centered on conduct that is at the core of this criminal case – the entry of futures orders without the intent to execute."  In other words, both investigations were focused on spoofing by the Precious Metals Trading Desk.

145.    On September 25, 2013, the CFTC announced the closure of the 2008 CFTC Investigation without recommending any charges.

146.    In commenting on the CFTC's decision to close the 2008 CFTC Investigation, then-Commissioner Chilton stated to *Reuters* that "[f]or me, there's not been a more frustrating nor disappointing non-policy-related matter at the CFTC[.]"

147.    The closure of the 2008 CFTC Investigation was not an exoneration of Defendants. According to James McDonald ("McDonald"), the CFTC's enforcement director from 2017 to December 2020 who oversaw the CFTC investigation into JPMorgan's Precious Metals Trading

Desk that led to the DOJ Statement of Facts and the Superseding Indictment, the 2008 CFTC Investigation failed because the CFTC lacked the computer storage space or analytical tools to host or search the underlying trades, orders, and electronic messages that CME possessed.  It was not until after McDonald became the head of enforcement for the CFTC in 2017 that the CFTC obtained the ability to store and analyze this CME trading data.

148.     Specifically, in October 2020, *The Wall Street Journal* quoted McDonald as stating, in pertinent part, that "[t]welve years ago, we were just conducting those types of investigations differently.  We were relying on statements presented to us either from the entity itself or the traders in sworn testimony.  We didn't have the same ability to look beneath them to ensure they were truthful and accurate."  In other words, the 2008 CFTC Investigation only concluded with no charges because the CFTC lacked the technology that has long existed within JPMorgan, especially after the significant compliance upgrades made by at least the start of the Class Period in response to Dodd-Frank, the Madoff DPA, and the FX Plea Agreement.

149.     The 2008 CFTC Investigation led to the filing of at least two separate investor lawsuits against JPMorgan.

150.     First, the Silver Litigation, a putative class action, was filed in 2011 against JPMorgan by retail investors who transacted in silver futures contracts on COMEX and were allegedly injured by JPMorgan's manipulation of the silver futures market.

151.     According to the Amended Consolidated Class Action Complaint filed in the Silver Litigation on January 23, 2013 (the "Silver Litigation AC"), Jordan engaged in spoofing of silver futures contracts in June 2007 and August 2008.  Specifically, the Silver Litigation AC alleges that on August 14, 2008, as Jordan was actively trading silver futures contracts, between 7:15 p.m. and 7:30 p.m., there was a staggering increase in the number silver futures contracts traded, from 27 total

in the previous 15 minutes to 1,171 contracts.  This amounted to a 4,237% increase in the number of trades and caused the price of silver futures contracts to fall from $14.11 to $12.80, a decline of 10.23% that inured to JPMorgan's benefit.

152.    In arguing in a brief filed on December 13, 2011, that the Silver Litigation should be dismissed, JPMorgan acknowledged that "[t]he heart of the Complaint is . . . 'spoof orders' that allegedly misled the market[.]"

153.    Ultimately, the Silver Litigation was dismissed in 2013 by Judge Patterson of the Southern District of New York.  This dismissal was upheld by the Second Circuit in 2014 because the Silver Litigation plaintiffs failed to "allege any specific facts indicative of an intent to affect prices similar to those that have been found sufficient in comparable [Commodity Exchange Act] actions."  *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 560 Fed. Appx. 84, 87 (2d Cir. Mar. 27, 2014).

154.    According to a declaration filed by JPMorgan in the Silver Litigation on May 9, 2012, "JPMorgan produced more than 720,000 pages of documents to the CFTC" in connection with the 2008 CFTC Investigation.  This necessarily means that, at the very least, the Company culled and reviewed all of the Trader Defendants' documents from 2008 to 2013 relating to market manipulation in the silver futures markets.

155.    Second, in early 2015, Daniel Shak, a precious metals trader who focuses primarily on trading in silver and gold futures contracts and is a former floor trader on COMEX, sued the Company because "JPMorgan manipulated the prices of silver futures spreads to its advantage" by, among other things, "plac[ing] artificial, unrealistic bids on the trading floor[.]"  *Shak v. JPMorgan Chase & Co.*, 2016 U.S. Dist. LEXIS 84696, at *5 (S.D.N.Y. June 29, 2016).  JPMorgan's illicit

trading practices in the silver futures market caused the *Shak* Litigation plaintiff, who alleged that such trading took place in 2010 and 2011, to lose at least $25 million.

156.    Although the district court twice dismissed the *Shak* Litigation, it was reinstated on appeal by the Second Circuit.  *See Wacker v. JPMorgan Chase & Co.*, 678 Fed. Appx. 27 (2d Cir. Feb. 1, 2017).

157.    As demonstrated by the *Shak* Litigation, JPMorgan and the Executive Defendants recklessly disregarded the illegal spoofing taking place on the Company's Precious Metals Desk through August 2016.

158.    Specifically, the public docket of the *Shak* Litigation demonstrates that the trading practices of the Precious Metals Trading Desk – specifically whether it was engaged in market manipulation during 2010 and 2011 – were subject to extensive fact and expert discovery during 2017 and 2018.  Indeed, the Company was intimately involved in this fact and expert discovery.

159.    For example, during 2017, the Company made substantial document productions in the *Shak* Litigation on behalf of Edmonds and each of the Trader Defendants.  This necessarily means that, at the least, the Company culled and reviewed all of the Trader Defendants' and Edmonds' documents from 2010 and 2011 relating to market manipulation in the silver futures markets.

160.    Thereafter, defendant Nowak was deposed on October 24, 2017 as JPMorgan's Federal Rule of Civil Procedure 30(b)(6) witness in the *Shak* Litigation.  Defendant Nowak was again deposed on October 25, 2017 as a fact witness.  This necessarily means that the Company spent significant time with defendant Nowak and his documents preparing for his two depositions.

161.    Then, on March 1, 2018, JP Morgan designated defendant Nowak as a non-retained expert witness who is not required to provide a written report.  Again, this necessarily means that the

Company spent significant time with defendant Nowak and his documents to prepare him to serve as a non-retained expert witness.

162. According to JPMorgan in a disclosure of non-retained expert witness filed in the *Shak* Litigation on November 19, 2018, during defendant Nowak's employment with the Company, his "responsibilities have included trading precious metals and managing traders who trade precious metals, ***including but not limited to understanding, supervising, and executing trades, analyzing market trends, managing risk, overseeing implementation of and compliance with JP Morgan policies and procedures, and various managerial duties associated with his position***. His current responsibilities at JP Morgan include managing the teams responsible for trading base and precious metals[.]" In other words, JPMorgan has acknowledged that defendant Nowak is a control person as that term is defined by Section 20(a) of the Exchange Act.

163. In addition, Edmonds was deposed in the *Shak* Litigation on November 14, 2017. This necessarily means that the Company spent significant time with Edmonds and his documents preparing for his deposition. Edmonds testified that he worked closely with his immediate supervisor, defendant Nowak. Further, Edmonds testified that defendant Nowak oversaw his performance, risk, and trading strategies in the precious metals futures market.

164. Moreover, in the brief filed by JPMorgan in moving to dismiss the *Shak* Litigation, dated June 19, 2015, the Company extensively detailed the numerous regulatory investigations into the Precious Metals Trading Desk dating back to 2004, including the 2008 CFTC Investigation. The acknowledgment of this information being known within JPMorgan by June 2015 demonstrates that the Company and the Executive Defendants recklessly disregarded the substantial regulatory and private scrutiny that surrounded the Precious Metals Trading Desk before the Class Period. Specifically, the Company stated, in pertinent part, that:

During the period 2004 to 2013, the CFTC conducted three investigations into claims that the silver futures market was being manipulated, after receiving complaints from traders like Plaintiffs about divergences between silver futures prices and other derivative and physical prices. *See In re Commodity Exch., Inc., Silver Futures and Options Trading Litig.*, No. 11 Md. 02213, 2012 WL 6700236, at *3 (S.D.N.Y. Dec. 21, 2012) ("*Silver I*"). The first two investigations closed with announcements by the CFTC that the complainants' theories were unfounded and lacking a "plausible explanation." *Id.* In October 2010, the CFTC publicly announced the existence of the third investigation, which had begun in late 2008. *Id.* The day after the announcement, the first of the complaints later consolidated in a multidistrict class action before Judge Robert P. Patterson was filed. The district court's decision dismissing that action for failure to state a claim is referred to as *Silver I*, 2012 WL 6700236; the district court's decision denying leave to amend the complaint on futility grounds is referred to as *Silver II*, *In re Commodity Exch., Inc. Silver Futures and Options Trading Litig.*, No. 11 Md. 02213, 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013). The CFTC later announced in 2013 that after an exhaustive investigation, it had declined to bring ***any*** enforcement action against JPMorgan or any other firm. (Ex. A (CFTC Press Release PR6709-13 (Sept. 25, 2013)).) The Second Circuit affirmed Judge Patterson's dismissal of the *Silver* class action. *In re Commodity Exch., Inc. Silver Futures and Options Trading Litig.*, 560 F. App'x 84 (2d Cir. 2014) ("*Silver III*") (summary order).

(Emphasis in original.)

165.    According to *Bloomberg*, "JPMorgan has cited those CFTC investigations [including the 2008 CFTC Investigation] while defending against civil lawsuits, accusing plaintiffs of rehashing '***implausible theories***' of silver futures manipulation that were rejected by regulators."

166.    JPMorgan and the Executive Defendants' reckless disregard of the Company's illegal trading practices was further demonstrated in the *Shak* Litigation when, following the indictments of defendants Nowak and Smith, the DOJ filed a letter with Judge Engelmayer of the Southern District of New York on September 19, 2019, to alert him that one of the electronic chat exchanges in the Superseding Indictment included an explicit reference to spoofing silver futures contracts to specifically harm the plaintiff in the *Shak* Litigation.  *See* Superseding Indictment ¶37.

167.    After JPMorgan steadfastly denied liability for years, and actively litigated the case through fact and expert discovery and produced volumes of documents, following the guilty pleas

from Edmonds and defendant Trunz, and the criminal indictments of defendants Nowak and Smith, the *Shak* Litigation settled for an undisclosed amount in August 2020.

168. In addition to the 2008 CFTC Investigation and the Silver Litigation and the *Shak* Litigation, JPMorgan and the Executive Defendants also recklessly disregarded the criminal conspiracy scheme of spoofing orchestrated by the Precious Metals Trading Desk through the CME investigation into defendant Smith that ultimately led to him being suspended for 10 business days from trading on any CME exchange and paying a $95,000 fine.

169. Specifically, according to the Superseding Indictment, on October 17, 2013, defendant Smith was interviewed by the CME in connection with a CME inquiry into defendant Smith's trading practices. Superseding Indictment ¶42. During the interview, defendant Smith lied when he was asked about whether he was spoofing when he made the following trading sequence on June 26, 2013: "beginning at 9:04:55.477 a.m., [defendant] SMITH placed an iceberg Genuine Order to buy 30 gold futures contracts at $1,235.60. Beginning at 9:05:21.638 a.m., [defendant] SMITH placed 22 layered Deceptive Orders to sell 10 contracts each (220 contracts total) from $1,237.00 to $1,235.80. Beginning at 9:05:22.653 a.m., all 30 contracts in [defendant] SMITH's Genuine Order were filled. Beginning at 9:05:23.897 a.m., [defendant] SMITH canceled his Deceptive Orders." Superseding Indictment ¶30(o).

170. In response, defendant Smith lied to CME investigators and stated that the June 26, 2013 trading sequence did not involve spoofing. Superseding Indictment ¶42. Specifically:

| Question | SMITH's False Answer |
|---|---|
| "Now those sell orders, do you want to trade those?" | "Absolutely, and absolutely is the answer, yes." |

171. Defendants recklessly disregarded that defendant Smith lied when he spoke with CME investigators in October 2013.

172.     Specifically, according to *CNBC*, "[i]n July 2017, a panel of the COMEX Business Conduct Committee found that [defendant] Smith had spoofed in the gold futures markets in July and August 2013. As part of the settlement, in which Smith neither admitted nor denied the panel's findings, he was ordered to pay a $95,000 fine and was suspended for 10 business days from trading on the CME Group exchange."

173.     On July 24, 2017, the COMEX Business Conduct Committee issued Disciplinary Action Notice No. COMEX 12-8979-BC against defendant Smith, finding that he presented an offer of settlement for alleged violations of COMEX Exchange Rule 432 and did not admit or deny "that in July and August 2013, in the August 2013 Gold and December 2013 Gold futures markets, [defendant] Smith employed a trading strategy that consisted of frequently entering and cancelling a series of orders, at various prices, for the purpose of, including but not limited to, discovering support for or resistance to the order prices he had entered and whether any such support or resistance was a legitimate indicator of other market participants' interest in executing trades at various prices, rather than to execute trades."

174.     As a result of defendant Smith's spoofing in July and August 2013, in a Notice of Disciplinary Action dated July 24, 2017, the COMEX Business Conduct Committee "found that . . . [defendant] Smith violated [COMEX] Exchange Rules 432.B.2, 432.Q, and 432.T."  Further, the COMEX Business Conduct Committee "ordered Smith to pay a fine to the Exchange in the amount of $95,000 and to serve a 10 business day suspension of any access to any CME Group, Inc. trading floor and of direct and indirect access to all electronic trading and clearing platforms owned or controlled by CME Group, Inc., including CME Globex. The suspension shall run from July 24, 2017, through August 4, 2017, inclusive."

175.    As of March 24, 2021, the "Notices" section of the CME website discloses only three Notices of Disciplinary Action against JPMorgan traders that have been issued by the CME since defendant Dimon became JPMorgan's CEO on December 31, 2005.  In other words, the CME website suggests that only two JPMorgan traders other than defendant Smith had disciplinary action taken against them by the CME since defendant Dimon became the Company's CEO.

176.    First, on June 1, 2012, the COMEX Business Conduct Committee issued a Notice of Disciplinary Action against JPMorgan trader Ebele Emelumadu ("Emelumadu") for making "wash sales," which are "buy and sell orders in the same product and expiration month, and, for a put or call option, the same strike price, where the person knows or reasonably should know that the purpose of the orders is to avoid taking a bona fide market position exposed to market risk[.]"  For engaging in this violation of NYMEX Rule 534, the COMEX Business Conduct Committee ordered Emelumadu to pay a $10,000 fine.  Emelumadu was not suspended for any length of time by the COMEX Business Conduct Committee.

177.    Although Emelumadu's fine from the COMEX Business Conduct Committee was a fraction of defendant Smith's fine, *Reuters* reported on Emelumadu's fine on June 1, 2012.  In so doing, *Reuters* quoted a JPMorgan spokeswoman, who stated, in pertinent part, that "[w]e're confident that Ebele's (Emelumadu) intentions were blameless.  She is a valued member of our team."  Thus, this *Reuters* article confirms that JPMorgan's corporate headquarters knew about fines against individual JPMorgan traders by June 2012.  In other words, if a JPMorgan spokeswoman was commenting on Emelumadu's $10,000 fine in June 2012 (before the Madoff DPA or the FX Plea Agreement), JPMorgan's headquarters recklessly disregarded defendant Smith's CME fine of $95,000 and ten business day trading suspension in July 2017.

178.     Second, on January 17, 2013, the COMEX Business Conduct Committee issued a Notice of Disciplinary Action against JPMorgan trader Brent Belote ("Belote") for making "wash sales." Like Emelumadu, Belote was ordered by the COMEX Business Conduct Committee to pay a $10,000 fine. Further, like Emelumadu, Belote was not suspended for any length of time by the COMEX Business Conduct Committee.

179.     Thus, the $95,000 fine and 10 business day trading suspension against defendant Smith in July 2017 means that Defendants recklessly disregarded that defendant Smith had been illegally spoofing in 2013.

180.     Finally, according to the DOJ Statement of Facts, "Trader 4 was terminated from [JPMorgan] in June 2014 in connection with an inquiry into his trading activity." DOJ ¶16.

181.     This means that the Company undertook an investigation into Trader 4's trading activity in the precious metals market that likely included reviewing the underlying trades, orders, and electronic messages from CME associated with Trader 4, along with interviewing Trader 4's colleagues and supervisors, which would have included, at the very least, defendant Nowak. JPMorgan's termination of Trader 4 demonstrates that the Company and the Executive Defendants recklessly disregarded that the Precious Metals Trading Desk had been engaged in an illegal spoofing scheme by no later than June 2014.

### JPMorgan and the Executive Defendants Had the Access and Capability to Uncover the Criminal Spoofing Scheme Orchestrated by the Precious Metals Trading Desk

182.     Beyond the numerous credible spoofing and market manipulation allegations made against the Precious Metals Trading Desk since defendant Nowak began supervising and managing the desk in 2006 detailed in ¶¶137-81 above, of which JPMorgan and the Executive Defendants recklessly disregarded by the start of the Class Period, numerous other indicators demonstrate that

JPMorgan and the Executive Defendants recklessly disregarded that the Precious Metals Trading Desk had facilitated a criminal conspiracy scheme of spoofing.

183.    First, according to the 2014 Letter and the 2015 Letter, by April 2015 JPMorgan had: (i) hired over 21,000 additional regulatory and compliance employees; (ii) implemented a state-of-the-art control room in the Company's corporate headquarters to oversee, among other things, risk and compliance; (iii) centralized risk functions in the Company's corporate headquarters; and (iv) spent billions upgrading the Company's compliance function.  This means that by the start of the Class Period in February 2016, JPMorgan and the Executive Defendants *had the access and capability* to discern the existence of the criminal conspiracy scheme of spoofing orchestrated by the Precious Metals Trading Desk.

184.    Indeed, according to *Bloomberg*, the criminal conspiracy scheme of spoofing orchestrated by the Precious Metals Trading Desk was uncovered by just *two individuals*: a federal prosecutor, Avi Perry, and an FBI investigator, Jonathan Luca.  "Together, they created a screen for precious metals trading data.  The idea, according to two people familiar with the analysis, was to turn up sequences in which a trader placed and canceled a profusion of orders on one side of the market while executing a trade on the other.  The bigger the mismatch between genuine and pulled offers, and the more a given trader did it, they said, the more it would be considered a red flag for potential spoofing.  *When they ran the screen, traders at JPMorgan stood out*."

185.    The Company's robust compliance function as of the beginning of the Class Period meant that JPMorgan and the Executive Defendants recklessly disregarded this illegal scheme. Indeed, the size, scope, and extent of the criminal conspiracy scheme of spoofing orchestrated by the Precious Metals Trading Desk means that JPMorgan and the Executive Defendants recklessly disregarded that it was ongoing by the start of the Class Period in February 2016.

186.   The CFTC Order (defined below), which was issued the same day as the DOJ Statement of Facts, further illustrates that JPMorgan and the Executive Defendants recklessly disregarded that the Precious Metals Trading Desk had been engaged in an illegal spoofing scheme. Specifically, by 2015, the Company "*was required to conduct surveillance in order to identify potential market manipulation or other impermissible trading activity*."  This means that JPMorgan and the Executive Defendants were supposed to be using the Company's robust compliance function to identify the criminal conspiracy scheme of spoofing orchestrated by the Precious Metals Trading Desk that was uncovered by one DOJ lawyer and one FBI investigator.

187.   In addition, the CFTC Order details numerous red flags that, beginning in 2014, placed JPMorgan and the Executive Defendants on notice of the illegal spoofing scheme perpetrated by the Precious Metals Trading Desk, including: (i) "*internal allegations of misconduct from a [JPMorgan] trader*"; (ii) "internal surveillance alerts" from the new surveillance system implemented by the Company in 2014 that had "*the ability to effectively identify spoofing conduct*"; and (iii) "inquiries from CME and the [CFTC.]"

188.   Next, that the DOJ has indicted defendants Nowak and Smith (and Jordan and Ruffo) for RICO conspiracy demonstrates the unusual severity and pervasiveness of the criminal conspiracy scheme of spoofing orchestrated by the Precious Metals Trading Desk.  Indeed, it has been almost 40 years since the DOJ has used RICO against a trader at an investment bank.  Such charges were not previously levied against JPMorgan employees even though the conduct that led to the FX Plea Agreement involved the Company's participation in a scheme called "The Cartel" and "The Mafia." That the DOJ has received approval under the *Justice Manual* to pursue these RICO conspiracy charges shows that JPMorgan and the Executive Defendants had access to information suggesting

that their public statements regarding the Company's trading of physical commodities were inaccurate.

189.     Furthermore, JPMorgan's prolific recent history of criminal activity in the financial markets as illustrated by the RMBS Settlement Agreement, the Madoff DPA, the FX Plea Agreement, and the Consent Order, and defendant Dimon's concession in the 2014 Letter that he was personally involved in the resolution of these government investigations, demonstrates that JPMorgan and the Executive Defendants recklessly disregarded the 2008 CFTC Investigation and the numerous government investigations that led to the DOJ Statement of Facts and the Superseding Indictment.

190.     Indeed, JPMorgan's corporate probation period in the FX Plea Agreement was in effect during the Class Period from January 2017 to January 2020 and required JPMorgan to report to the DOJ any instances of securities or commodities fraud by any Company employee that was known to management, *i.e.*, supervisors like defendant Nowak.  In the DPA, however, the DOJ stated that JPMorgan was not receiving any disclosure credit related to the criminal conspiracy scheme facilitated by the Precious Metals Trading Desk "because [JPMorgan] did not voluntarily and timely disclose to the Fraud Section and the Office the conduct described in the Statement of Facts."  The failure by JPMorgan to comply with the terms of the FX Plea Agreement by not timely disclosing the illegal spoofing scheme, especially in light of the requirement in the FX Plea Agreement that JPMorgan must actively monitor itself for such fraud, demonstrates that JPMorgan and the Executive Defendants had access to information suggesting that their public statements regarding the Company's trading of physical commodities were inaccurate.

191.     Moreover, the investigations by the DOJ, CFTC and SEC that led to the DOJ Statement of Facts in September 2020 and the Superseding Indictment in September 2019 had been

- 47 -

ongoing for multiple years, *i.e.*, during and throughout the Class Period.  JPMorgan's prolific recent history of criminal activity in the financial markets – as illustrated by the RMBS Settlement Agreement, the Madoff DPA, the FX Plea Agreement, and the Consent Order, combined with defendant Dimon's concession in the 2014 Letter that he was personally involved in the resolution of these government investigations – demonstrates that JPMorgan and the Executive Defendants recklessly disregarded the government investigation that led to the DOJ Statement of Facts and the Superseding Indictment.

192.    Finally, according to the DOJ Statement of Facts, at approximately the same time that the Precious Metals Trading Desk had been engaged in a criminal conspiracy scheme of spoofing for precious metals futures, from April 2008 until January 2016 the Company's U.S. Treasuries Desk was also engaged in a criminal spoofing scheme in the markets for U.S. Treasury future contracts and U.S. Treasury notes and bonds in the secondary cash market.  DOJ ¶¶54-97.

193.    As with the Trader Defendants' illegal spoofing scheme, the U.S. Treasuries spoofing scheme involved thousands of instances of spoofing by five traders on the U.S. Treasuries trading desk, including the head and supervisor of that desk (listed as Trader A in the DOJ Statement of Facts (DOJ ¶59)), and caused "at least $105,744,906 in losses to other participants in the markets for U.S. Treasury Products[.]"  DOJ ¶75.  And like the Trader Defendants' illegal spoofing scheme, the U.S. Treasuries trading desk traders brazenly used the word "spoof" when discussing their fraudulent scheme on JPMorgan's electronic chat communications, including on the following dates: (i) January 17, 2008; (ii) February 11, 2009; (iii) July 1, 2009; (iv) December 3, 2009; (v) November 3, 2010; and (vi) July 6, 2011.  DOJ ¶97.

194.    Upon information and belief, Trader A is Andrew Lombara ("Lombara").  According to *CNBC*, Lombara was fired by JPMorgan in January 2016 for violating the Company's compliance

policies.   According to the SEC Order (defined below), JPMorgan's illegal spoofing in U.S. Treasuries "ceased in early January 2016, when certain personnel changes were made on the [JPMorgan] Treasuries Desk."   The Company's termination of Lombara in January 2016 demonstrates that JPMorgan and the Executive Defendants recklessly disregarded the existence of a distinct spoofing scheme within the Company by the start of the Class Period.

195.    Furthermore, the second spoofing scheme within JPMorgan demonstrates that the Company and the Executive Defendants recklessly disregarded the illegal spoofing conduct occurring at JPMorgan before the Class Period.

196.    Accordingly, by the start of and during the Class Period, JPMorgan and the Executive Defendants recklessly disregarded that the Precious Metals Trading Desk had facilitated and were continuing to operate a criminal conspiracy scheme by spoofing tens of thousands of buy or sell orders for precious metals futures contracts with the intent to cancel those orders before execution to deceive, and profit from, other market participants by misrepresenting JPMorgan's genuine belief about the value of precious metals.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### Materially False and Misleading Statements Made During the Class Period

197.    During the Class Period, Defendants made materially false and misleading statements, and otherwise violated an obligation to disclose material information.   Specifically: (i) JPMorgan and the Trader Defendants made materially false and misleading statements by submitting spoofed buy or sell orders for precious metals futures contracts with the intent to deceive the market about the actual value that JPMorgan ascribed to such precious metals in order to materially and artificially benefit the Company; (ii) JPMorgan and the Executive Defendants made materially false and misleading statements, and otherwise violated an obligation to disclose material information, in describing how the Company valued physical commodities like precious metals; and

(iii) JPMorgan and the Executive Defendants failed to disclose material known uncertainties, trends, and events associated with the Company's operations in violation of SEC regulation Item 303.

**JPMorgan and the Trader Defendants' False and Misleading Statements**

198.    From February 23, 2016 until August 2016, the Trader Defendants made numerous buy or sell orders for precious metals futures contracts with the intent to cancel those orders before execution to deceive, and allow JPMorgan to profit from, other market participants by misrepresenting JPMorgan's genuine belief about the value of precious metals.  Each spoofed buy or sell order made by the Trader Defendants during the Class Period was itself a materially false and misleading statement.

199.    According to the DOJ Statement of Facts:

During the Precious Metals Relevant Period,[6] Smith, Nowak, Jordan, Trunz, Edmonds, Traders 1 through 4, and one or more other traders on the Precious Metals Desk (collectively, the "Subject PM Traders") and Ruffo and one or more other salespeople on the Precious Metals Desk (together with the Subject PM Traders, the "Subject PM Desk Members") engaged in a scheme to defraud in connection with the purchase and sale of precious metals futures contracts on and subject to the rules of a registered entity, specifically NYMEX and COMEX.

In furtherance of the scheme, ***the Subject PM Traders knowingly and intentionally placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution*** ("Deceptive PM Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts.

DOJ ¶¶18-19.

200.    According to the press release issued by the DOJ on September 29, 2020 in connection with the DPA:

---

[6]    The DOJ defines the "Precious Metals Relevant Period" as "the period from at least March 2008 until August 2016[.]"  DOJ ¶6.

According to admissions and court documents, between approximately March 2008 and August 2016, numerous traders and sales personnel on JPMorgan's precious metals desk located in New York, London, and Singapore engaged in a scheme to defraud in connection with the purchase and sale of gold, silver, platinum, and palladium futures contracts (collectively, precious metals futures contracts) that traded on the New York Mercantile Exchange Inc. and Commodity Exchange Inc., which are commodities exchanges operated by the CME Group Inc.  In tens of thousands of instances, traders on the precious metals desk placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution, ***including in an attempt to profit by deceiving other market participants through injecting false and misleading information concerning the existence of genuine supply and demand for precious metals futures contracts***.

201.    For example, as recounted in the DOJ Statement of Facts, on June 22, 2016, at 3:14:33.935 a.m., defendant Trunz placed a genuine order to sell 20 platinum futures contracts at $981.80.  Defendant Trunz subsequently was able to fill nine of those 20 contracts.  Then, 1.991 seconds later, beginning at 3:14:35.926 a.m., defendant Trunz placed a series of eight deceptive orders to buy five contracts each (40 contracts total) at prices from $981.20 to $981.60 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Next, 594 milliseconds later, beginning at 3:14:36.520 a.m., four of the twenty contracts in defendant Trunz's genuine order to sell were filled.  Last, 886 milliseconds after the last contract in defendant Trunz's genuine order was filled, beginning at 3:14:37.407 a.m., defendant Trunz canceled the deceptive orders in their entirety.  DOJ ¶45.

202.    The statements referenced above in ¶¶198-201 regarding the spoofed buy and sell orders made by JPMorgan and the Trader Defendants were materially false and misleading, as JPMorgan conceded in the DOJ Statement of Facts, and were made with the intent to deceive the market about JPMorgan's actual belief regarding the value of the precious metals being manipulated in order to materially and artificially benefit the Company.  In other words, JPMorgan and the Trader Defendants repeatedly submitted false buy and sell orders for precious metals futures contracts to

allow JPMorgan to illegally, materially, and artificially profit on the Company's trading of precious metals futures contracts.

203.    In addition, each of the spoofed buy and sell orders made by JPMorgan and the Trader Defendants before the Class Period began on February 23, 2016, were also materially false and misleading.  According to the DOJ Statement of Facts, such spoofed trades were made tens of thousands of times dating back to May 2008, including by: (i) defendant Smith on May 27, 2008 (DOJ ¶35), February 24, 2009 (*id.* ¶36), January 12, 2012 (*id.* ¶41); and (ii) defendant Nowak on February 6, 2012 (*id.* ¶42).

204.    Likewise, the Superseding Indictment alleges that spoofed trades were made by: (i) defendant Smith on May 27, 2008, October 20, 2008, February 24, 2009, November 11, 2009, February 11, 2010, January 5, 2011, November 29, 2011, May 10, 2012, July 13, 2012, March 5, 2013, May 14, 2013, March 4, 2014, March 7, 2014, October 15, 2014, November 26, 2014, December 1, 2014, December 5, 2014, January 9, 2015, February 23, 2015, March 19, 2015,  and April 17, 2015 (Superseding Indictment ¶30); and (ii) defendant Nowak on September 22, 2009, September 25, 2009, November 4, 2010, December 27, 2010, April 13, 2011, February 6, 2012, September 18, 2012, October 15, 2012, November 1, 2013, February 7, 2014, and March 3, 2014 (Superseding Indictment ¶31).

### JPMorgan and the Executive Defendants' False and Misleading Statements and Omissions

205.    On the first day of the Class Period, February 23, 2016, JPMorgan filed the 2015 Form 10-K, which was signed by defendants Dimon and Lake.  The 2015 Form 10-K states that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

206.     By speaking about the topic of JPMorgan's activities in the precious metals markets, JPMorgan and defendants Dimon and Lake had a duty to speak fully and truthfully.   Because JPMorgan and defendants Dimon and Lake failed to disclose that the Company's Precious Metals Trading Desk was presently, and had been since 2008, manipulating the precious metals market through spoofing buy and sell orders to generate the appearance of market demand, this statement omitted material information from JPMorgan's investors, thereby rendering it materially false and misleading.  The failure by JPMorgan and defendants Dimon and Lake to adequately disclose an accurate portrayal of the Company's trading in the precious metals markets before and during the Class Period rendered this statement materially false and misleading.[7]

207.     In the 2015 Form 10-K, JPMorgan and the Executive Defendants also commented on the Company's use of commodity derivatives, *i.e.*, futures contracts, to manage JPMorgan's risk exposure to physical commodities.  Specifically, the 2015 Form 10-K states, in pertinent part, that "[c]ommodity derivatives are frequently used to manage the Firm's risk exposure to its physical commodities inventories."

208.     The statement referenced above in ¶207 was materially false and misleading when made because the Precious Metals Trading Desk was not using futures contracts to manage JPMorgan's risk exposure to physical commodities.  Instead, as the Company admitted in the DOJ Statement of Facts, at all relevant times from at least March 2008 to August 2016, the Precious Metals Trading Desk facilitated a criminal conspiracy scheme by spoofing tens of thousands of buy or sell orders for precious metals futures contracts with the intent to cancel those orders before execution to deceive, and profit from, other market participants by misrepresenting JPMorgan's

---

[7]   This statement was also materially false and misleading when made before the Class Period in JPMorgan's Form 10-K filing on February 24, 2015, for the fiscal year ended December 31, 2014.

genuine belief about the value of precious metals. Accordingly, this statement by JPMorgan and defendants Dimon and Lake was materially false when made.[8]

209.    The 2015 Form 10-K also discusses the methodology that JPMorgan, through its Precious Metals Trading Desk, was purportedly using to determine the market value of precious metals, stating, in pertinent part, that "[p]hysical commodities," which includes precious metals, were "[v]alued using observable market prices or data."

210.    The statement in ¶209 above was materially false and misleading when made because the Precious Metals Trading Desk was not valuing precious metals using observable market prices or data. Instead, as the Company admitted in the DOJ Statement of Facts, at all relevant times from at least March 2008 to August 2016, the Precious Metals Trading Desk facilitated a criminal conspiracy scheme by spoofing tens of thousands of buy or sell orders for precious metals futures contracts with the intent to cancel those orders before execution to deceive, and profit from, other market participants by misrepresenting JPMorgan's genuine belief about the value of precious metals. Accordingly, this statement by JPMorgan and defendants Dimon and Lake was materially false when made.[9]

---

[8]    This statement was also materially false and misleading when made before the Class Period in the Company's: (i) Form 10-K filing on February 24, 2015, for the fiscal year ended December 31, 2014; (ii) Form 10-K filing on February 20, 2014, for the fiscal year ended December 31, 2013; (iii) Form 10-K filing on February 28, 2013, for the fiscal year ended December 31, 2012; and (iv) Form 10-K filing on February 29, 2012, for the fiscal year ended December 31, 2011.

[9]    This statement was also materially false and misleading when made before the Class Period in the Company's: (i) Form 10-K filing on February 24, 2015, for the fiscal year ended December 31, 2014; (ii) Form 10-K filing on February 20, 2014, for the fiscal year ended December 31, 2013; (iii) Form 10-K filing on February 28, 2013, for the fiscal year ended December 31, 2012; and (iv) Form 10-K filing on February 29, 2012, for the fiscal year ended December 31, 2011.

211.    On February 28, 2017, JPMorgan filed its Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K"), which was signed by defendants Dimon and Lake. The 2016 Form 10-K states that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

212.    By speaking about the topic of JPMorgan's purchases and sales of precious and base metals, JPMorgan and defendants Dimon and Lake had a duty to speak fully and truthfully. Because JPMorgan and defendants Dimon and Lake failed to disclose that the Company's Precious Metals Trading Desk had been routinely manipulating the precious metals market through August 2016 by spoofing buy and sell orders to generate the appearance of market demand and that this conduct would result in enhanced regulatory scrutiny and criminal liability, this statement omitted material information from JPMorgan's investors, thereby rendering it materially false and misleading.  The failure by JPMorgan and defendants Dimon and Lake to adequately disclose the risk posed by the Company's criminal conspiracy scheme to spoof the precious metals market through August 2016 rendered this statement materially false and misleading.

213.    The 2016 Form 10-K also discusses the methodology that JPMorgan, through its Precious Metals Trading Desk, was purportedly using to determine the market value of precious metals, stating, in pertinent part, that "[p]hysical commodities," which includes precious metals, were "[v]alued using observable market prices or data."

214.    The statement referenced above in ¶213 was materially false and misleading for the reasons set forth in ¶210.

215.    On February 27, 2018, JPMorgan filed its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), which was signed by defendants Dimon and Lake.

The 2017 Form 10-K states that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

216.     The statement referenced above in ¶215 was materially false and misleading for the reasons set forth in ¶212.

217.     The 2017 Form 10-K also discusses the methodology that JPMorgan, through its Precious Metals Trading Desk, was purportedly using to determine the market value of precious metals, stating, in pertinent part, that "[p]hysical commodities," which includes precious metals, were "[v]alued using observable market prices or data."

218.     The statement referenced above in ¶217 was materially false and misleading for the reasons set forth in ¶210.

219.     On February 26, 2019, JPMorgan filed its Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Form 10-K"), which was signed by defendants Dimon and Lake. The 2018 Form 10-K states that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

220.     The statement referenced above in ¶219 was materially false and misleading for the reasons set forth in ¶212.

221.     The 2018 Form 10-K also discusses the methodology that JPMorgan, through its Precious Metals Trading Desk, was purportedly using to determine the market value of precious metals, stating, in pertinent part, that "[p]hysical commodities," which includes precious metals, were "[v]alued using observable market prices or data."

222.    The statement referenced above in ¶221 was materially false and misleading for the reasons set forth in ¶210.

223.    On February 25, 2020, JPMorgan filed its Form 10-K with the SEC for the period ended December 31, 2019 (the "2019 Form 10-K"), which was signed by defendant Dimon.  The 2019 Form 10-K states that "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients."

224.    The statement referenced above in ¶223 was materially false and misleading for the reasons set forth in ¶212.

225.    The 2019 Form 10-K also discusses the methodology that JPMorgan, through its Precious Metals Trading Desk, was purportedly using to determine the market value of precious metals, stating, in pertinent part, that "[p]hysical commodities," which includes precious metals, were "[v]alued using observable market prices or data."

226.    The statement referenced above in ¶225 was materially false and misleading for the reasons set forth in ¶210.

### Omissions Based on Violations of Item 303 by
### JPMorgan and the Executive Defendants

227.    The SEC has created specific rules governing the content of disclosures by public companies in their filings with the SEC.  As explained herein, JPMorgan's Class Period Forms 10-K failed to comply with Item 303 of Regulation S-K.

228.    SEC Regulation S-K requires that every Form 10-K filing contain a section called "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303.  The MD&A requirements are intended to provide material historical and prospective textual disclosures

that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

229.    Pursuant to Item 7 of Form 10-K, JPMorgan's Class Period Forms 10-K were required to furnish certain information required under Item 303(a)(3) of Regulation S-K including, among other things:

(a)    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations; and

(b)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

230.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

231.    The following were known trends, events, or uncertainties that were reasonably likely to have a negative impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in JPMorgan's 2015 Form 10-K:

(a)     that since at least March 2008 the Precious Metals Trading Desk was facilitating a criminal conspiracy scheme by spoofing tens of thousands of buy or sell orders for precious metals futures contracts with the intent to cancel those orders before execution to deceive, and profit from, other market participants by misrepresenting JPMorgan's genuine belief about the value of precious metals; and

(b)     that the criminal enterprise being orchestrated by the Precious Metals Trading Desk was exposing the Company to enhanced regulatory scrutiny and significant criminal liability.

232.    The following were known trends, events, or uncertainties that were reasonably likely to have a negative impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in JPMorgan's 2016-2019 Forms 10-K:

(a)     that through August 2016, the Company's Precious Metals Trading Desk had been routinely manipulating the precious metals market by spoofing buy and sell orders to generate the appearance of market demand; and

(b)     that this conduct had and would result in enhanced regulatory scrutiny and caused the Company to be exposed to significant criminal liability that would result in a record-breaking $920 million criminal penalty.

233.    The foregoing facts were required to be disclosed pursuant to Item 303 because they were, among other things: (i) "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and/or (iii) "unusual or infrequent events or

transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

### The Criminal Conspiracy Scheme Orchestrated by JPMorgan's Precious Metals Trading Desk is Publicly Exposed

234. On November 6, 2018, the DOJ announced that Edmonds had pleaded guilty to one count of commodities fraud and one count of conspiracy to commit wire fraud, commodities fraud, commodities price manipulation, and spoofing.

235. According to the DOJ press release issued that same day:

> As part of his plea, Edmonds admitted that from approximately 2009 through 2015, he conspired with other precious metals traders at the Bank to manipulate the markets for gold, silver, platinum and palladium futures contracts traded on the New York Mercantile Exchange Inc. (NYMEX) and Commodity Exchange Inc. (COMEX), which are commodities exchanges operated by CME Group Inc. Edmonds and his fellow precious metals traders at the Bank routinely placed orders for precious metals futures contracts with the intent to cancel those orders before execution (the Spoof Orders), he admitted. This trading strategy was admittedly intended to inject materially false and misleading liquidity and price information into the precious metals futures contracts markets by placing the Spoof Orders in order to deceive other market participants about the existence of supply and demand. The Spoof Orders were designed to artificially move the price of precious metals futures contracts in a direction that was favorable to Edmonds and his co-conspirators at the Bank, to the detriment of other market participants. In pleading guilty, Edmonds admitted that he learned this deceptive trading strategy from more senior traders at the Bank, and he personally deployed this strategy hundreds of times with the knowledge and consent of his immediate supervisors.

236. According to Edmonds' plea agreement dated October 9, 2018, by pleading guilty Edmonds is facing a combined term of imprisonment of 30 years. As of March 24, 2021, Edmonds has still not been sentenced.[10]

---

[10] Plaintiffs do not name Edmonds as a defendant only because the DOJ stated that his illicit spoofing conduct ended in 2015, meaning before the Class Period. Plaintiffs reserve the right to seek leave to amend under Federal Rule of Civil Procedure 15(a) to name Edmonds as a defendant if it is revealed in discovery that he engaged in spoofing misconduct during the Class Period.

237. The London Bullion Market Association ("LBMA") is an international trade association representing the global OTC bullion market and is the global authority on precious metals. According to the LBMA website, its "mission is to ensure the highest levels of leadership, integrity and transparency for the global precious metals industry[.]"

238. Notwithstanding Edmond's guilty plea and JPMorgan's acknowledgment in the 2018 Form 10-K that there was an ongoing government investigation into the trading practices of the precious metals market, on or about July 12, 2019, on behalf of JPMorgan, defendant Nowak was appointed to be a director on the eight-person LBMA board of directors to serve a two year term.

239. On July 25, 2019, the CFTC announced an order filing and settling charges against Edmonds for violating the CEA and CFTC regulations prohibiting spoofing and the use of manipulative or deceptive devices in connection with futures contracts for precious metals. Edmonds admitted to these violations and the CFTC agreed to withhold issuing sanctions until after Edmonds is sentenced for his crimes. According to the CFTC press release:

> The order finds that Edmonds and others placed futures orders they intended to cancel before execution, with the purpose of falsely inducing market participants to execute against the orders they wanted filled. The order further finds that Edmonds, his employer, and others benefitted financially from such conduct.

240. According to *Bloomberg*, "[a]lthough banks often place individuals on leave when legal action may be pending, [defendants] Nowak and Smith remained at their desks well after the charges against Edmonds were made public in November 2018."

241. On August 20, 2019, the DOJ announced that defendant Trunz had pleaded guilty to one count of conspiracy to engage in spoofing and one count of spoofing.

242. According to the DOJ press release issued that same day:

> According to admissions made as part of his plea and other statements made in court, between approximately July 2007 and August 2016, Trunz placed thousands of orders that he did not intend to execute for gold, silver, platinum and palladium futures contracts traded on the New York Mercantile Exchange Inc. (NYMEX) and

- 61 -

Commodity Exchange Inc. (COMEX), which are commodities exchanges operated by CME Group Inc. Trunz learned to spoof from more senior traders, and spoofed with the knowledge and consent of his supervisors.

243. According to the Information filed in defendant Trunz's criminal case on August 20, 2019, "[defendant] Trunz knowingly and willfully did combine, conspire, confederate, and agree with other employees of [JP Morgan] to engage in . . . 'spoofing,' that is, bidding and offering with the intent to cancel the bid and offer before execution[.]" "***The purpose of the conspiracy was for [defendant] Trunz and his co-conspirators to maximize trading profits and minimize losses, at least in part for the benefit of [JP Morgan]***."

244. As of March 24, 2021, defendant Trunz has still not been sentenced.

245. On September 16, 2019, the CFTC announced an order filing and settling charges against defendant Trunz for violating the CEA and CFTC regulations by spoofing in the futures market for precious metals. Defendant Trunz admitted to these violations and the CFTC agreed to withhold issuing sanctions until after defendant Trunz is sentenced for his crimes. According to the CFTC order:

> During the Relevant Period, Trunz engaged in a pattern of spoofing in the precious metals markets while placing orders for, and trading futures contracts through, accounts owned by the Banks. Trunz placed thousands of bids or offers for futures contracts with the intent to cancel those orders before their execution. Trunz learned the trading strategy of spoofing from more senior traders at the Banks, and deployed this strategy thousands of times with the knowledge and consent of his immediate supervisors.
>
> \*       \*       \*
>
> Trunz and others at the Banks engaged in spoofing to induce other market participants to trade against their Genuine Orders at prices, quantities, and times that they otherwise likely would not have traded. Trunz and others at the Banks entered Spoof Orders in a manner designed to move the price of precious metals futures contracts in a direction that was favorable for Trunz and others at the Banks, ***for the purpose of maximizing trading profits and minimizing trading losses, at least in part for the benefit of the Banks.***

- 62 -

246. That same day – September 16, 2019 – the DOJ filed an indictment against defendants Nowak and Smith, and Jordan. The indictment charged each of them with one count of: (i) RICO conspiracy; (ii) conspiracy to commit wire fraud, bank fraud, commodities fraud, price manipulation and spoofing; (iii) bank fraud; and (iv) wire fraud. In addition, defendants Smith and Nowak were each charged with one count of: (i) attempted price manipulation; (ii) commodities fraud; and (iii) spoofing.

247. According to the DOJ press release issued that same day:

As alleged in the indictment, between approximately May 2008 and August 2016, the defendants and their co-conspirators were members of Bank A's global precious metals trading desk in New York, London and Singapore with varying degrees of seniority and supervisory responsibility over others on the desk. As it relates to the RICO conspiracy, the defendants and their co-conspirators were allegedly members of an enterprise—namely, the precious metals desk at Bank A—and conducted the affairs of the desk through a pattern of racketeering activity, specifically, wire fraud affecting a financial institution and bank fraud.

The indictment alleges that the defendants engaged in widespread spoofing, market manipulation and fraud while working on the precious metals desk at Bank A through the placement of orders they intended to cancel before execution (Deceptive Orders) in an effort to create liquidity and drive prices toward orders they wanted to execute on the opposite side of the market. In thousands of sequences, the defendants and their co-conspirators allegedly placed Deceptive Orders for gold, silver, platinum and palladium futures contracts traded on the New York Mercantile Exchange Inc. (NYMEX) and Commodity Exchange Inc. (COMEX), which are commodities exchanges operated by CME Group Inc. By placing Deceptive Orders, the defendants and their co-conspirators allegedly intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices and times that they otherwise likely would not have traded, the indictment alleges.

As also alleged in the indictment, the defendants and their co-conspirators defrauded Bank A's clients who had bought or sold "barrier options" by trading precious metals futures contracts in a manner that attempted to push the price towards a price level at which Bank A would make money on the option (barrier-running), or away from a price level at which Bank A would lose money on the option (barrier-defending).

Namely, when barrier-running, the defendants and their co-conspirators would allegedly place orders for precious metals futures contracts in a way that was intended to deliberately trigger the barrier option held by Bank A. Conversely, when barrier-defending, the defendants and their co-conspirators would allegedly place orders for precious metals futures contracts in a way that was intended to deliberately avoid triggering the barrier option held by clients of Bank A.

The indictment also identifies two former Bank A precious metals traders, John Edmonds and Christian Trunz, as being among the defendant's co-conspirators. Edmonds worked at Bank A from 2004 to 2017 and was a trader on Bank A's precious metals desk, leaving as a vice president. On Oct. 9, 2018, Edmonds pleaded guilty in the District of Connecticut to an information charging him with one count of commodities fraud and one count of conspiracy to commit wire fraud, commodities fraud, price manipulation and spoofing. Trunz is a former precious metals trader at Bank A who worked at the bank from 2007 to August 20, 2019, leaving as an executive director. On Aug. 20, 2019, Trunz pleaded guilty in the Eastern District of New York to an information charging him with one count of conspiracy to engage in spoofing and one count of spoofing.

248.    According to *The Wall Street Journal*, "[t]he [DOJ] has aggressively pursued what it believes are the worst examples of spoofing, including charging four former JPMorgan Chase & Co. precious-metals traders with a range of offenses including racketeering conspiracy."

249.    According to *The Wall Street Journal*, Goelman, a former CFTC director of enforcement and McDonald's predecessor in that role at the CFTC, stated that "[l]abeling that part of the bank a racketeering enterprise was an escalation that is unprecedented."

250.    According to the *Financial Times*, the same day that the indictments were announced, the LBMA removed defendant Nowak from its board of directors. The *Financial Times* stated that "[t]he DOJ indictment is an embarrassment for the LBMA, which represents London's precious metals market, and launched a code of conduct for its members in 2017."

251.    Also on September 16, 2019, the CFTC filed a civil enforcement action against defendants Nowak and Smith for engaging in spoofing and attempting to manipulate prices in the precious metals futures market while employed at JP Morgan.

252.    On November 15, 2019, the DOJ filed the Superseding Indictment to add Ruffo as a defendant in the *Smith* Litigation.  Ruffo, who is now a co-defendant with defendants Nowak and Smith, and Jordan, was charged with one count of: (i) RICO conspiracy; and (ii) conspiracy to commit wire fraud, bank fraud, commodities fraud, price manipulation, and spoofing.

253.    According to the DOJ press release issued that same day:

The superseding indictment alleges that between approximately March 2008 and August 2016, Ruffo along with the other defendants and co-conspirators were members of Bank A's global precious metals desk in New York, London and Singapore, with varying degrees of seniority and supervisory responsibility over others on the desk.  Ruffo, who joined Bank A in May 2008, worked there until August 2017.  During that time, he was an executive director and a salesperson on Bank A's precious metals desk in New York, specializing in hedge fund sales. Ruffo's clients included hedge funds that were global investment management firms that invested in precious metals. As it relates to the RICO conspiracy, the defendants and their co-conspirators were allegedly members of an enterprise—namely, the precious metals desk at Bank A—and conducted the affairs of the desk through a pattern of racketeering activity, specifically, wire fraud affecting a financial institution and bank fraud.

The superseding indictment alleges that the defendants engaged in widespread spoofing, market manipulation and fraud while working on the precious metals desk at Bank A through the placement of orders they intended to cancel before execution (Deceptive Orders) in an effort to create liquidity and drive prices toward orders they wanted to execute on the opposite side of the market.  In thousands of sequences, the defendants and their co-conspirators allegedly placed Deceptive Orders for gold, silver, platinum and palladium futures contracts traded on the New York Mercantile Exchange Inc. (NYMEX) and Commodity Exchange Inc. (COMEX), which are commodities exchanges operated by CME Group Inc.  By placing Deceptive Orders, the defendants and their co-conspirators allegedly intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.  This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices and times that they otherwise likely would not have traded, the superseding indictment alleges.

As also alleged in the superseding indictment, the defendants and their co-conspirators defrauded Bank A's clients who had bought or sold "barrier options" by trading precious metals futures contracts in a manner that attempted to push the price towards a price level at which Bank A would make money on the option (barrier-

running), or away from a price level at which Bank A would lose money on the option (barrier-defending). Namely, when barrier-running, the defendants and their co-conspirators would allegedly place orders for precious metals futures contracts in a way that was intended to deliberately trigger the barrier option held by Bank A. Conversely, when barrier-defending, the defendants and their co-conspirators would allegedly place orders for precious metals futures contracts in a way that was intended to deliberately avoid triggering the barrier option held by clients of Bank A.

The superseding indictment alleges that one of the reasons the defendants and their co-conspirators used Deceptive Orders in their trading was to service and benefit key clients, including Ruffo's hedge fund clients, which were important sources of revenue and market intelligence for the precious metals desk at Bank A. For example, as alleged in the superseding indictment, if a hedge fund client wished to purchase gold, Ruffo would receive the order and communicate it to Smith, who, with Ruffo's knowledge and encouragement, would then place Deceptive Orders to sell gold futures contracts in order to artificially lower the price at which the hedge fund could buy (or the defendants and their co-conspirators could buy on the hedge fund's behalf). By passing along the lower price, the superseding indictment alleges, the defendants and their co-conspirators hoped to retain that hedge fund's business for the precious metals desk at Bank A.

254.    The criminal trial for defendants Nowak and Smith (and Jordan and Ruffo) in the

*Smith* Litigation is scheduled to begin by October 18, 2021 and conclude by November 19, 2021.

### JPMorgan Enters into the DPA to Resolve the Government Investigations into the Precious Metals Trading Desk's Criminal Spoofing Scheme

255.    On September 23, 2020, *Bloomberg* reported for the first time that JPMorgan was

nearing a settlement to resolve criminal spoofing charges against the Company for nearly $1 billion,

a record for spoofing penalties. The *Bloomberg* article stated, in pertinent part, that:

JPMorgan Chase & Co. is poised to pay close to $1 billion to resolve market manipulation investigations by U.S. authorities into its trading of metals futures and Treasury securities, according to three people with knowledge of the matter. The potential record for a settlement involving alleged spoofing could be announced as soon as this week, said the people who asked not to be named because the details haven't yet been finalized. The accord would end probes by the Justice Department, the Commodity Futures Trading Commission and the Securities and Exchange Commission into whether traders on JPMorgan's precious metals and treasuries desks rigged markets, two of the people said. A penalty approaching $1 billion would far exceed previous spoofing-related fines. It would also be on par with sanctions in many prior manipulation cases, including some brought several years ago against banks for allegedly rigging benchmark interest rates and foreign exchange markets.

\*        \*        \*

The pending spoofing case against JPMorgan follows criminal charges filed last year against several of its employees, including former head of the precious metals desk, Michael Nowak. In that case, the Justice Department used racketeering laws more commonly used in mafia and drug gang prosecutions, alleging the precious metals desk effectively became a criminal enterprise for eight years. Nowak and three others accused in the case pleaded not guilty and are seeking to have the charges dismissed. Two other former traders have pleaded guilty to conspiracy claims and are cooperating.

256.    On September 29, 2020, the DOJ announced that JPMorgan had entered into the DPA to resolve criminal wire fraud charges related to two distinct schemes to defraud: (i) the criminal conspiracy scheme of spoofing orchestrated by the Precious Metals Trading Desk between March 2008 and August 2016; and (ii) an unrelated scheme by a different JPMorgan trading desk involving thousands of spoofed trades in U.S. Treasury futures contracts from April 2008 to January 2016.

257.    In the DPA, JPMorgan agreed to pay over $920 million in a criminal monetary penalty to avoid continued prosecution.  This amount represents the largest spoofing criminal penalty in United States history.

258.    As part of the DPA, JPMorgan admitted, accepted, and acknowledged that the "***facts described in the Statement of Facts are true and accurate***."  Moreover, JPMorgan agreed that it "***will not dispute the Statement of Facts set forth this Agreement***[.]"

259.    In addition, the DPA states that JPMorgan admitted, accepted, and acknowledged that it was "responsible under United States law for the acts of [its] officers, directors, employees and agents . . . as set forth in the Statement of Facts[.]"  The DOJ Statement of Facts states that:

The Company, together with JPMorgan Chase Bank, N.A. ("JPMC") and J.P. Morgan Securities LLC ("JPMS"), hereby agree and stipulate that the following information is true and accurate. ***The Company, JPMC, and JPMS admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set forth below***. Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, the Company, JPMC, and JPMS agree that they will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a

- 67 -

reasonable doubt the charges set forth in the criminal Information attached to this Agreement.

DOJ ¶1.

260.    According to the DOJ press release issued that same day, JPMorgan is required to assist the DOJ in, among other things, its prosecution of defendants Nowak and Smith (and Jordan and Ruffo) in the *Smith* Litigation.  Specifically:

> As part of the DPA, JPMorgan, and its subsidiaries JPMorgan Chase Bank, N.A. (JPMC) and J.P. Morgan Securities LLC (JPMS) have agreed to, among other things, continue to cooperate with the Fraud Section and the U.S. Attorney's Office for the District of Connecticut in any ongoing or future investigations and prosecutions concerning JPMorgan, JPMC, JPMS, and their subsidiaries and affiliates, and their officers, directors, employees and agents.  As part of its cooperation, JPMorgan, JPMC, and JPMS are required to report evidence or allegations of conduct which may constitute a violation of the wire fraud statute, the anti-fraud, anti-spoofing and/or anti-manipulation provisions of the Commodity Exchange Act, the securities and commodities fraud statute, and federal securities laws prohibiting manipulative and deceptive devices.

261.    According to the DOJ, if JPMorgan complies with its obligations described in the DPA and no further criminal activity occurs for a period of three years, the DOJ will discontinue its prosecution of the Company and the DPA will expire.

262.    Further, the DPA prohibits JPMorgan from making "***any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by [JPMorgan] set forth . . . in the attached Statement of Facts.  Any such contradictory statement shall . . . constitute a breach of this Agreement***[.]"  This limitation extends to "***present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for [JPMorgan.]***"

263.    In addition, the DPA noted that JPMorgan was not receiving any disclosure credit related to the criminal conspiracy scheme facilitated by the Precious Metals Trading Desk, stating that "***[JPMorgan] did not receive voluntary disclosure credit because it did not voluntarily and***

*timely disclose to the Fraud Section and the Office the conduct described in the Statement of Facts.*"

264.    In the DOJ Statement of Facts, JPMorgan admitted that its Precious Metals Trading Desk engaged in spoofing tens of thousands of times, including during the Class Period. Specifically, the DOJ Statement of Facts states, in pertinent part, that:

> During the Precious Metals Relevant Period, Smith, Nowak, Jordan, Trunz, Edmonds, Traders 1 through 4, and one or more other traders on the Precious Metals Desk (collectively, the "Subject PM Traders") and Ruffo and one or more other salespeople on the Precious Metals Desk (together with the Subject PM Traders, the "Subject PM Desk Members") engaged in a scheme to defraud in connection with the purchase and sale of precious metals futures contracts on and subject to the rules of a registered entity, specifically NYMEX and COMEX.

> In furtherance of the scheme, the Subject PM Traders knowingly and intentionally placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution ("Deceptive PM Orders"), including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts.

> In tens of thousands of trading sequences, the Subject PM Traders placed one or more orders for precious metals futures contracts that they intended to execute ("Genuine PM Orders"). Sometimes, but not always, the Genuine PM Orders were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time. An "iceberg" order was a type of order that a trader could place on COMEX and NYMEX that did not display the order's full size to other market participants. Only a pre-set portion of an iceberg order was visible at any given time. When the visible portion was filled, the next pre-set portion of the order became visible, and so forth.

> During the same trading sequences, the Subject PM Traders also placed one or more Deceptive PM Orders on the opposite side of the market from the Genuine PM Orders. The Deceptive PM Orders were not iceberg orders, and so the full order size was visible to other market participants.

> For the most part, the Subject PM Traders placed Deceptive PM Orders electronically using Globex. At times, however, certain of Subject PM Traders (and, in particular, Jordan) placed Deceptive PM Orders through telephone calls to floor brokers in trading pits.

> Even prior to May 2008, certain precious metals traders at JPMC, including Jordan, were trading in this unlawful manner, typically using a single, large Deceptive PM

Order that was many times bigger than the visible portion of the opposite-side Genuine PM Order.

But when the Company acquired Bear Stearns in May 2008, Smith and Trunz brought to JPMC a new style of unlawful trading which involved layering multiple Deceptive PM Orders at different prices in rapid succession that in the aggregate, if not individually, were substantially larger than the visible portion of the opposite-side Genuine PM Order. This new style of "layering," which was more difficult both to execute and to detect than placing a single, large Deceptive PM Order, took hold on the Precious Metals Desk and was adopted by, among others, Nowak, Edmonds, Trader 2, Trader 3, and Trader 4.

By placing Deceptive PM Orders, the Subject PM Traders intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.

This false and misleading information was intended to, and at times did, trick other market participants, including competitor financial institutions and proprietary traders, into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded.

By placing Deceptive PM Orders to buy precious metals futures contracts, the Subject PM Traders intended to create the false impression in the market of increased demand in an effort to drive up the prices of those futures contracts.

By placing Deceptive PM Orders to sell precious metals futures contracts, the Subject PM Traders intended to create the false impression in the market of increased supply in an effort to drive down the prices of those futures contracts.

In either situation, the Subject PM Traders placed Deceptive PM Orders with the intent to fraudulently and artificially move the price of a given precious metals futures contract in a manner that would increase the likelihood that one or more of their own opposite-side Genuine PM Orders would be filled by other market participants, *allowing the Subject PM Traders to generate trading profits and avoid losses for themselves and other members of the Precious Metals Desk, the Precious Metals Desk itself, and ultimately, JPMC and the Company.*

Once the Subject PM Traders successfully used their Deceptive PM Orders to get their Genuine PM Orders filled (either in whole or in part), they attempted to, and generally did, quickly cancel their Deceptive PM Orders before they could be executed. Sometimes, however, they were unable to cancel quickly enough, and had to accept unintended (and unwanted) executions of their Deceptive PM Orders.

One of the reasons the Subject PM Traders used Deceptive PM Orders in their trading was to service and benefit key clients, including hedge funds, which were

important sources of revenue and market intelligence for the Precious Metals Desk. For example, if a hedge fund wished to purchase gold, Ruffo would receive the order and communicate it to Smith, who, with Ruffo's knowledge and encouragement, would then place Deceptive PM Orders to sell gold futures contracts in order to artificially lower the price at which the hedge fund could buy (or one of the Subject PM Traders could buy on the hedge fund's behalf). By passing along the lower price, the Subject PM Desk Members hoped to retain the hedge fund's business for the Precious Metals Desk.

In total, during the Precious Metals Relevant Period, the Subject PM Desk Members' fraudulent and manipulative trading activity involving the placement of Deceptive PM Orders resulted in at least $200,847,102 in losses to other participants in the markets for precious metals futures contracts.

The Deceptive PM Orders placed by the Subject PM Traders were transmitted electronically via international and interstate wire communications from New York, London, and Singapore to computer servers operated by the CME Group in and around Chicago and Aurora, Illinois.

***In executing the scheme to defraud in connection with the purchase and sale of precious metals futures contracts and the placement of Deceptive PM Orders, the Subject PM Desk Members were acting within the scope of their employment as employees of JPMC and its affiliates, and as agents of the Company, and with the intent, at least in part, to benefit the Company.***

DOJ ¶¶18-34.

265. That same day – September 29, 2020 – the CFTC issued an order filing and settling charges against JPMorgan for manipulative and deceptive spoofing conduct from at least 2008 through 2016 (the "CFTC Order"). The press release issued by the CFTC in connection with the CFTC Order stated, in pertinent part, that the CFTC Order "***finds that JPM's illegal trading significantly benefitted JPM and harmed other market participants***. JPM is required to pay a total of $920.2 million—the largest amount of monetary relief ever imposed by the CFTC—including the highest restitution ($311,737,008), disgorgement ($172,034,790), and civil monetary penalty ($436,431,811) amounts in any spoofing case." The penalty amounts imposed by the CFTC offset the criminal penalties issued by the DOJ, meaning that JPMorgan's payment of these amounts to the CFTC satisfied, in part, their payment obligations under the DPA.

- 71 -

266.    According to the CFTC Order:

The JPM Precious Metals Desk and Treasuries Desk's spoofing conduct followed a general pattern. A trader would place a relatively small order for precious metals futures (sometimes an iceberg order) that he desired to execute ("Genuine Order"). Before or after entering a Genuine Order, the trader would, on the opposite side of the market, place a noniceberg, relatively large resting order that he intended to cancel before execution ("Spoof Order"), or alternatively would rapidly place a series of non-iceberg resting orders that he intended to cancel before execution ("Layered Spoof Orders"). The trader's Spoof Order or some or all of his Layered Spoof Orders would be active on the market at the same time as the Genuine Order. The trader's Spoof Order or total Layered Spoof Orders would be for a greater number of lots than the visible quantity of his Genuine Order on the opposite side of the market. Finally, traders would typically cancel their Spoof Orders shortly after placing them, and would typically cancel the highest bids or lowest offers placed in a given series of Layered Spoof Orders shortly after placing them. A Precious Metals Desk or Treasuries Desk trader's goal in spoofing through this pattern of trading was, in many instances, to manipulate market prices so that all or part of his Genuine Order would be filled at an artificial price. In placing Spoof Orders and Layered Spoof Orders, Precious Metals Desk and Treasuries Desk traders falsely represented to market participants that they actually wanted to buy or sell the number of lots in their orders when, in reality, they did not want to do so.

Precious Metals Desk and Treasuries Desk traders entered their Spoof Orders and Layered Spoof Orders to create a false impression of buying or selling interest, with the intent, in many instances, to manipulate market prices and trick market participants into trading based on their spoofing. The traders knew that their Spoof Orders and Layered Spoof Orders would appear in the order book and that other traders often considered information about order book balance when making their trading decisions. Thus, the traders intended that their Spoof Orders and Layered Spoof Orders would mislead other market participants.

***This scheme benefitted JPM financially in the amount of $172,034,790 while also inflicting harm on the markets and other market participants, resulting in $311,737,008 in market losses.***

                              *       *       *

During the Relevant Period, JPMS failed to identify, investigate, and stop the violative conduct described above. JPMS' FCM Compliance Manual prohibited the FCM's personnel from engaging in disruptive trading practices including spoofing, forbid them to engage in manipulative activity, and required them to report internally any suspected or known fraudulent activity or market manipulation. ***JPMS also was required to conduct surveillance in order to identify potential market manipulation or other impermissible trading activity.***

Prior to 2014, JPM's surveillance system lacked the ability to effectively identify spoofing conduct. ***Despite using a newer surveillance tool beginning in 2014, and despite numerous red flags, including internal surveillance alerts, inquiries from CME and the Commission, and internal allegations of misconduct from a JPM trader, JPMS still failed to provide supervision to its employees sufficient to enable JPMS to identify, adequately investigate, and put a stop to JPM's Precious Metals Desk and Treasuries Desk's misconduct.*** Accordingly, JPMS failed to perform its supervisory duties diligently.

*     *     *

***During the earlier stages of the investigation, JPM failed to respond to certain of the Division's requests for documents in a timely manner, responded incompletely or unsatisfactorily to certain of the Division's information requests in a manner that resulted in the Division being misled, and failed to timely inform the Division of relevant information.***

*     *     *

Traders on JPM's Precious Metals Desk and Treasuries Desk engaged in the conduct described herein within the scope of their employment or agency with, respectively, JPMCB and JPMS. Therefore, pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2, JPMCB and JPMS are liable for those acts, omissions, and failures in violation of the provisions of the Act and Regulations cited above. JPMC & Co., which is the ultimate parent company of all JPM entities including JPMCB and JPMS, is liable for all acts, omissions, and failures with respect to the conduct described above.

267.    Also on that same day, September 29, 2020, the SEC charged JPMorgan for engaging in manipulative spoofed trading of U.S. Treasury securities.  JPMorgan admitted to the findings in the SEC's order and agreed to pay disgorgement of $10 million and a civil penalty of $25 million (the "SEC Order").  As with the CFTC penalties, the penalty amounts imposed by the SEC Order offset the criminal penalties issued by the DOJ, meaning that JPMorgan's payment of these amounts to the SEC satisfied, in part, their payment obligations under the DPA.

268.    According to the SEC Order, "between April 2015 and January 2016, certain traders on J.P. Morgan Securities' Treasuries trading desk employed manipulative trading strategies involving Treasury cash securities. . . . ***This manipulative conduct ceased in early January 2016, when certain personnel changes were made on the JPMS Treasuries Desk***."

269.    Further, JPMorgan issued a press release on Form 8-K on September 29, 2020 entitled "JPMorgan Chase Resolves Investigations Into Precious Metals and U.S. Treasuries Markets."   The press release quotes Daniel Pinto, co-President of JPMorgan and CEO of the Corporate & Investment Bank, who stated, in pertinent part, that "[t]he conduct of the individuals referenced in today's resolutions is unacceptable and they are no longer with the firm[.]"

270.    According to *The Wall Street Journal*, JPMorgan has paid a disproportionate share of the fines issued to investment banks for spoofing, paying more than eleven times the amount of fines paid by the bank with the second highest amount of fines.  Specifically:



- 74 -

271.    *The Wall Street Journal* also spoke with McDonald in October 2020 about the actions taken by the CFTC against Edmonds, defendants Trunz, Nowak, and Smith, and Jordan and Ruffo and JPMorgan in light of the 2008 CFTC Investigation being concluded with no charges issued. According to the *Wall Street Journal*:

> Investigators probing whether traders at JPMorgan Chase & Co. rigged silver prices seven years ago decided there was no case to bring. Last week, the same agency hammered the megabank with a $920 million fine.
>
> How a small agency that once walked away from an investigation of price manipulation, only to later impose its biggest fine yet for the conduct, shows the advances government has made in using data to uncover market manipulation, said James McDonald, enforcement director of the Commodity Futures Trading Commission.
>
> "We could not have brought the JPMorgan case without the data analytics program we have now," said Mr. McDonald, who will step down as director this week after more than three years in the post.
>
> *            *            *
>
> The CFTC began looking for manipulation in the silver market in 2008, after the agency received requests from hundreds of investors who complained that silver prices were being rigged. The agency closed the probe in 2013, saying there was no "viable basis" for an enforcement action.
>
> "Twelve years ago, we were just conducting those types of investigations differently. We were relying on statements presented to us either from the entity itself or the traders in sworn testimony," Mr. McDonald said. "We didn't have the same ability to look beneath them to ensure they were truthful and accurate."
>
> Two former JPMorgan traders misled the CFTC when the agency interviewed them as part of the earlier silver-market investigation, according to a November 2019 indictment that charged four of the bank's former employees with crimes including racketeering. The traders had been asked about conduct that resembled spoofing and denied doing it, the indictment said. All of the traders have pleaded not guilty and are fighting the charges, which were filed in Chicago federal court.
>
> *            *            *
>
> The CFTC has settled with or sued over 60 defendants for spoofing-related misconduct since 2013, with nearly half of the total coming during 2019 and 2020. Trading arms of Deutsche Bank, Bank of America Corp. and Morgan Stanley have settled CFTC spoofing probes over precious-metals activity.

272.     The same law firm – Sullivan & Cromwell LLP – represented JPMorgan in the 2008 CFTC Investigation, the Silver Litigation, the *Shak* Litigation, and the multi-year DOJ and CFTC investigations that led to the DOJ Statement of Facts and the Superseding Indictment.  A few weeks after McDonald spoke with *The Wall Street Journal* in October 2020, McDonald left the CFTC to become a litigation partner at Sullivan & Cromwell LLP.

### Additional Scienter Allegations

273.     During the Class Period, Defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and they substantially participated or acquiesced in the issuance or dissemination of such statements or documents.

274.     As set forth elsewhere herein in detail, each of the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding JPMorgan, their control over and/or receipt of JPMorgan's allegedly materially misleading statements, knowingly participated in the fraudulent scheme alleged herein.

275.     The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of JPMorgan's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each of the Executive Defendants was provided with copies of the Company's SEC filings and press releases alleged herein to be false and misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the market, and that the positive representations which were being made

were then materially false and misleading. The Executive Defendants signed and/or certified the Class Period Forms 10-K.

276. The Trader Defendants, because of their roles as supervisors and/or traders on the Precious Metals Trading Desk, possessed the power and authority to control the spoofed buy or sell orders made by JPMorgan for precious metals futures contracts. Because of their positions and access to material non-public information, the Trader Defendants understood and directly participated in the Precious Metals Trading Desk's criminal conspiracy scheme to defraud in connection with the purchase and sale of precious metals futures contracts on the NYMEX and COMEX. Thus, each of the Trader Defendants knew the adverse facts specified herein had not been disclosed to, and were being concealed from, the market, and that the positive representations which were being made were then materially false and misleading.

277. The allegations above also establish a strong inference that JPMorgan as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing JPMorgan's true operating condition from the investing public. By concealing these material facts from investors, JPMorgan maintained its artificially inflated common stock price throughout the Class Period.

278. Because each of the Individual Defendants made statements on behalf of the Company during the Class Period, and/or directly participated in the Precious Metals Trading Desk's

illegal scheme, corporate scienter can be imputed to JPMorgan through each of the Individual Defendants.

### Loss Causation/Economic Loss

279.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of JPMorgan's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of JPMorgan's common stock fell precipitously as the artificial inflation was removed.

280.    As a result of their purchases of JPMorgan common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $141.09 per share on January 2, 2020.

281.    On February 26, 2019, at the beginning of the trading day, the 2018 Form 10-K was publicly released and disclosed to investors for the first time that the DOJ and other governmental authorities were investigating possible criminal trading practices in the precious metals markets generally.

282.    In response to this revelation, the price of JPMorgan common stock declined $0.81 per share, or approximately 0.8%, from a close of $106.10 per share before the announcement on February 25, to close at $105.29 on February 26, 2019.  This decline erased over $2.6 billion of JPMorgan's market capitalization.

283.    On August 20, 2019, during the trading day, news reports emerged that disclosed to investors for the first time that the DOJ's investigation was focused on the Precious Metals Trading

Desk, that it had secured the cooperation of defendant Trunz, and that it involved spoofing misconduct that lasted until August 2016.

284.    In response to this revelation, the price of JPMorgan common stock declined $1.38 per share, or approximately 1.3%, from a close of $108.69 per share before the announcement on August 19, 2019 to close at $107.31 on August 20, 2019.  This decline erased over $4.4 billion of JPMorgan's market capitalization.

285.    On September 16, 2019, at the beginning of the trading day, news reports emerged that disclosed to investors for the first time that that JPMorgan's spoofing misconduct amounted to criminal racketeering activity more commonly associated with mafia and drug gangs, and that the head of the Precious Metals Trading Desk, defendant Nowak, was the ringleader of this criminal RICO conspiracy scheme.

286.    In response to this revelation, the price of JPMorgan common stock declined $1.07 per share, or approximately 0.9%, from a close of $120.23 per share before the announcement on Friday, September 13, 2019 to close at $119.16 on Monday, September 16, 2019.  This decline erased over $3.4 billion of JPMorgan's market capitalization.

287.    On September 23, 2020, during the trading day, a *Bloomberg* article disclosed to investors for the first time that JPMorgan was nearing a settlement with the DOJ to resolve criminal spoofing charges for nearly $1 billion, which would be a record penalty for spoofing.

288.    In response to this revelation, the price of JPMorgan common stock declined $1.53 per share, or approximately 1.6%, from a close of $94.27 per share before the announcement on September 22, to close at $92.74 on September 23, 2020.  This decline erased over $4.6 billion of JPMorgan's market capitalization.

289.    As shown above, the timing and magnitude of the price declines in JPMorgan's common stock negate any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

### Fraudulent Scheme and Course of Business

290.    During the Class Period, Defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of JPMorgan common stock during the Class Period.  The fraudulent scheme: (i) deceived the investing public regarding JPMorgan's business, operations and management and the intrinsic value of JPMorgan's common stock; and (ii) caused Plaintiffs and other Class members to purchase JPMorgan common stock at artificially inflated prices, causing them damage.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine and *Affiliated Ute* Presumptions

291.    Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as set forth in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

292.    With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiffs and other members of the Class purchased JPMorgan common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

293.    At all relevant times, the market for JPMorgan's common stock was efficient for the following reasons, among others:

(a)     the Company's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, JPMorgan filed periodic public reports with the SEC and the NYSE;

(c)     JPMorgan regularly communicated with public investors via established market communication mechanisms, including pricing precious metals futures contracts on NYMEX and COMEX, regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     JPMorgan was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

294.    As a result of the foregoing, the market for JPMorgan's common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of the

Company's common stock during the Class Period suffered similar injury through their purchase of such common stock at artificially inflated prices, and a presumption of reliance applies.

295.     In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding JPMorgan's business operations and financial performance – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

296.     Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### No Safe Harbor

297.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of JPMorgan who knew that those statements were false when made.

- 82 -

## CLASS ACTION ALLEGATIONS

298.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of JPMorgan between February 23, 2016 and September 23, 2020, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

299.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, JPMorgan's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by JPMorgan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

300.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

301.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

302.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of JPMorgan;

(c)      whether the price of JPMorgan common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

303.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

304.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

305.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

306. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

307. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for JPMorgan's common stock. Plaintiffs and the Class would not have purchased JPMorgan common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

308. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of JPMorgan common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Executive Defendants and Defendant Nowak

309. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

310. The Executive Defendants acted as controlling persons of JPMorgan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of JPMorgan, the Executive Defendants had the power and authority to cause JPMorgan to engage in the wrongful conduct complained of herein. By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

311. Defendant Nowak acted as a controlling person of JPMorgan within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of his management and supervision

of the Company's Precious Metals Trading Desk, defendant Nowak had the power and authority to cause JPMorgan to engage in the wrongful conduct complained of herein.  By reason of such conduct, defendant Nowak is liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.       Determining that this action is a proper class action, certifying Plaintiffs as Class Representatives under Federal Rule of Civil Procedure 23, and appointing Co-Lead Counsel as Co-Class counsel;

B.       Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Awarding Plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  March 24, 2021                    ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                      SAMUEL H. RUDMAN
                                                      DAVID A. ROSENFELD
                                                      MICHAEL G. CAPECI
                                                      SARAH E. DELANEY


                                                          */s/ Michael G. Capeci*
                                                      MICHAEL G. CAPECI

- 86 -

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mcapeci@rgrdlaw.com
sdelaney@rgrdlaw.com

*Lead Counsel for Plaintiffs City of Ann Arbor
Employees' Retirement System and Michiana Area
Electrical Workers' Pension Fund and the Class*

THE ROSEN LAW FIRM, P.A.
JACOB A. GOLDBERG
LEAH HEIFETZ-LI
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: 215/600-2817
212/202-3827 (fax)
jgoldberg@rosenlegal.com
lheifetz@rosenlegal.com

*Lead Counsel for Plaintiff Julius Pappas and the
Class*

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiff City of Ann
Arbor Employees' Retirement System*

URDA PROFESSIONAL CORPORATION
RICHARD B. URDA, JR. (928-71)
205 W. Jefferson Blvd., Suite 210
South Bend, IN 46601
Telephone: 574/234-2161
rurdapc@gmail.com

*Additional Counsel for Plaintiff Michiana Area
Electrical Workers' Pension Fund*

- 87 -

DocuSign Envelope ID: 53166754-E47A-4F7D-B706-4B9CD93F012F

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

MICHIANA AREA ELECTRICAL WORKERS' PENSION FUND ("Plaintiff")
declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

3/15/2021  I declare under penalty of perjury that the foregoing is true and correct.  Executed this _____ day of March, 2021.

MICHIANA AREA ELECTRICAL WORKERS'
PENSION FUND

By: _____
Eric Grounds, Chairman

By: _____
Robert White, Secretary

JPMORGAN

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---------------|---------------------------|-------|
| 08/27/2018 | 5,573 | $117.00 |
| 11/19/2018 | 454 | $109.97 |
| 07/12/2019 | 1,989 | $115.19 |
| 07/23/2019 | 789 | $116.19 |
| 07/24/2019 | 515 | $116.75 |
| 07/26/2019 | 520 | $116.28 |
| 10/24/2019 | 244 | $125.13 |
| 04/07/2020 | 658 | $91.81 |
| 05/27/2020 | 266 | $100.19 |

| Date Sold | Amount of Shares Sold | Price |
|-----------|-----------------------|-------|
| 11/29/2018 | 739 | $110.57 |
| 01/28/2019 | 382 | $103.36 |
| 02/28/2019 | 637 | $104.36 |
| 03/21/2019 | 691 | $102.99 |
| 03/25/2019 | 3,578 | $99.02 |
| 06/26/2020 | 358 | $92.05 |
| 07/28/2020 | 719 | $97.32 |

Prices listed are rounded up to two decimal places.