UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re JPMORGAN CHASE & CO. SECURITIES LITIGATION | : : : | Master File No. 1:20-cv-05124-ENV-RML |
| | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : : | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS |
| ALL ACTIONS. | : : | PLAINTIFFS' SECOND AMENDED COMPLAINT |
| | : | |
| | : | DATE OF SERVICE: JULY 30, 2021 |
| | x | |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF FACTS .................................................................................3

        A.      The Existence of the Desk's Criminal Spoofing Conspiracy Is Not
                Contested by Defendants ...................................................................3

        B.      The DPA is the Latest in a String of Significant Criminal Financial
                Misconduct That Has Taken Place at JPM During Dimon's Tenure......................5

        C.      The Executive Defendants Oversaw JPM's Expenditure of Billions of
                Dollars to Bolster the Company's Compliance Function Before the Class
                Period .................................................................................6

        D.      JPM Admits to Its Criminal Spoofing Conspiracy a Year After the DOJ
                Levies Unprecedented RICO Charges Against Nowak and Smith...........................8

        E.      Before the DPA, the Desk Was Constantly and Credibly Accused of
                Spoofing by the Government and Investors for Over a Decade ..........................10

        F.      The Desk Openly Discussed Spoofing in the Electronic Chats Monitored
                By Thousands of JPM Compliance Personnel Hired Before the Class
                Period ................................................................................12

        G.      Defendants' Fraud Was Revealed Through a Series of Disclosures ....................14

III.    ARGUMENT......................................................................................15

        A.      The Standards Applicable to Defendants' Motion..................................15

        B.      Certain of the Extrinsic Materials Submitted by Defendants Must Be
                Stricken ...........................................................................16

        C.      Defendants' False and Misleading Statements and Omissions.........................18

                1.      The Materially False and Misleading Statements and Omissions
                        Made By JPM and the Executive Defendants...............................19

                        a.      The Forms 10-K Misstatements....................................19

                        b.      The Forms 10-K Omissions........................................22

                        c.      The Challenged Statements and Omissions Are Material .............24

                2.      JPM's Item 303 Omissions........................................25

- i -

**Page**

3. The Materially False and Misleading Statements Made By JPM and the Trader Defendants ................................................................27

4. JPM and the Trader Defendants Are Liable for Scheme Liability for the Desk's Spoofing ................................................................31

D. Defendants' False Statements and Omissions Were Made with Scienter .............33

1. The SAC Adequately Alleges Scienter for the Trader Defendants ...........33

2. The SAC Adequately Alleges Scienter for the Executive Defendants ................................................................................................35

3. The SAC Adequately Alleges Corporate Scienter for JPM.......................43

E. The SAC Adequately Alleges Loss Causation ......................................................45

1. The February 26, 2019 Disclosure............................................................48

2. The August 20, 2019 Disclosure................................................................49

3. The September 16, 2019 Disclosure ..........................................................50

4. The September 23, 2020 Disclosure ..........................................................51

F. The Executive Defendants and Nowak Are Liable as Control Persons.................53

G. Should Defendants' Motions Be Granted, Leave to Amend Is Warranted............54

IV. CONCLUSION....................................................................................................................55

## TABLE OF AUTHORITIES

**Page**

### CASES

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ..................................................................................33

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ...............................................................................................15

*AP-Fonden v. Goldman Sachs Grp., Inc.*,
2021 WL 2659797
(S.D.N.Y. June 28, 2021) ....................................................................................................52

*Barrett* v. *PJT Partners Inc.*,
2017 WL 3995606
(S.D.N.Y. Sept. 8, 2017) .....................................................................................................45

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................................30, 31

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
56 F. Supp. 3d 549 (S.D.N.Y. 2014).....................................................................................31

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)........................................................................................ *passim*

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)...............................................................................23

*Chechele v. Scheetz*,
466 F. App'x 39 (2d Cir. 2012) ...........................................................................................17

*Christine Asia Co. Ltd. v. Yun Ma*,
718 F. App'x 20 (2d Cir. 2017) ...........................................................................................37

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)..............................................................................31, 41

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)...................................................................................40

*CompuDyne Corp. v. Shane*,
453 F. Supp. 2d 807 (S.D.N.Y. 2006)...................................................................................53

*Constr. Laborers Pension Tr. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)..............................................................................21, 53

**Page**

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)...................................................................54

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)...................................................................21

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................45, 46

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................................34

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)................................................................................46

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)................................................................................16

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)...................................................................24

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................20

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................................19

*Giaguara S.p.A. v. Amiglio*,
    257 F. Supp. 2d 529 (E.D.N.Y. 2003) ..................................................................55

*Gordon v. Vanda Pharms. Inc.*,
    2021 WL 911755
    (E.D.N.Y. Mar. 10, 2021) ...................................................................................47

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)................................................................................26

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)....................................................................20

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)....................................................................53

**Page**

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
2020 WL 1950783
(E.D.N.Y. Apr. 22, 2020)................................................................................................23

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)........................................................................20, 23

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................................................32, 48

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)........................................................................36, 44

*In re Electrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................................22, 32

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................................................38

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019)................................................................................22

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851
(E.D.N.Y. Sept. 27, 2019)................................................................................................51

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016)..........................................................................26, 27

*In re Marsh & McLennan Cos., Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................................34

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)................................................................................43

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)..........................................................................................46, 49

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014)................................................................................41

*In re Pall Corp.*,
2009 U.S. Dist. LEXIS 88240
(E.D.N.Y. Sept. 21, 2009)................................................................................................41

**Page**

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015)...............................................................16, 17

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008)...................................................................18

*In re Ravisent Techs., Inc. Sec. Litig.*,
    2004 U.S. Dist. LEXIS 13255
    (E.D. Pa. July 12, 2004)........................................................................................30

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................................18, 35

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..............................................................36, 54

*In re Sequans Commc'ns S.A. Sec. Litig.*,
    2019 WL 4805072
    (E.D.N.Y. Sept. 30, 2019)....................................................................................48

*In re ShengdaTech, Inc. Sec. Litig.*,
    2014 WL 3928606
    (S.D.N.Y. Aug. 12, 2014) .....................................................................................42

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................49

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................................23

*In re VEON Ltd. Sec. Litig.*,
    2017 WL 4162342
    (S.D.N.Y. Sept. 19, 2017).....................................................................................21

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F. Supp. 3d 528 (S.D.N.Y. 2016)...................................................................53

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)............................................................................19, 46

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016).............................................................25, 26, 27, 30

**Page**

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)................................................................................38

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)................................................................................43

*Kalnit v. Eichler*,
  99 F. Supp. 2d 327 (S.D.N.Y. 2000)..................................................................34

*Lea v. TAL Educ. Grp.*,
  837 Fed. App'x 20 (2d Cir. 2020)......................................................................42

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)..............................................................................26

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)........................................................................45, 54

*Manavazian v. ATEC Grp., Inc.*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) ......................................................15, 16, 19

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)......................................................................................15, 19

*Mayo v. Fed. Gov't*,
  558 Fed. App'x 55 (2d Cir. 2014)......................................................................16

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990)........................................................................18, 19

*Menaldi v. Och–Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)................................................................32

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)..............................................................................19

*Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)..................................................................50

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................18, 33, 35, 37

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)............................................................24, 39

**Page**

*Operating Local 949 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010)..................................................................................23, 24

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012)........................................................................44

*Reiner v. Teladoc Health, Inc.*,
   2020 WL 7028638
   (S.D.N.Y. Nov. 30, 2020) ..................................................................................20, 55

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................................44

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)........................................................................15, 16, 17

*Schering Corp. v. Pfizer Inc.*,
   189 F.3d 218 (2d Cir. 1999)..................................................................................44, 45

*Schiro v. Cemex*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019)........................................................20, 24, 42

*SEC v. Fiore*,
   416 F. Supp. 3d 306 (S.D.N.Y. 2019)........................................................................17, 18

*SEC v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011)........................................................................32

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020)........................................................................43

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) ........................................................................23

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004)........................................................................16

*Slayton v. American Express Co.*,
   604 F.3d 758 (2d Cir. 2010)........................................................................17

*Speakes v. Taro Pharm. Indus., Ltd.*,
   2018 WL 4572987
   (S.D.N.Y. Sept. 24, 2018)..................................................................................23, 51

**Page**

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008)..................................................................43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................................................................... *passim*

*Tomasino v. Estee Lauder Cos., Inc.*,
2015 U.S. Dist. LEXIS 38918
(E.D.N.Y. Mar. 26, 2015) ..................................................................18

*U.S. v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012)................................................................41

*UA Local 13 Pension Fund v. Sealed Air Corp.*,
2021 U.S. Dist. LEXIS 102894
(S.D.N.Y. June 1, 2021)....................................................................45

*Utesch v. Lannett Co.*,
385 F. Supp. 3d 408 (E.D. Pa. 2019) ....................................................37

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013).............................................29, 34

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§78j(b)..................................................................................... *passim*
§78t(a) ...............................................................................................1
§78u-4(b)(1) .................................................................................18, 53
§78u-4(b)(2)(A) ..................................................................................16

17 C.F.R.
§229.303..........................................................................................25
§240.10b-5(a) and (c)..........................................................................31

Federal Rule of Civil Procedure
Rule 8.........................................................................................45, 53
Rule 9(b) ..........................................................................................18
Rule 10b–5 .......................................................................................31
Rule 12(b)(6)............................................................................. *passim*
Rule 15(a)(2)......................................................................................54
Rule 30(b)(6)................................................................................36, 44

**Page**

Federal Rule of Evidence
   Rule 801(d)(2)........................................................................................................45

Private Securities Litigation Reform Act of 1995 ("PSLRA")
   Pub. L. No 104-67, 109 Stat. 737 (1995)...........................................................15, 18

Commodity Exchange Act...................................................................................................8

## TABLE OF ABBREVIATIONS

| Term | Definition |
|---|---|
| ¶ | Paragraphs of the SAC |
| 2008 CFTC Investigation | The CFTC Division of Enforcement's investigation into spoofing in the silver futures market by JPM, announced in September 2008 |
| 2014 Letter | Dimon's annual letter to shareholders, dated April 9, 2014 |
| 2015 Form 10-K | Annual report of JPMorgan Chase & Co. for the fiscal year ended December 31, 2015, filed on Form 10-K with the SEC on February 23, 2016 |
| 2016 Form 10-K | Annual report of JPMorgan Chase & Co. for the fiscal year ended December 31, 2016, filed on Form 10-K with the SEC on February 28, 2017 |
| 2017 Form 10-K | Annual report of JPMorgan Chase & Co. for the fiscal year ended December 31, 2017, filed on Form 10-K with the SEC on February 27, 2018 |
| 2018 Class Action | Putative class action filed by precious metals futures contract traders on November 7, 2018, captioned *In re JPMorgan Precious Metals Spoofing Litigation*, 1:18-cv-10356-GHW (S.D.N.Y.). |
| 2018 Form 10-K | Annual report of JPMorgan Chase & Co. for the fiscal year ended December 31, 2018, filed on Form 10-K with the SEC on February 26, 2019 |
| 2019 Form 10-K | Annual report of JPMorgan Chase & Co. for the fiscal year ended December 31, 2019, filed on Form 10-K with the SEC on February 25, 2020 |
| CFTC | U.S. Commodity Futures Trading Commission |
| CFTC Order | CFTC Order Instituting Proceedings against JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC, dated September 29, 2020 |
| Class Period | February 23, 2016 to September 23, 2020, inclusive |
| Company | JPM |
| Bank | JPMorgan Chase Bank, N.A |
| Davidoff Decl. | Declaration of Amanda F. Davidoff, dated June 15, 2021 |
| Defendants | JPMorgan Chase & Co. (including its wholly-owned subsidiary, JPMorgan Chase Bank, N.A.), James Dimon, Marianne Lake, Michael Nowak, Gregg Smith, and Christian Trunz |
| Def. Mem. | JPM and the Executive Defendants' Memorandum of Law, dated June 15, 2021 |
| Def. Ex. | Exhibits to the Davidoff Decl. |
| Desk | JPM's Precious Metals Trading Desk |
| Dimon | James Dimon |
| Disputed Exhibits | Def. Exs. 11-13, 16-20, and 22 |
| DOJ | U.S. Department of Justice |
| DPA | Deferred Prosecution Agreement between the DOJ and JPM, dated September 29, 2020 |
| Edmonds | John Edmonds |

| | |
|---|---|
| Edmonds Plea | Edmonds' guilty plea to two felonies for spoofing from 2009 through 2015, announced by the DOJ on November 6, 2018 |
| Executive Defendants | Dimon and Lake |
| FX Plea Agreement | JPM's plea agreement for the felony charge of conspiring to manipulate the foreign currency exchange spot market, dated May 20, 2015 |
| Jones Decision | U.K. Employment Tribunals Judgment in the case captioned *Bradley Jones v. JP Morgan Securities PLC*, case number 3201630/2020 V, dated June 29, 2021 |
| JPM | JPMorgan Chase & Co. |
| Lake | Marianne Lake |
| Lead Plaintiffs | City of Ann Arbor Employees' Retirement System and Julius Pappas |
| Madoff DPA | Deferred Prosecution Agreement between JPM and the DOJ to resolve felony violations related to Bernard L. Madoff Investment Securities, dated January 6, 2014 |
| Nowak | Michael Nowak |
| Nowak & Smith Mem. | Nowak and Smith's Memorandum of Law, dated June 15, 2021 |
| Plaintiffs | Lead Plaintiffs and Michiana Area Electrical Workers' Pension Fund |
| Pl. Ex. | Exhibits to the Declaration of Michael G. Capeci, dated July 30, 2021 |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(b)(2)(A) |
| RICO | Racketeer Influenced and Corrupt Organizations |
| SAC | Plaintiffs' Second Amended Complaint for Violations of the Federal Securities Laws (ECF No. 29) |
| SEC | U.S. Securities and Exchange Commission |
| *Shak* Litigation | Litigation brought in early 2015 against JPM by a precious metals trader, captioned *Shak v. JPMorgan Chase & Co.*, Case No. 1:15-cv-00992-LJL (S.D.N.Y.) |
| SI | Superseding Indictment filed against Nowak, Smith, and others on November 14, 2019 |
| Silver Litigation | Putative class action filed in 2011 against JPM, captioned *In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.*, No. 11 Md. 2213-RPP (S.D.N.Y.) |
| Smith | Gregg Smith |
| SOF | Statement of Facts incorporated into the DPA |
| Trader Defendants | Nowak, Smith, and Trunz |
| Trunz | Christian Trunz |
| Trunz Mem. | Trunz's Memorandum of Law, dated June 15, 2021 |
| Turnbull | Donald Turnbull |

Lead plaintiffs City of Ann Arbor Employees' Retirement System and Julius Pappas ("Lead Plaintiffs"), together with plaintiff Michiana Area Electrical Workers' Pension Fund (collectively, "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants' motions to dismiss Plaintiffs' Second Amended Complaint ("SAC") (ECF No. 29).[1]

## I.     INTRODUCTION

This lawsuit is not, as Defendants contend, a "meritless strike suit" that seeks to "capitalize" on JPM's admission that the Company's precious metals trading desk (the "Desk") engaged in a criminal spoofing[2] conspiracy from March 2008 until August 2016 in precious metals futures contracts, resulting in unprecedented Racketeer Influenced and Corrupt Organizations ("RICO") charges against Nowak and Smith – the first time since the 1980s that the U.S. Department of Justice ("DOJ") has criminally charged Wall Street bankers with RICO – and JPM agreeing to pay a near-billion dollar criminal penalty that is the largest spoofing penalty in U.S. history.

Rather, this lawsuit seeks to hold: (i) JPM and the Executive Defendants liable for misstatements and omissions in JPM's 2015 to 2019 Forms 10-K regarding the Company's use of

---

[1]     The SAC alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of all purchasers of JPMorgan Chase & Co. ("JPM" or the "Company") common stock between February 23, 2016 and September 23, 2020, inclusive (the "Class Period"). "Defendants" refers to JPM (which encompasses its wholly-owned subsidiary, JPMorgan Chase Bank, N.A. (the "Bank")), James Dimon ("Dimon"), Marianne Lake ("Lake," and with Dimon, the "Executive Defendants"), Michael Nowak ("Nowak"), Gregg Smith ("Smith"), and Christian Trunz ("Trunz," and with Nowak and Smith, the "Trader Defendants").  "¶_" refers to paragraphs in the SAC.  "Def. Mem." refers to JPM and the Executive Defendants' memorandum of law, dated June 15, 2021.  "Def. Ex." refers to the exhibits to the Declaration of Amanda F. Davidoff, dated June 15, 2021 ("Davidoff Decl.").  "Trunz Mem." refers to Trunz's memorandum of law, dated June 15, 2021.  "Nowak & Smith Mem." refers to Nowak and Smith's memorandum of law, dated June 15, 2021.  "Pl. Ex." refers to the exhibits to the Declaration of Michael G. Capeci, dated July 30, 2021. All emphasis in quotations is added and all internal citations and quotation marks are omitted.

[2]     Spoofing involves purposely placing false bids or offers for precious metals futures contracts with the intent to cancel the bids or orders before execution to manipulate commodity prices. ¶270.

precious metals futures contracts and valuation of precious metals; and (ii) JPM and the Trader Defendants liable for the spoofing misstatements themselves.

In so doing, the SAC provides an ***unprecedented*** level of detail regarding the information available to Defendants, uncovered from, among other things, Trunz's guilty plea with the DOJ, the DOJ's factual findings made in connection with JPM's criminal penalty, the indictments issued by the DOJ against Smith and Nowak, the many investigations and lawsuits pertaining to the Desk's criminal spoofing conspiracy before and during the Class Period, and a wrongful termination lawsuit filed against JPM by a former trader on the Desk, Donald Turnbull ("Turnbull"). Indeed, JPM has admitted that the DOJ's factual findings are true and accurate, has agreed not to contest them, and has acknowledged that, in conducting the illegal scheme, the Trader Defendants were agents of JPM and intended to, and did, cause the Company (and, by proxy, its investors) to illicitly profit.

JPM's illegal spoofing scheme was very easy to detect. Once the government obtained the same technology that JPM had long-possessed – a requirement from previous criminal financial misconduct that JPM engaged in under Dimon's tenure, which forced it onto criminal corporate probation during the majority of the Class Period – in 2018, it took just two government employees to uncover the Desk's criminal spoofing scheme. It is no wonder why: the Desk repeatedly used the term "spoof" in the electronic chats they used to facilitate their illegal scheme – the very communications JPM monitored before and during the Class Period.

In other words, the Executive Defendants had more than sufficient access to information before the Class Period to detect the Desk's criminal spoofing conspiracy. Turnbull, a former trader on the Desk with the Trader Defendants, confirms that JPM's compliance function actively surveilled the Desk's electronic chats before the Class Period, and was aware of – and approved – Smith and Trunz's spoof trading strategy before the Class Period. Turnbull specifically discredits

- 2 -

the thrust of Defendants' dismissal motions, alleging that JPM knew all along about the Desk's illicit activities and, instead of stopping it, defended it and allowed it to proliferate.

For their part, between the factual findings made by the DOJ and Trunz's guilty plea, JPM and the Trader Defendants cannot seriously dispute their actual knowledge of this misconduct.

After John Edmonds ("Edmonds"), a former junior trader on the Desk, pled guilty to spoofing in November 2018, the scope and extent of Defendants' fraud began to be revealed through four loss-causing events: (i) on February 26, 2019, JPM disclosed that it was cooperating with the government's spoofing investigation; (ii) on August 20, 2019, the DOJ announced that Trunz had pleaded guilty and was cooperating; (iii) on September 16, 2019, the DOJ announced that it had indicted Nowak – the supervisor of the Desk and ringleader of the illegal scheme – and Smith for, among other things, virtually unprecedented RICO charges; and (iv) on September 23, 2020, new reports emerged indicating that JPM would pay a record-setting, near-billion dollar penalty to resolve the investigation.  None of this information was revealed in Edmonds' guilty plea.

In the face of the mountain of evidence against them, Defendants still challenge the existence of false and misleading statements and omissions, materiality, scienter, and loss causation.  Their arguments fail for the reasons below, as well as for the simple fact that they do not acknowledge the remarkable detail pled in the SAC.  Nor can Defendants create their own record by citing exhibits not incorporated into the SAC or that cannot be considered under judicial notice – which must be stricken.  Accordingly, Plaintiffs respectfully submit Defendants' motions be denied in their entirety.

## II.    STATEMENT OF FACTS

### A.    The Existence of the Desk's Criminal Spoofing Conspiracy Is Not Contested by Defendants

Unlike in most putative securities fraud class actions that are at the pleading stage, in this litigation there can be no dispute that the underlying misconduct occurred.  The reason is because on

September 29, 2020, JPM entered into a deferred prosecution agreement (the "DPA") with the DOJ, and admitted in the incorporated statement of facts (the "SOF") that, from March 2008 until August 2016, the Desk engaged in a scheme to defraud in connection with the purchase and sale of precious metals futures contracts by spoofing tens of thousands of times, which allowed JPM to illegally profit by over $172 million. ¶¶281, 289-291.

In the DPA, in which JPM resolved felony wire fraud charges for a $920 million criminal penalty – the largest spoofing penalty in U.S. history – JPM agreed that the SOF was "true and accurate." ¶283. In addition, JPM agreed that it will not dispute the SOF and that if JPM or its attorneys did contradict its contents in any future litigations (such as this one), that would constitute a breach of the DPA. ¶¶283, 287. The DPA also obligates JPM to assist the DOJ in its criminal RICO prosecution of Nowak and Smith, which is currently ongoing. ¶285.

Furthermore, the DPA states that JPM was not receiving any disclosure credit "because it did not voluntarily and timely disclose to the [DOJ] the conduct described in the [SOF]." ¶288. Inherent in that finding is the DOJ's belief that JPM knew about, or should have known about, this misconduct all along. *Id.*

The U.S. Commodity Futures Trading Commission ("CFTC") was also investigating JPM for spoofing misconduct, which led to a parallel settlement also announced on September 29, 2020 (the "CFTC Order"). ¶290. The CFTC Order explains why the DOJ criticized JPM for not timely disclosing the Desk's criminal spoofing conspiracy. *Id.* Specifically, in 2014 – before the Class Period began – the CFTC had required JPM to institute a new surveillance tool that was able to detect spoofing misconduct. ¶¶202, 291. The CFTC Order explains that, from 2008 until 2016, JPM received "numerous red flags, including internal surveillance alerts, inquiries from CME and the [CFTC], and internal allegations of misconduct from a JPM trader" regarding the Desk's criminal

spoofing conspiracy. *Id.* According to the CFTC Order, the "internal surveillance alerts" that were implemented by JPM in 2014 had "the ability to effectively identify spoofing conduct[.]" ¶203. In other words, the CFTC believes that JPM knew, or should have known, internally by the start of the Class Period that the Desk was engaged in a criminal spoofing conspiracy. *Id.* The CFTC Order also criticizes JPM for "respond[ing] incompletely or unsatisfactorily to certain of the [CFTC]'s information requests in a manner that resulted in the [CFTC] being misled[.]" ¶291.

Furthermore, JPM agreed in the DPA that the traders on the Desk – including the Trader Defendants – "were acting . . . as agents of the Company, and with the intent, at least in part, to benefit the Company." ¶¶284, 289-290. The DPA defines "Company" to mean JPM. Def. Ex. 1 at 1. Similarly, the CFTC Order clearly imputes the Trader Defendants' misconduct to JPM. Def. Ex. 2 at 9 ("JPMC & Co., which is the ultimate parent company of all JPM entities including JPMCB and JPMS, is liable for all acts, omissions, and failures with respect to the conduct described above."). Thus, through the DPA and the CFTC Order, JPM has admitted that the Trader Defendants' knowledge and actions can be imputed to the Company.

### B. The DPA Is the Latest in a String of Significant Criminal Financial Misconduct That Has Taken Place at JPM During Dimon's Tenure

By February 2016 – years before the DPA was announced – JPM's investors were highly attuned to the Company's criminal exposure under Dimon's tenure because the DOJ had levied several felony charges against JPM. ¶¶57-58. Among other things (¶¶59-60, 74-75), in January 2014 the Company entered into a deferred prosecution agreement with the DOJ to resolve two felony charges in connection with JPM's relationship with Bernard L. Madoff Investment Securities (the "Madoff DPA"). ¶61. The Madoff DPA required JPM to implement significant remedial changes to its compliance program by January 2014 and pay a $1.7 billion criminal penalty. ¶¶61-62. A few months later, in April 2014, Dimon issued his annual letter to shareholders (the "2014 Letter") and

- 5 -

admitted that resolving the Madoff DOJ investigation was "[t]he most painful, difficult and nerve-wracking experience that I have ever dealt with professionally[.]" ¶¶64-65.  No RICO conspiracy charges were made in connection with the Madoff DPA.  ¶63.

Shortly thereafter, in May 2015, JPM pleaded guilty to a felony charge of conspiring to manipulate the foreign currency exchange spot market and agreed to pay a criminal fine of $550 million and serve a three-year term of corporate probation (the "FX Plea Agreement").  ¶66.  The JPM traders whose conduct led to the FX Plea Agreement were described as "The Cartel" or "The Mafia," but no RICO conspiracy charges were levied against these traders.  ¶¶67, 73.

The criminal probation required by the FX Plea Agreement, which was in effect from January 2017 to January 2020 – *i.e.*, the majority of the Class Period – forced JPM to take numerous steps by 2015 to enhance its compliance function, including: (i) measures to enhance detection and deterrence of trader misconduct; (ii) monitoring systems designed to enhance the detection and deterrence of manipulative trading; and (iii) enhanced supervision of trading desks.  ¶¶69-72.  In other words, before the Class Period, the FX Plea Agreement required JPM to implement the very practices and procedures that could easily uncover the Desk's criminal spoofing conspiracy.  *Id.*  In addition, the FX Plea Agreement obligated JPM during the Class Period to report all securities or commodities fraud by any JPM employees that was known to any "supervisors within the bank[,]" (¶68), which includes Nowak.  ¶37.  JPM failed to do so.  ¶¶215, 288.

C.    **The Executive Defendants Oversaw JPM's Expenditure of Billions of Dollars to Bolster the Company's Compliance Function Before the Class Period**

Dimon carefully explained to investors before the Class Period the steps JPM had taken in response to the Madoff DPA and the FX Plea Agreement to ensure that no future criminal conduct occurred at JPM.  Specifically, in the 2014 Letter, Dimon detailed JPM's significant compliance upgrades, including: (i) hiring 13,000 employees in regulatory and compliance functions;

- 6 -

(ii) spending over $600 million on technology to support JPM's regulatory and compliance functions; and (iii) building "a state-of-the art control room in our corporate headquarters to provide streamlined data analysis and reporting capabilities of control and operational risk data across the firm[.]" ¶¶83, 193, 214, 216.

Likewise, the April 8, 2015 letter issued by Dimon to JPM's shareholders explained that the Company had further "strengthened compliance" by: (i) adding "approximately 8,000 people across the firm with a mission to strengthen our compliance capabilities[,]" bringing the total number of additional compliance employees to at least 21,000; and (ii) centralizing JPM's risk functions to "improve the consistency of controls[,]" giving the compliance function "huge amounts of additional authority . . . at our corporate headquarters." ¶¶85-86.

And Dimon's April 6, 2016 letter issued to shareholders stated that JPM's compliance upgrades in 2014 and 2015 had led to the creation of a "permanent Oversight & Control Group" that "is charged with enhancing the firm's control environment by looking within and across the lines of business and corporate functions to identify and remediate control[,]" which allowed JPM "to detect control problems more quickly" and "escalate issues promptly[.]" ¶87.

Lake, who served as JPM's Chief Financial Officer at the time of the Madoff DPA and FX Plea Agreement (¶36), was primarily responsible at JPM for implementing the significant compliance reforms instituted by the start of the Class Period. ¶88. Specifically, Lake oversaw "improving and solidifying our Global Finance organization to help the Firm navigate the changing financial/regulatory landscape more effectively; enhancing our overall risk and control governance; [and] improving relationships with our regulators, particularly with regards to reporting[.]" *Id.* Indeed, Lake has publicly acknowledged that JPM spent over $35 ***billion*** in legal and compliance

costs from 2010 to 2015. ¶89. Thus, like Dimon, Lake was substantially involved in JPM's compliance efforts before and during the Class Period.

**D.     JPM Admits to Its Criminal Spoofing Conspiracy a Year After the DOJ Levies Unprecedented RICO Charges Against Nowak and Smith**

Spoofing was a core business practice of the Desk, effectively forming a criminal racketeering operation within JPM in violation of RICO. ¶139. Spoofing is defined by the Commodity Exchange Act as "bidding or offering with the intent to cancel the bid or offer before execution" and was outlawed in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act. ¶79. Each instance of spoofing carries a sentence of up to ten years in prison. ¶80. Spoofing requires proof of "some degree of intent, or scienter, beyond recklessness" and "reckless trading, practices, or conduct will not constitute a 'spoofing' violation." ¶81.

To "spoof," (i) a trader places a genuine order for a precious metals futures contract; (ii) the trader then quickly places spoofed orders (*i.e.*, fake orders they do not intend to execute) on the opposite side of the market from the genuine order; (iii) the market price moves in response to the spoofed orders, allowing the genuine order to be filled; and (iv) the trader quickly cancels the spoofed orders before they could be filled. ¶125.

Futures contracts are financial instruments that allow investors to hedge the price movement of precious metals to prevent losses from unfavorable price changes. ¶101. Investment banks trade in physical commodities by buying and selling futures contracts. *Id.* In other words, futures contracts are used by investment banks to value precious metals based on the present observable prices and data for that commodity. *Id.* With each spoof, Defendants undermined the fundamental purpose of futures contracts because spoofing amounts to misrepresenting JPM's genuine belief of the value of the precious metal being artificially manipulated. ¶¶115, 124.

- 8 -

JPM admitted in the DPA that, through the Desk, it intentionally orchestrated a criminal spoofing scheme through August 2016. ¶121. Nowak, the former supervisor of the Desk – which generated $250 million in annual profits for JPM (¶91) – was the ringleader of the scheme. ¶92. Numerous other traders on the Desk, including Smith, Trunz, and Edmonds, were key participants. ¶¶93-98.[3] According to JPM, so was Turnbull, the former Global Head of Precious Metals Trading on the Desk, who has sued JPM – ***not*** the Bank or any other JPM subsidiary (Def. Ex. 14 at 1) – for allegedly wrongfully terminating him for spoofing. ¶99.

According to the SOF, the Desk executed tens of thousands of illegal spoofed trades from March 2008 until August 2016. ¶131. During this time, Smith executed approximately 38,000 spoofed trades, or approximately 20 spoofs per day through August 2016. ¶140. Likewise, Nowak executed approximately 3,600 spoofed trades, or approximately at least one spoof per day through August 2016. ¶141. As part of his plea agreement, Trunz also admitted to making thousands of spoofed trades through August 2016, and, as an example, provided the details of a spoof from during the Class Period, on June 22, 2016. ¶131.

The Desk had two related motivations for the criminal spoofing scheme. First, according to the SOF, the Desk's misconduct was done with "the intent, at least in part, to benefit the Company" (¶289) by "generat[ing] trading profits and avoid[ing] losses for themselves . . . and ultimately, [JPM]." ¶127. Second, the Desk engaged in spoofing to compete with "algos" – traders utilizing algorithmic trading programs to process market information and place orders at extraordinary speeds. ¶¶111-114. At bottom, spoofing gave JPM an edge over the algos and enabled the Desk to continue generating hundreds of millions in annual profits for JPM, even in the digital age. ¶115.

---

[3]    Trunz and Edmonds have pleaded guilty to spoofing while employed by JPM and admit that the Desk was engaged in a criminal spoofing scheme. ¶¶259-261, 266-270.

Although JPM and Trunz have admitted to the existence of the criminal spoofing conspiracy at the Company from 2008 until August 2016, Nowak and Smith have chosen to fight the numerous spoofing-related felonies made against them, which the DOJ outlines in the November 14, 2019 superseding indictment (the "SI"). The SI features RICO conspiracy charges against Nowak and Smith. ¶133. The inclusion of RICO charges demonstrates the unusually severe and extreme nature of their fraudulent misconduct because the DOJ selectively uses RICO, and such charges must first be reviewed and approved by the DOJ's Organized Crime and Gang Section before being filed. ¶¶135-136. Indeed, RICO charges against financial professionals is virtually unheard of – federal prosecutors have not filed RICO charges against Wall Street traders since the mid-1980s. ¶¶134, 213. That the DOJ is treating Nowak and Smith like the mafia bosses typically charged with RICO speaks volumes about the extent, scope, and severity of JPM's misconduct. ¶¶134, 137, 139.

E.    **Before the DPA, the Desk Was Constantly and Credibly Accused of Spoofing by the Government and Investors for Over a Decade**

Before the DPA – meaning before and during the Class Period – the Desk faced a steady stream of credible allegations from the government and investors of spoofing misconduct.

First, in 2008 the CFTC began an investigation into spoofing in the silver futures market by JPM (the "2008 CFTC Investigation"). ¶¶145-148. Nowak was interviewed as part of the 2008 CFTC Investigation and denied spoofing when questioned in August 2010 by the CFTC's investigators. ¶¶149-150. The DOJ has confirmed that the 2008 CFTC Investigation centered on the spoofing misconduct described in the DPA. ¶151. But unlike JPM, which had spent billions of dollars and hired tens of thousands of employees to monitor the Company for misconduct, the CFTC lacked the necessary resources and in September 2013 was forced to close the 2008 CFTC Investigation without recommending any charges. ¶¶152-154. The CFTC's former enforcement director (and current partner of JPM's long-standing attorneys, including those in this litigation

- 10 -

(¶297)) has explained that the inconclusive result of this investigation was due to the CFTC lacking the necessary computer storage space and analytical tools to detect JPM's spoofing misconduct. ¶¶154-155, 296. Long after JPM had made the significant compliance upgrades required by the Madoff DPA and the FX Plea Agreement, the CFTC ultimately obtained adequate technology. ¶155. It then took *just two individuals* – a prosecutor and an investigator – to quickly uncover JPM's criminal spoofing conspiracy in 2018. ¶194.

Next, a putative class action was filed in 2011 against JPM by retail investors alleging that the Desk was spoofing silver futures contracts in 2007 and 2008 (the "Silver Litigation"). ¶¶157-159. Although the Silver Litigation was dismissed because the plaintiffs could not prove JPM's intent to engage in spoofing (¶160), JPM acknowledged in the Silver Litigation that the Company had produced over 720,000 pages of documents during the 2008 CFTC Investigation. ¶161.

Then, in early 2015, a precious metals trader sued JPM for spoofing silver futures contracts in 2010 and 2011, causing the trader to lose at least $25 million (the "*Shak* Litigation"). ¶162. During the Class Period, the *Shak* Litigation engaged in extensive fact and expert discovery. ¶¶163-165. Among other things, in the *Shak* Litigation: (i) JPM made substantial document productions on behalf of each Trader Defendant (¶166); (ii) Nowak was deposed in October 2017 as JPM's Federal Rule of Civil Procedure ("Rule") 30(b)(6) representative and as a fact witness (¶167); and (iii) Nowak was designated as a non-retained expert witness by JPM in 2018. ¶¶168-169. As a result, just two years before the DPA, the *Shak* Litigation provided JPM with significant and direct access to many of the very documents and individuals who formed the core of the Desk's spoofing scheme. ¶¶163-172. The *Shak* Litigation was ongoing when Nowak and Smith were indicted, prompting the DOJ to file a letter to alert Judge Engelmayer that one of the electronic chat exchanges in the SI included an explicit reference to spoofing silver futures contracts to specifically

harm the plaintiff in the *Shak* Litigation. ¶173. In August 2020, the *Shak* Litigation settled on confidential terms. ¶174.

In addition, the CME investigated Smith for spoofing in October 2013. ¶175. During that investigation, Smith lied when denying to CME's investigators that he engaged in spoofing for those trades. ¶¶175-178. Nonetheless, in July 2017, the CME concluded that Smith spoofed the gold futures markets in July and August 2013 and ordered him to pay a $95,000 fine and serve a ten business day suspension. ¶¶180-181. According to Turnbull, JPM paid Smith's fine to the CME and knew by 2014 that the CME was investigating Smith for spoofing. ¶¶182-184. According to the CME's website, during Dimon's tenure only two other JPM traders received sanctions from CME, neither of which was suspended or fined more than $10,000. ¶¶185-189.

Finally, according to the SOF, one of the unnamed traders in the DPA was terminated by JPM in June 2014 following an inquiry into his trading activity. ¶190. This indicates that by June 2014, JPM had the ability to review the underlying orders and electronic messages of traders on the Desk – precisely the capabilities that the DOJ and CFTC lacked until during the Class Period. ¶191.

**F.   The Desk Openly Discussed Spoofing in the Electronic Chats Monitored By Thousands of JPM Compliance Personnel Hired Before the Class Period**

The Desk was brazen in conducting its criminal spoofing conspiracy, with traders openly discussing their illegal scheme by explicitly using the word "spoof" in the electronic chats that JPM spent billions and hired thousands to monitor. ¶¶192-196, 201. Indeed, according to Turnbull, JPM was actively surveilling the Desk's electronic chats to monitor for misconduct before and during the Class Period. ¶¶197-198. Turnbull further alleges that JPM "knew about" the "trading data and chat transcripts" for one of the traders on the Desk. ¶199. In fact, Turnbull alleges that excerpts of this trader's electronic chats were used in training documents as an example of potential spoofing. ¶200.

Further, Turnbull alleges that by 2016, JPM had investigated at least three traders on the Desk for spoofing. ¶204. First, Turnbull alleges that an unnamed trader in London was investigated for spoofing in 2014 – the same year an unnamed trader from the SOF was terminated. ¶¶190, 205. Second, Turnbull alleges that in 2014 he informed his manager of his belief that Smith was engaging in spoofing. ¶206. In response, Turnbull's manager stated that JPM had vetted Smith's trading methods and approved them for continued use. ¶207. The CME investigation did not change JPM's view, as Turnbull alleges that his manager assured him in 2014, after learning of the CME investigation, that JPM still supported Smith's trading practices. ¶208. Third, Turnbull alleges that JPM investigated Trunz for spoofing in 2016 and concluded that his trading conduct did not meet company standards, resulting in a verbal warning. ¶¶209-210. Turnbull alleges that JPM thereafter used Trunz's order sequences in employee training materials as examples of how not to trade precious metals futures contracts. ¶211.

At bottom, Turnbull alleges that JPM undoubtedly knew about the Desk's criminal spoofing conspiracy by 2016 because it "was the most culpable entity in the alleged conspiracy," had been "defending, and in some cases, sanctioning and profiting from trading conduct that would later be alleged to be unlawful and manipulative[,]" and has "sought to reframe the narrative as though the [Desk] operated in their allegedly manipulative manner without JPMorgan's knowledge." ¶212.

Further, according to the SOF, another JPM trading desk – the U.S. Treasuries desk – was also engaged in a criminal spoofing conspiracy. ¶217. Like the Desk's illegal scheme, traders on the U.S. Treasuries desk also repeatedly used the word "spoof" when discussing its fraudulent scheme in JPM electronic chats. ¶218. The supervisor of the U.S. Treasuries desk – who, like Nowak, was named in the SOF as the ringleader of the spoofing misconduct (*id.*) – was fired by JPM

- 13 -

in January 2016 for violating JPM's compliance policies. ¶219. According to the government, JPM's U.S. Treasuries spoofing scheme ceased when this former supervisor was fired. *Id.*

### G.  Defendants' Fraud Was Revealed Through a Series of Disclosures

During 2019 and 2020, a series of events disclosed the existence and extent of Defendants' fraud to investors. First, on February 26, 2019, JPM disclosed in its 2018 Form 10-K that it was cooperating with government investigations into trading practices in the precious metals markets. ¶306; Def. Ex. 6 at 280. Next, on August 20, 2019, news reports announced that the criminal investigation was focused on the Desk, involved spoofing misconduct that lasted until August 2016, and that Trunz had pleaded guilty and was cooperating with the investigation. ¶308. Then, on September 16, 2019, the DOJ announced the indictment of Nowak and Smith for engaging in alleged criminal racketeering activity in violation of RICO by spoofing at JPM. ¶310.[4] Finally, on September 23, 2020, *Bloomberg* reported that JPM was close to paying almost $1 billion in criminal penalties to settle with the DOJ to resolve criminal spoofing charges, a record criminal penalty for spoofing. ¶312. Each of these disclosures led to declines in JPM's stock price (¶¶307, 309, 311, 313), which collectively erased over $15 billion of JPM's market capitalization. ¶26.

Two earlier disclosures are irrelevant to loss causation. First, on November 6, 2018, the DOJ announced that Edmonds had pleaded guilty to two felonies for spoofing from 2009 through 2015 while employed on the Desk at JPM (the "Edmonds Plea"). ¶¶259-61. The Edmonds Plea does not disclose that JPM was cooperating in any broader investigation into spoofing, that the Desk engaged in criminal racketeering activity in violation of RICO, or that JPM would pay a nearly billion dollar, record spoofing penalty to resolve the Desk's criminal spoofing conspiracy. *See* Def. Ex. 9. One

---

[4]     While Defendants correctly note that the original indictment of Smith and Nowak is dated August 22, 2019 (Def. Mem. at 11; Def. Ex. 24), they concede that this information first became publicly known through news reports on September 16, 2019. Def. Mem. at 35.

- 14 -

day later, on November 7, 2018, a putative class action was filed by precious metals futures contract traders against JPM on November 7, 2018 (the "2018 Class Action"). The 2018 Class Action mentions only Edmonds by name and does not disclose the information revealed by the 2019 and 2020 loss causing events alleged in the SAC. Def. Ex. 10 at 1.[5]

## III.   ARGUMENT

### A.   The Standards Applicable to Defendants' Motion

On a Rule 12(b)(6) motion, "the Court's task is 'necessarily a limited one.'" *Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 476 (E.D.N.Y. 2001). "'[Courts] must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally.'" *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must "accept all factual allegations in the complaint as true" on Rule 12(b)(6) motions). "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (alterations in original).

To state a Section 10(b) claim, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted

---

[5]   Shortly after the 2018 Class Action was filed, the DOJ obtained a stay of it in light of the upcoming criminal trial for Nowak and Smith. Pl. Ex. 1 at 7. After being sealed for more than two years, on July 12, 2021, the parties in the 2018 Class Action announced that they had reached a binding settlement term sheet. Pl. Ex. 2. As here, the 2018 Class Action sued only JPM – not the Bank or any other subsidiary (Def. Ex. 10 at 1) – and this fact did not deter JPM from entering into a settlement of the 2018 Class Action solely on behalf of JPM. Pl. Ex. 2.

with the required state of mind [*i.e.*, scienter]." 15 U.S.C. §78u-4(b)(2)(A).  However, "this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

## B.      Certain of the Extrinsic Materials Submitted by Defendants Must Be Stricken

Ignoring that "[a] court normally may not look beyond the four corners of the complaint in considering a motion to dismiss," *Mayo v. Fed. Gov't*, 558 Fed. App'x 55, 56 (2d Cir. 2014), Defendants improperly submit numerous documents to repeatedly make factual arguments that contravene the SAC's allegations.  *See* Def. Exs. 11-13, 16-20, 22 (the "Disputed Exhibits").[6] Neither of the two narrow exceptions to the general rule – incorporation by reference and judicial notice – permit consideration of the Disputed Exhibits at this stage.  *See Roth*, 489 F.3d at 509.

"Limited quotation from or reference to documents . . . is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  Instead, "[t]o be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 354 (S.D.N.Y. 2015).  The Davidoff Decl. acknowledges that the Disputed Exhibits are not cited or referenced ***at all*** in the SAC.  *Compare* the descriptions of Def. Exs. 1-9 *with* those for Def. Exs. 11-13, 16-20, 22.  Thus, the Disputed Exhibits cannot be considered because they are "neither attached to the complaint nor appear[] to be incorporated by reference." *Manavazian*, 160 F. Supp. 2d at 482;

---

[6]      Def. Ex. 11 is an advisory notice from the CME.  Def. Ex. 12 is the CME's 2016 Form 10-K. Def. Ex. 13 is the CME Globex Reference Guide.  Def. Exs. 16-20 and 22 are news articles.

*see also PetroChina*, 120 F. Supp. 3d at 354 n.14 (finding that the incorporation by reference exception does not extend to news articles that were not referenced in the complaint).[7]

Judicial notice is also inappropriate because it only allows the Court "'to determine **what** statements [the Disputed Exhibits] contained' . . . '*not for the truth of the matters asserted*'" therein. *Roth*, 489 F.3d at 509 (emphasis added by *Roth* court). Importantly, that means the Disputed Exhibits cannot be submitted to contravene the facts alleged in the SAC. *See id.* at 511 (finding that the district court "improperly considered" the truth of SEC filings because "they raised issues of fact that should not have been determined at the pleading stage").

Here, the Disputed Exhibits are not submitted to demonstrate the fact of their existence, but instead are used by Defendants to interject disputed factual issues. Specifically, Defendants rely on Def. Exs. 11-13 to establish that trading precious metals futures contracts is purportedly "anonymous," which forms the premise of their argument for why the spoofing misstatements made by JPM and the Trader Defendants should be dismissed. Def. Mem. at 2, 5, 6, 9 n.7, 36-37, 39. But the SAC does not allege that, nor does it appear in the: (i) DPA and SOF; (ii) Edmonds Plea; (iii) CFTC Order; (iv) SI; (iv) Turnbull complaint; or (v) the 2018 Class Action complaint. *See* Def. Exs. 1-2, 8-10, 14. Moreover, Defendants' argument that "spoof orders are anonymous and therefore are not attributable to JPM" (Def. Mem. at 6) fails to explain how precious metals investors were able to discern that JPM traders (as opposed to other traders) were spoofing. *Id.* Thus, Defendants cannot rely on judicial notice to use Def. Exs. 11-13 to make their factual argument. *See Chechele v. Scheetz*, 466 F. App'x 39, 40-41 (2d Cir. 2012) (sustaining district court's refusal to consider SEC filings not incorporated into the complaint for their truth); *see also SEC v. Fiore*, 416

---

7       The main authority cited by Defendants as support for submitting the Disputed Exhibits, *Slayton v. American Express Co.*, 604 F.3d 758, 763 (2d Cir. 2010) (Def. Mem. at 7 n.3), only considered a news article on a Rule 12(b)(6) motion because "the plaintiffs attached [it] to their [complaint.]"

F. Supp. 3d 306, 328-29 (S.D.N.Y. 2019) (refusing to judicially notice a Form 10-K because "Defendants ask the Court to consider the truth of the SEC filings' contents and hold as a matter of law that the statements made therein establish that Eat at Joe's was primarily involved in the business of 'creating American Diner themed restaurants, not investing.'").

Likewise, Def. Exs. 16-20 and 22 are news articles that Defendants submit to prove that the specific information contained in the four loss-causing disclosures alleged in the SAC was publicly disclosed by November 2018. *See* Def. Mem. at 32-36. Using these articles to establish facts precludes judicial notice. *See, e.g.*, *Tomasino v. Estee Lauder Cos., Inc.*, 2015 U.S. Dist. LEXIS 38918, at *15-*16 (E.D.N.Y. Mar. 26, 2015) (declining to judicially notice articles because doing so "could only create a point of factual dispute that is not properly decided on a motion to dismiss"); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 634 (S.D.N.Y. 2008) (rejecting a defendant's reliance on judicial notice to establish factual matters through extraneous documents).

## C.      Defendants' False and Misleading Statements and Omissions

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). Specifically, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Although securities fraud actions are subject to the heightened pleading requirements of the PSLRA and Rule 9(b), the Second Circuit "do[es] not require the pleading of detailed evidentiary matter[,]" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply facts sufficient "to support a reasonable belief" that Defendants' statements were materially false or misleading. *Novak*, 216 F.3d at 314 n.1.

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan &*

*Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Thus, Defendants had "'a duty to be both accurate and complete'" in their Class Period statements. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.").

An omission is actionable under Section 10(b) if it is "material." *Manavazian*, 160 F. Supp. 2d at 478. Omissions are material if there is a "substantial likelihood" that their disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives*, 563 U.S. at 38. "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

### 1. The Materially False and Misleading Statements and Omissions Made By JPM and the Executive Defendants

#### a. The Forms 10-K Misstatements

As detailed in the SAC, two sets of statements in the 2015 to 2019 Forms 10-K are false and misleading because of the criminal spoofing conspiracy by the Desk – misconduct that JPM has admitted to and agreed it will not contest. *See* ¶¶232, 234, 238, 242, 246, 250, 283-84.

First, the 2015 Form 10-K discussed JPM's use of futures contracts to manage risk exposure to physical commodities, which JPM defines to include precious metals (¶230), by stating, in pertinent part, that, "[c]ommodity derivatives are frequently used to manage the Firm's risk exposure to its physical commodities inventories." ¶232.[8] This statement was materially false and misleading

---

[8] The 2015 Form 10-K defines "Firm" as solely comprising JPM. Pl. Ex. 3 at 1. Thus, when JPM's Forms 10-K discuss using futures contracts to manage precious metals risk, the 2015 Form 10-K acknowledges that the Desk was acting on behalf of JPM, not the Bank.

when made because JPM's criminal spoofing conspiracy meant the Desk was using derivatives (*i.e.*, futures contracts) to manipulate the precious metals futures market to deceive, and profit from, other market participants, not to manage JPM's risk exposure to its precious metals inventories.  ¶233. Similarly false statements are routinely found to be actionable under Section 10(b).  *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 182-84 (S.D.N.Y. 2010) (finding statement that company had "zero" subprime loans was actionable because such loans constituted a substantial portion of its portfolio); *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 85-86 (S.D.N.Y. 2017) (statements that there was no toxic waste in a river were false because independent testing confirmed the presence of toxic waste).

Recognizing the obvious falsity of this statement, Defendants' only argument in response is that it is *per se* inactionable because it comes from "the first sentence of a footnote[.]"  Def. Mem. at 16.  Defendants fail to cite any case law holding that a footnote from a Form 10-K, signed by a company's executives, cannot form the basis of a Section 10(b) claim.  *Id.*  Instead, Defendants cite cases dismissing statements of puffery – boilerplate aspirational statements that are not meant to be taken literally – that find factual misstatements like the one in ¶232 to be actionable.  *See Schiro v. Cemex*, 396 F. Supp. 3d 283, 297 n.4 (S.D.N.Y. 2019) (recognizing that "statements attributing the low cost of raw materials to 'market prices,' foreign exchange rates, and other factors were misleading in light of the company's failure to disclose a bribery scheme that fixed materials' price at a low rate") (citing *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758-59 (S.D.N.Y. 2017)); *see also Reiner v. Teladoc Health, Inc.*, 2020 WL 7028638, at \*4 (S.D.N.Y. Nov. 30, 2020) (finding that a statement is not puffery if it "can be demonstrably proven true or false.").

Moreover, courts in this Circuit have found far more informal statements than those in ¶232 to be actionable under the securities laws.  *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v.*

- 20 -

*Barclays PLC*, 750 F.3d 227, 230-31 (2d Cir. 2014) (finding LIBOR submissions made by an investment bank to *Thomson Reuters* to be actionable misstatements); *Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515, 539-40 (S.D.N.Y. 2020) (finding defendant CEO's statement at "an industry event hosted by *Variety*" actionable).

Second, the 2015 through 2019 Forms 10-K discussed JPM's methodology for determining the value of physical commodities, stating, in pertinent part, that, "[p]hysical commodities," which include precious metals, were "[v]alued using observable market prices or data." ¶¶234, 238, 242, 246, 250. These statements were materially false and misleading when made because the Desk was not valuing precious metals using observable market prices or data, but instead was purposely misrepresenting JPM's genuine belief of their value to generate illicit profits. ¶¶235, 239, 243, 247, 251. These misstatements are actionable. *See DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 444 (S.D.N.Y. 2018) (finding statements that a company procured competitive bids due to its engineering capabilities were actionable because the company actually won this business through illegal bribes); *see also In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *6-*7 (S.D.N.Y. Sept. 19, 2017) (holding that a company's statement that its growth in a certain market was due to legitimate means was false because the business generated in that market was due to illegal bribes).

Defendants advance two arguments in response, each of which is without merit. Def. Mem. at 17-18. First, Defendants argue that the challenged statements do not relate to precious metals futures contracts because they only mention "physical commodities." Def. Mem. at 17. This ignores that the 2015 to 2019 Forms 10-K state that "[i]n the physical commodity markets, [JPM] primarily purchases and sells precious and base metals" (¶230) – meaning that precious metals are encompassed by JPM's usage of the term "physical commodities." Furthermore, futures contracts

- 21 -

are the financial mechanism JPM used to value precious metals (¶101), meaning the statements in ¶¶234, 238, 242, 246 and 250 necessarily implicate precious metals futures contracts.

Second, Defendants argue that a statement about how JPM valued precious metals is too "generalized" to be actionable.  Def. Mem. at 17-18.  Essentially, Defendants again advance a puffery argument, ignoring that such statements typically relate to reputation, integrity, and compliance with ethical norms – types of statements that Defendants concede are not challenged in the SAC.  The challenged statements directly speak about JPM's valuation of (*i.e.*, use of futures contracts to value) precious metals (¶¶230, 234), meaning they are precisely the type of specific, factual statements that court routinely find actionable.  *See supra* 20; *see also In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (statements were actionable for not disclosing that the company's success was due to a fraud scheme); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) ("Even if Televisa was not otherwise obligated to disclose that it or its subsidiary participated in bribing FIFA officials, speaking about the issue imposed a duty to do so.").

### b.      The Forms 10-K Omissions

In addition to the aforementioned misstatements from the 2015 to 2019 Forms 10-K (¶¶232, 234, 238, 242, 246, 250), which are false and misleading but also gave rise to a duty to disclose JPM's criminal spoofing scheme, the 2015 to 2019 Forms 10-K include an additional statement that is also an actionable omission: "[i]n the physical commodity markets, the Firm primarily purchases and sells precious and base metals and may hold other commodities inventories under financing and other arrangements with clients." ¶¶230, 236, 240, 244, 248.  By speaking about JPM's activities in the precious metals markets, Defendants were obligated to disclose – but did not – that the Desk was illegally manipulating those markets through spoofing.  ¶¶231, 237, 241, 245, 249.  Thus, when Defendants spoke about specific aspects of the physical commodity markets, or about the mitigation of risk through the use of commodity derivatives, they were duty-bound to disclose the Desk's

- 22 -

criminal spoofing conspiracy. *See In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *10 (E.D.N.Y. Apr. 22, 2020) (finding that the statement "as we have continued to scale our business, grow our direct supplier relationships, and introduce increased automation into our fulfillment centers, we have become more cost efficient" was an actionable omission because "[o]nce Blue Apron spoke on the topic of fulfillment center automation 'there is a duty to tell the whole truth.'"); *see also In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (statements about sources of revenue required disclosure of illicit trading practices).

In response, Defendants argue that "[d]isclosure is not a rite of confession," and that they were not required to disclose uncharged criminal conduct. Def. Mem. at 15. But courts routinely find that "the failure to disclose uncharged criminal conduct may be actionable where the failure to do so would make other disclosures materially misleading." *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *4 (S.D.N.Y. Sept. 24, 2018); *see also Braskem*, 246 F. Supp. 3d at 752 (collecting cases); *see supra* 20-21. Courts in other Circuits similarly agree. *See, e.g.*, *Singer v. Reali*, 883 F.3d 425, 441, 449 (4th Cir. 2018) ("the duty to disclose may extend to uncharged and unadjudicated illegal conduct"); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708-09 (E.D. Mich. 2010) ("a duty to disclose uncharged illegal conduct will arise 'when disclosure is necessary to prevent another statement from misleading the public.'").

Defendants then argue that even if they had a disclosure obligation, there can be no liability because the statements that JPM "purchases and sells precious and base metals" are "undeniably true." Def. Mem. at 16. It is well settled law within this Circuit, however, that a technically correct material statement can be actionably misleading. *See Operating Local 949 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (reversing dismissal, and stating, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to

- 23 -

accurately inform rather than mislead prospective buyers"); *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 401 (S.D.N.Y. 2005) (finding that a technically correct description of an event was incomplete and therefore materially misleading).

So even if it is true that JPM "primarily purchases and sells base metals and may hold other commodities inventories under financing," (Def. Mem. at 15), and even if "commodity derivatives are frequently used to manage risk exposure to physical commodities," (*id.* at 17), those statements are still rendered false and misleading by Defendants' failure to disclose the Desk's criminal spoofing conspiracy. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (finding statements actionable because "even if literally true" they were "misleading by what they failed to mention").[9] Indeed, the main authority Defendants cite – *Schiro* (Def. Mem. at 16) – found an actionable omission where, as here, ostensibly innocuous statements were rendered misleading by failing to disclose illegal conduct. 396 F. Supp. 3d at 296.

### c. The Challenged Statements and Omissions Are Material

Although they conspicuously avoid explaining how JPM's criminal spoofing conspiracy would not be material to investors following the Madoff DPA and the FX Plea Agreement, Defendants nonetheless contest materiality. Def. Mem. at 14-18.

But Defendants do not squarely address, for example, that by the start of the Class Period, in order to remediate the numerous criminal penalties paid by JPM under Dimon's tenure (¶¶59-75), JPM had hired at least 21,000 new compliance employees and, according to Lake, spent billions of

---

[9]    In contending that the 2018 Form 10-K and 2019 Form 10-K cannot be actionable (Def. Mem. at 16 n.8), Defendants misunderstand that the 2018 Form 10-K contained only a partial corrective disclosure (¶¶304-314), meaning that it was not until the final partial corrective disclosure that investors understood the full extent of the falsity for the statements in these Forms 10-K.

dollars in compliance upgrades.  ¶¶82-89.  It is undoubtedly material to investors that JPM was so publicly hyper-focused on curtailing illicit acts, but was, in fact, not doing so in private.

The facts surrounding the spoofing investigations further establish materiality.  *See generally* ¶¶144-192.  Indeed, the 2008 CFTC Investigation publicly probed JPM's market manipulation of the silver market.  ¶¶145-155.  This investigation led to the filing of the Silver Litigation and the *Shak* Litigation.  ¶¶156-174.  The CME fined and suspended Smith.  ¶¶175-191.  Moreover, the investigations by the DOJ and CFTC that led to the SOF in September 2020, and the SI in November 2019, had been ongoing for multiple years, *i.e.*, before and during the Class Period.  ¶216.

Materiality is also established by the severity of the indictments and punishment issued to JPM and the Trader Defendants.  Specifically, the RICO charges against Nowak and Smith are the first instances of the DOJ leveling racketeering charges against Wall Street traders in decades. ¶¶133-137.  Further, JPM was required to pay $920.2 million—the largest amount of monetary relief ever imposed by the CFTC—including the highest restitution ($311,737,008), disgorgement ($172,034,790), and civil monetary penalty ($436,431,811) amounts in any spoofing case.  ¶290.

Defendants fail to explain how these circumstances do not support materiality.

### 2.    JPM's Item 303 Omissions

Item 303 of Regulation S-K, 17 C.F.R. §229.303, requires disclosure "where a trend, demand, commitment, event or uncertainty is both presently known to ***management*** and reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016); *see also* ¶¶252-255.

In the 2015 to 2019 Forms 10-K, JPM[10] violated Item 303 by failing to disclose that, through Nowak – a member of JPM's management by virtue of his position as the supervisor of the Desk

---

[10]    Plaintiffs inadvertently included Item 303 claims against the Executive Defendants in the SAC.

(¶¶68, 169) – the Company knew since at least March 2008 that the Desk was facilitating a criminal spoofing conspiracy to deceive, and profit from, other market participants that exposed the Company to significant criminal liability. ¶¶256-258. The failure to disclose these uncertainties under Item 303 is actionable. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (Item 303 liability attached when "Plaintiffs allege that the downward trend in the real estate market was already known and existing at the time" of the SEC filing); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir. 2011) (concluding that "cost overruns" for a condominium project constituted an "existing trend, event or uncertainty under Item 303").

Defendants principally oppose Item 303 liability for JPM by arguing that the SAC does not allege the "actual knowledge" of the Executive Defendants. Def. Mem. at 19-20. This argument ignores, however, that JPM, through Nowak, possessed actual knowledge of the Desk's criminal spoofing conspiracy since March 2008. *Id.* In *SAIC*, the Second Circuit held that even if a company's executives are not alleged to have violated Item 303, the company can nonetheless be liable for an Item 303 violation if management has actual knowledge of the omitted information. 818 F.3d at 95-96. JPM's failure to address Nowak's knowledge for Item 303 purposes is unsurprising – the Company admitted in the *Shak* Litigation that Nowak was the supervisor of the Desk and had "various managerial duties associated with his position" (¶169) and that he was the ringleader of the Desk's criminal spoofing conspiracy. ¶123.

Next, Defendants argue that the Desk's criminal spoofing misconduct is not the type of information that Item 303 requires companies to disclose. Def. Mem. at 19-20 (citing *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016)). Again, Defendants overlook *SAIC*, which centered on a massive overbilling fraud by a mid-level manager for one contract out of SAIC's more than 10,000 ongoing contracts and resulted in SAIC having to reimburse New York

- 26 -

City over $500 million.  818 F.3d at 89-90, 96.  In finding this fraud was an uncertainty that had to be disclosed under Item 303, the Second Circuit explained that *Lions Gate* was inapplicable because it involved "a run-of-the-mill civil enforcement investigation by the SEC[,]" not "serious, ongoing criminal and civil investigations that exposed [SAIC] to potential criminal and civil liability and that ultimately did result in criminal charges and substantial liability."  *Id.* at 95 n.8.  Defendants cannot seriously compare the lone SEC investigation and $7.5 million civil penalty in *Lions Gate* (165 F. Supp. 3d at 5) to the decades-long government investigations into the Desk's spoofing misconduct and record-breaking near-billion dollar criminal penalty, RICO charges against Nowak and Smith, and JPM's acknowledgment of criminal culpability, which are akin to the fraud in *SAIC*.

Finally, Defendants argue that the disclosures of the government investigations in the 2018 and 2019 Forms 10-K mean that JPM satisfied Item 303 in these filings.  Def. Mem. at 20-21.  This misrepresents the nature of Plaintiffs' Item 303 claim, which does not allege a failure to disclose government investigations, but the uncertainty caused by the criminal liability stemming from the Desk's criminal spoofing conspiracy.  ¶¶256-258.  Although Item 303 requires the disclosure of this information, this did not occur until the final loss causing event alleged in the SAC.  ¶312.

### 3.    The Materially False and Misleading Statements Made By JPM and the Trader Defendants

From February 23, 2016 until August 2016, the Trader Defendants made numerous spoofed buy or sell orders to deceive, and allow JPM to profit from, other market participants by misrepresenting JPM's genuine belief about the value of precious metals.  ¶¶131, 140-141, 223-226.  Each spoofed buy or sell order was a materially false and misleading statement by the Trader Defendants and JPM that was made with the intent to illegally, materially, and artificially benefit JPM's profits from trading on precious metals futures contracts.  ¶227.

- 27 -

In the DPA, JPM admitted that the "facts described in the [SOF] are true and accurate" (¶283) and that JPM is "responsible for the acts of [its] officers, directors, employees, and agents as set forth [in the SOF]." ¶284. Indeed, the DPA precludes JPM from contradicting in any future litigation – including this one – any of the facts recited in the SOF. ¶287. According to the SOF, "from at least March 2008 until August 2016" the Desk "engaged in a scheme to defraud in connection with the purchase and sales of precious metal futures contracts[.]" ¶123. The Desk "knowingly and intentionally placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution . . . including in an attempt to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts." ¶124. This conduct took place "[i]n tens of thousands of trading sequences" between March 2008 and August 2016 (*id.*), and "[i]n executing the scheme defraud" the Trader Defendants "were acting . . . as agents of [JPM], and with the intent, at least in part, to benefit the Company." ¶128. All of this quoted language comes from the SOF. *See* Def. Ex. A at ¶¶6, 18-20, 25, 29, 34.

Thus, through JPM's admissions in the SOF, the SAC sufficiently alleges the falsity of the Trader Defendants' Class Period spoofed buy and sell orders. *See Carpenters*, 750 F.3d at 230-31, 235 (citing the statement of facts from a DOJ settlement to sustain the complaint's allegations that Barclays submitted false LIBOR rates, which was done to "preserve and/or enhance Barclays's reputation from what it believed were negative and unfair media and market perceptions" but had the collateral effect of "present[ing] a misleading picture of Barclays' financial condition and artificially inflated Barclays's share price."); *see also* Pl. Ex. 4 (explaining that the SEC charged Elon Musk with securities fraud for false and misleading tweets because the securities laws "appl[y] with equal force when the communications are made via social media or another non-traditional form.").

- 28 -

Notwithstanding JPM's admissions in the SOF, each Defendant challenges the falsity of these misstatements by advancing an inappropriate fact argument that cannot be resolved on a Rule 12(b)(6) motion. Def. Mem. at 36-39; Nowak & Smith Mem. at 1-2; Trunz Mem. at 1, 4-5. Specifically, Defendants cite Def. Exs. 11-13 in arguing that these misstatements are not actionable because trading in precious metals futures contracts is purportedly "anonymous." *Id.*[11] As explained above, however, those documents cannot properly be considered on Defendants' motions. *See supra* 15-17. At best, Defendants' singular reliance on a purely factual argument that is outside the SAC raises a factual dispute that cannot be resolved at this juncture. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013) ("Insofar as these contentions appear to take issue with Lead Plaintiffs' allegations, they serve merely to confirm that material factual disputes exist that cannot be resolved on a motion to dismiss.").

Next, JPM argues that "Plaintiffs fail to allege with specificity which orders they claim were fraudulent" (Def. Mem. at 38-39) even though Trunz admits that, at the very least, "the SAC pleads only one set of Mr. Trunz's spoofs with particularity: the spoofs of June 22, 2016, that Mr. Trunz admitted on the record." Trunz Mem. at 3. Setting aside that Trunz's concession satisfies Defendants' particularity concerns, Defendants overlook that the SOF alleges spoofed trades by all three Trader Defendants through August 2016. ¶¶131, 140-141, 267. This necessarily means that each Trader Defendant spoofed in August 2016, or else the end date of the misconduct detailed in the SOF would have been set earlier. *Id.* Further, this argument ignores that more information regarding the timing of the spoofed trades by Nowak and Smith will likely be revealed in their forthcoming criminal trial. ¶279. It is disingenuous for JPM and Trunz to admit that the Trader

---

[11] In making this argument, Trunz cites ¶¶104-105 (Trunz Mem. at 1), but nothing in these paragraphs – or in any other paragraph in the SAC – alleges that precious metals futures contract trading is anonymous.

Defendants spoofed until August 2016, but then to criticize Plaintiffs for not particularizing each spoofed trade after February 2016 merely because it was impractical for the DOJ to list each of the over 50,000 spoofed trades in the SOF.

Similarly, Defendants' argument that the spoofing misstatements are immaterial misses the mark. Def. Mem. at 37-38. As explained above, the Desk's criminal spoofing conspiracy was material to investors. *See supra* 24. While Defendants correctly explain that spoofed trades are only public for a few seconds (Def. Mem. at 38), their brief existence did not lessen JPM's ability to profit off of them (¶290), nor did they prevent Nowak and Smith from being charged with RICO violations for making them (¶¶271-274), Trunz from pleading guilty to felonies for making them (¶266-268), or JPM from paying a record criminal fine for making them. ¶¶282, 290. That more than sufficiently demonstrates materiality for purposes of Defendants' motions. *See SAIC*, 818 F.3d at 96 (finding materiality adequately alleged for a pervasive fraudulent scheme even though it involved "a single contract out of SAIC's more than 10,000 ongoing contracts and that it was worth a fraction of SAIC's yearly revenues"); *see also Carpenters*, 750 F.3d at 235 (declining to find that allegedly false LIBOR submissions were immaterial because "given the fact-specific nature of the question raised here, it would be inappropriate to dismiss upon a Rule 12(b)(6) motion").

Even less convincing is Defendants' argument that Plaintiffs have failed to adequately allege reliance for the spoofing misstatements. Def. Mem. at 39-40. In so doing, Defendants exclusively cite cases discussing whether a statement sufficiently alleges reliance in the context of a motion for class certification. *Id.* Class certification – not a motion to dismiss – is the correct avenue to resolve Defendants' misplaced concerns about reliance. *See In re Ravisent Techs., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 13255, at *46 n.26 (E.D. Pa. July 12, 2004) ("Defenses to reliance raised by defendants are not considered in a [Rule] 12(b)(6) analysis."); *see also Carpenters Pension Tr. Fund*

*of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94 (S.D.N.Y. 2015) (holding that plaintiffs were entitled to a presumption of reliance for allegedly false LIBOR submissions).

Finally, JPM argues in a footnote that it is not a "maker" of the spoofing misstatements on the inaccurate premise that the Trader Defendants did not act on behalf of the Company, but were instead acting on behalf of the Bank. Def. Mem. at 37 n.17. This argument contravenes JPM's admissions in the SOF, and the findings of the CFTC Order, that the Trader Defendants were agents of JPM and that the Company is liable for their misconduct. *See supra* 27. It also ignores that Turnbull's complaint, the 2018 Class Action complaint, and JPM's 2015 Form 10-K unequivocally indicate that JPM – not the Bank or any of its other subsidiaries – was responsible for the Desk's trading in precious metals futures contracts. *See supra* 9, 13, 14 n.5; *infra* 33-34, 43-44. Under these facts, JPM is undoubtedly a "maker" of the spoofing misstatements. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558-59 (S.D.N.Y. 2014) (finding that Barclays PLC, Barclays PLC's chief executive officer, and a Barclays PLC subsidiary were all makers of the allegedly false LIBOR submissions that were made by "Barclays Bank . . . the entity on the LIBOR panel[.]"); *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) (finding that *Janus* is silent on the issue of whether agents of the same entity can jointly be makers of a statement on a primary liability theory).

### 4. JPM and the Trader Defendants Are Liable for Scheme Liability for the Desk's Spoofing

JPM and the Trader Defendants should also be held liable on the basis of "scheme liability" for their spoofing. ¶315. Subsections (a) and (c) of Rule 10b–5 make it "unlawful for any person, directly or indirectly . . . (a) to employ any device, scheme, or artifice to defraud, . . . or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. §240.10b-5(a) and

- 31 -

(c).  The effect is to impose primary liability on any person who substantially participates in a manipulative or deceptive scheme intended to mislead investors, even if that person does not directly "speak" to investors.  Scheme liability is based on "an inherently deceptive act that is distinct from an alleged misstatement."  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).  "To state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'"  *Menaldi v. Och–Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016).  Defendants do not address the SAC's scheme liability allegations.

The SAC adequately alleges scheme liability by recounting, in detail, how each of the Trader Defendants carried out a criminal spoofing scheme that manipulated the markets for precious metals.  *See, e.g.,* ¶¶37, 92, 115, 131, 133, 138-39, 141, 232.  As JPM has admitted, Nowak was the ringleader, and along with Smith and Trunz, engaged in thousands of illegal spoofed trades.  ¶¶129-130.  Trunz has admitted his scienter and JPM has admitted the scienter of Nowak and Smith.  *See infra* 33-42.  And the SAC establishes Plaintiffs' reliance on the deceptive acts by JPM and the Trader Defendants by alleging that their spoofing scheme resulted in materially changing the Company's risk profile.  ¶232.  Their scheme made it "necessary or inevitable" that falsehoods by JPM about its precious metals strategy would result.  *Electrobras*, 245 F. Supp. 3d at 472 (finding scheme liability adequately alleged because the company "do[es] not appear to dispute that Cardeal [a member of management] allegedly committed a deceptive or manipulative act in furtherance of an alleged scheme to defraud"); *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008) (permitting a Section 10(b) conduct claim where a member of management committed deceptive acts in connection with a major litigation settlement and failed to correct his company's material misstatements about the nature of the settlement).

### D. Defendants' False Statements and Omissions Were Made with Scienter

In assessing scienter, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "[T]he 'tie . . . goes to the plaintiff'" in assessing whether scienter is adequately alleged. *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).

"[T]he absence of a motive allegation is not fatal," as scienter may be independently based on conscious disregard or recklessness. *Tellabs*, 551 U.S. at 325. Allegations: of "defendants' knowledge of facts"; of "access to information contradicting their public statements"; that Defendants "failed to check information they had a duty to monitor"; *or* that Defendants "ignored obvious signs of fraud," sufficiently allege scienter. *Novak*, 216 F.3d at 308, 311.

#### 1. The SAC Adequately Alleges Scienter for the Trader Defendants

In the SOF, JPM has admitted that the Trader Defendants "engaged in a scheme to defraud" whereby they "knowingly and intentionally" engaged in spoofing "to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts." ¶¶123-124. By placing spoofed orders, the Trader Defendants "intended to inject false and misleading information about the genuine supply and demand for precious metals futures contracts into the markets" in order "to generate trading profits and avoid losses for themselves . . . and ultimately, [JPM]." ¶¶126-127.

- 33 -

In facilitating their criminal spoofing conspiracy, the Trader Defendants "were acting . . . as agents of [JPM], and with the intent, at least in part, to benefit [JPM]. ¶128.

Moreover, Trunz has pleaded guilty to one felony count of conspiracy to engage in spoofing and one felony count of spoofing. ¶266. Because spoofing "requires a market participant to act with some degree of intent, or scienter, beyond recklessness" (¶81), Trunz's guilty plea is an admission of actual knowledge. The admissions by JPM and Trunz more than sufficiently allege scienter for the Trader Defendants. *See In re Marsh & McLennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 482 (S.D.N.Y. 2006) (allegations that a vice president was "aware of [misleading] practices" "are more than adequate to raise an inference of conscious misbehavior or recklessness"); *see also Van Dongen*, 951 F. Supp. 2d at 473 ("find[ing] a strong inference of scienter" where plaintiffs "adequately alleged that defendants were aware of information that contradicted their statements"). Any argument to the contrary directly conflicts with JPM's admissions in the SOF.

Nonetheless, the Company argues that the SAC does not adequately allege scienter for the Trader Defendants. Def. Mem. at 40. The Trader Defendants – including Trunz, who has pleaded guilty to spoofing – join this argument. Trunz Mem. at 5; Nowak & Smith Mem. at 1-2. But the decisions cited by JPM and the Trader Defendants all relate to alleged frauds directed at completely separate corporate entities. Def. Mem. at 40 (citing *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (finding scienter allegations to be implausible because JPM was alleged to have helped "conceal Enron's financial quandary," which only harmed Enron's shareholders); *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 338-39 & n.12 (S.D.N.Y. 2000) (holding that scienter was not shown by an alleged intent to deceive a contractual counterparty to a merger because the unique circumstances of corporate mergers makes it "difficult to parse through actions motivated by legitimate fiduciary obligations and actions motivated by fraudulent

- 34 -

intent[.]")).  Here, by contrast, JPM has admitted that the Trader Defendants sought to benefit JPM, which necessarily encompasses the Company's shareholders.  JPM and the Trader Defendants' attempt to avoid scienter while admitting it to the DOJ should be rejected.

### 2.     The SAC Adequately Alleges Scienter for the Executive Defendants

The SAC is replete with allegations that demonstrate the Executive Defendants either recklessly disregarded the Desk's criminal spoofing conspiracy or had the access and capability to uncover this illicit scheme, either of which establish scienter.  *See Novak*, 216 F.3d at 308, 311.

As an initial matter, Defendants implicitly acknowledge that the Executive Defendants have scienter starting on November 6, 2018, due to the announcement of the Edmonds Plea.  Def. Mem. at 23 ("There is no allegation that either Executive Defendant . . . learned of any widespread misconduct prior to November 2018, when the Edmonds Plea was made public.").  That makes sense, as JPM's internal access to Edmonds' electronic chats and its disclosure on February 26, 2019 acknowledging that JPM was cooperating in the investigation (¶306; Def. Ex. 6 at 280) necessarily means the Executive Defendants were apprised by at least November 2018 of the Desk's illegal scheme.  *See Scholastic Corp.*, 252 F.3d at 77 (recklessness found when defendants "issued no warnings or corrections" after seeing increasing returns and then waited "several months . . . before a special pre-tax charge was taken"); *see also Novak*, 216 F.3d at 308 (recklessness adequately alleged when executives plainly had the requisite "access to information" to uncover the alleged fraud).

In any event, the SAC adequately alleges the Executive Defendants' scienter for the entire Class Period.  Following the Madoff DPA and the FX Plea Agreement (¶¶57-73), the Executive Defendants oversaw the addition of over 21,000 compliance employees and spent billions of dollars in making compliance upgrades by April 2015.  ¶193.  As Dimon told investors, this effort led to "a state-of-the-art control room in our corporate headquarters to provide . . . reporting capabilities of

- 35 -

control and operational risk data across [JPM]" and the creation of the "permanent Oversight & Control Group" to "identify and remediate control issues." ¶¶83-87, 193, 214, 216. Lake was primarily responsible at JPM for overseeing these significant compliance reforms. ¶¶88-89. By virtue of the criminal probation period required by the FX Plea Agreement, both Dimon and Lake were obligated from January 2017 to January 2020 to monitor JPM for any misconduct known to supervisors, such as Nowak. ¶215. According to the DPA, JPM failed to do this. ¶¶215-216. Even worse, the Desk's illegal scheme was easy to detect – it took just two government employees to uncover it. ¶194. Thus, the scope and extent of this illicit scheme – Smith alone made an average of 20 spoofed trades per day from May 2008 to August 2016 (¶140) – demonstrates recklessness. ¶195; *see In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 & n.174 (S.D.N.Y. 2007) (finding that the "number, size, timing, nature, frequency, and context of the [misconduct at issue]" supports scienter); *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (finding scienter when management took "a number of actions" "that indicate awareness of CDO risk," which "support a strong inference that [company] officials were at least reckless . . . .").

Moreover, during the Executive Defendants' tenure, the Desk was repeatedly and credibly accused of illegal spoofing by the government and investors. ¶192. In the 2008 CFTC Investigation, the CFTC explained that it knew JPM was engaged in market manipulation (¶148), but simply lacked the proper technology at the time – which JPM had by the start of the Class Period – to prove it. ¶¶153-155. Likewise, the Silver Litigation and *Shak* Litigation challenged JPM's practices in the silver futures market for constituting illegal spoofing. ¶¶157-174. During the Class Period, JPM made substantial document productions on behalf of each of the Trader Defendants, Edmonds, and Turnbull in fact discovery in the *Shak* Litigation. ¶166. Likewise, JPM elected Nowak to serve as the Company's Rule 30(b)(6) deponent and as a non-retained expert witness.

¶¶167-169.  In addition, the CME investigated Smith and suspended him in July 2017 – the only time that the CME has levied such a sanction against a JPM trader during Dimon's tenure – and, according to Turnbull, JPM paid his fine.  ¶¶175-189.  And one of the unnamed spoofing traders from the Desk was fired in June 2014 following "an inquiry into his trading activity."  ¶¶190-191.  Assessed together, as *Tellabs* requires, these circumstances demonstrate that the Executive Defendants recklessly disregarded the Desk's criminal spoofing conspiracy.  *See Christine Asia Co. Ltd. v. Yun Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (finding scienter when it was "virtually inconceivable" that executives were not given information about key areas of risk); *see also Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) (holding that multiple government investigations into the subject of the alleged fraud show scienter).

Indeed, even a cursory review of the Desk's electronic chats would have revealed the existence of the criminal spoofing scheme, as JPM's traders explicitly used the word "spoof" in these chats – the exact conversations the FX Plea Agreement required JPM to monitor by the start of the Class Period.  ¶¶192-196, 201.  So did the U.S. Treasuries Desk traders at JPM, who also perpetrated a criminal spoofing scheme.  ¶¶217-220.  That two unrelated illegal spoofing schemes operated simultaneously at JPM and each used the word "spoof" in the electronic chats that the Executive Defendants were obligated to monitor demonstrates recklessness.  *See Novak*, 216 F.3d at 311 (recklessness includes "fail[ing] to check information they had a duty to monitor").

According to Turnbull, not only was JPM actively monitoring these electronic chats for misconduct before and during the Class Period (¶¶197-198), Turnbull alleges that JPM "knew about" the "trading data and chat transcripts" for one of the traders named in the SI and used that trader's chats in training documents as examples of potential spoofing.  ¶¶197-200.  Further, Turnbull alleges that by 2016 JPM had investigated at least three traders on the Desk for spoofing, including Trunz,

Smith, and an unnamed trader in London. ¶¶204-211. Indeed, in 2014 Turnbull reported to his manager that he believed Smith was spoofing, but was told that JPM had vetted and approved Smith's trading method and approved them for continued use (¶¶206-207) – the very trading methods that form the core of the SOF. ¶123. In fact, Turnbull alleges that management knew about the CME investigation into Smith, but nonetheless continued to support Smith's trading practices. ¶208. And Turnbull alleges that Trunz was given a verbal warning in 2016 for spoofing and was thereafter used as an example in employee training materials for how not to trade precious metals futures contracts. ¶¶209-211. At bottom, Turnbull, who was employed on the Desk with the Trader Defendants and Edmonds before and during the Class Period, alleges that JPM defended and knew about the spoofing misconduct detailed in the DPA. ¶212. Turnbull's allegations demonstrate that the Executive Defendants recklessly disregarded the Desk's illegal scheme. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) ("In employing a holistic analysis, surely an inference of knowledge may be appropriate . . . where it would be 'absurd to suggest that management was without knowledge of the matter.'").

Moreover, that the DOJ has indicted Nowak and Smith for criminal RICO charges demonstrates the unusual severity and pervasiveness of the Desk's criminal spoofing conspiracy. ¶213. Indeed, the DOJ did not level RICO charges for the fraud that led to the FX Plea Agreement, even though the Company participated in a scheme called "The Cartel" and "The Mafia." (*id.*), and has not made such charges against Wall Street traders since the mid-1980s. ¶134. This further demonstrates the Executive Defendants' recklessness. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 272, 280 (3d Cir. 2009) (finding scienter based on the "picture painted by the . . . allegations," explaining that "it is the composite picture, not the isolated components, that judges must evaluate[.]").

Defendants respond to the well-pled allegations of recklessness scienter against the Executive Defendants by raising a host of insufficient arguments that contravene *Tellabs*. Def. Mem. at 21-32.

First, the Executive Defendants make much of the lack of motive allegations in the SAC (Def. Mem. at 22), ignoring that motive is not required. *Lexmark*, 367 F. Supp. 3d at 38-39 (rejecting argument that recklessness allegations were implausible because no motive was alleged).

Next, citing to answers provided by Nowak and Smith to CFTC and CME investigators in 2010 and 2013, respectively, the Executive Defendants argue they could not have recklessly disregarded the Desk's illegal scheme because the "materials cited in the SAC confirm that the traders actively concealed their conduct from both the government and JPM." Def. Mem. at 3, 22 (citing ¶¶149-150, 177). Not true. Among other things, the findings in the CFTC Order demonstrate that by 2016 JPM had received "numerous red flags, including internal surveillance alerts, inquiries from CME and the [CFTC], and internal allegations of misconduct from a JPM trader" regarding the Desk's criminal spoofing conspiracy. ¶¶202-203. Further, Turnbull alleges that by 2014 JPM had approved Smith's trading, and paid his fine when the CME suspended Smith in 2017 for spoofing. ¶¶184, 207. Likewise, Turnbull alleges that Trunz was verbally warned for spoofing in 2016 and that Trunz's trades were used as spoofing examples in training materials. ¶¶210-211. These allegations hardly demonstrate that the Desk concealed their scheme from the Executive Defendants.

The Executive Defendants next argue that the SAC merely alleges scienter based on their respective positions. Def. Mem. at 23-24. But, as explained above, the SAC does much more than that by alleging JPM's recent criminal history,[12] the obligations of the Executive Defendants under

_____

[12]    Defendants misapprehend the SAC in arguing that Dimon's involvement in the Madoff DPA and FX Plea Agreement do not support scienter. Def. Mem. at 24. The allegations concerning JPM's recent criminal history are necessary to understand why the Executive Defendants made significant compliance changes and expenditures and were obligated to monitor JPM for criminal

the FX Plea Agreement and criminal corporate probation to prevent further instances of criminal misconduct, the Executive Defendants' personal roles in overseeing the compliance upgrades required by these circumstances, the ease with which JPM's enhanced compliance capabilities should have uncovered the Desk's illegal spoofing scheme before the Class Period, and Turnbull's allegations that JPM's compliance function knew about spoofing by Smith and Trunz by the start of the Class Period.  *See supra* 3-13; *see also City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 136 (S.D.N.Y. 2020) (finding recklessness even though the complaint did not specifically reference any internal reports, any confidential witnesses, or any meetings attended by the individual defendants because the fraud involved admitted misconduct).

Turning to Lake, while Defendants concede that Lake was primarily responsible for implementing JPM's compliance reforms before and during JPM's criminal corporate probation, they argue that these allegations cannot demonstrate scienter because the DPA states that the Desk's misconduct mostly occurred before the FX Plea Agreement.  Def. Mem. at 24-26.  But the DPA was merely recognizing that May 2015 (when the FX Plea Agreement was reached) to August 2016 was a small portion of the larger March 2008 to August 2016 time frame where the Desk's misconduct occurred.  Def. Ex. 1 at 8.  The CFTC Order, which Defendants avoid mentioning, explains why this is no exoneration of the Executive Defendants, unequivocally finding that the 2014 surveillance system had "the ability to effectively identify spoofing conduct[.]"  ¶¶202-203.  And Turnbull alleges that JPM's compliance function was doing just that from 2014 to 2016 and had uncovered spoofing by Smith and Trunz.  ¶¶204-212.  In other words, Lake had the ability (and obligation) to easily discern the Desk's spoofing scheme before and during the Class Period.  Nothing in the DPA states otherwise – to the contrary, the DPA states that JPM was not receiving any disclosure credit

activity during the Class Period, not because those prior criminal acts, in and of themselves, demonstrate scienter for the Desk's illegal spoofing scheme.

"because it did not voluntarily and timely disclose to the [DOJ] the conduct described in the [SOF]," a conclusion that could only be reached if JPM knew about this misconduct all along. ¶288.[13]

Defendants then attempt to discredit Turnbull's allegations by labeling them "self-serving" and Turnbull as "disgruntled." Def. Mem. at 26-28. Those pejorative descriptions do nothing to undermine Plaintiffs' reliance on Turnbull's allegations, which serve essentially the same function as confidential witness allegations that are routinely relied upon in finding recklessness for senior executives. *See In re Pall Corp.*, 2009 U.S. Dist. LEXIS 88240, at *18-*23 (E.D.N.Y. Sept. 21, 2009) ("The Confidential Informants' information, if true, would support an inference that the Defendants knew or had access to information showing that the company was engaging in improper cash and tax practices[.]"); *see also Lockheed*, 875 F. Supp. 2d at 371-72 (finding scienter adequately alleged against CEO and CFO based on confidential witness statements even though none of the witnesses interacted with these executives).[14]

Further, in contravention of *Tellabs*, Defendants isolate the scienter inferences provided by the 2008 CFTC Investigation,[15] the Silver Litigation, the *Shak* Litigation,[16] the CME suspension of

---

[13]     Lake also misstates the SAC by arguing that Plaintiffs do not identify "any specific reports or compliance alerts that Lake . . . ignored[.]" Def. Mem. at 25. Citing the SOF, the SAC recites specific electronic chats using the word "spoof" and allege that JPM's compliance function was actively monitoring these chats. These allegations render the cases Defendants cite for this argument inapposite. *Id.* at 25-26.

[14]     To the extent that Defendants are arguing it is improper for Plaintiffs to rely on Turnbull's allegations, that argument has repeatedly been rejected by courts in the Second Circuit, which permit securities fraud plaintiffs to rely on untested allegations from other lawsuits at the pleadings stage. *See, e.g.*, *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 621-22 (S.D.N.Y. 2014).

[15]     Defendants' attempt to use the inconclusive result of the 2008 CFTC Investigation to argue against scienter (Def. Mem. at 29) – ignoring that the CFTC's former enforcement chair, and current partner of Defendants' attorneys, has explained that this result only occurred because the CFTC lacked the necessary technology, not because the Desk was innocent (¶¶154-155, 297) – should be rejected. *See U.S. v. Mahaffy*, 693 F.3d 113, 126 n.9 (2d Cir. 2012) ("[A] judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted.").

Smith, and the June 2014 termination of an unnamed trader. Def. Mem. at 28-32. As an initial matter, Defendants principally rely on a decision finding no scienter for American outside audit committee directors to a Chinese company (Def. Mem. at 29) – hardly comparable to the Executive Defendants. *See In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *8 (S.D.N.Y. Aug. 12, 2014) ("merely alleging that a defendant had access to and should have reviewed documents containing red flags was 'not sufficient to plead the recklessness necessary to give rise to a strong inference of *auditor* scienter'"). In any event, Defendants overlook that the totality of these investigations and lawsuits, which spanned from 2008 until the end of the Class Period, collectively placed the Executive Defendants on notice of the Desk's criminal spoofing conspiracy. ¶144. Defendants' citation to *Schiro* exposes the flaw in their argument because in that case the subject of the lawsuit "pertained to property rights under Colombian law" and was unrelated to "the alleged bribery scheme." 396 F. Supp. 3d at 306. Here, by contrast, the DOJ has specifically linked together all the investigations and lawsuits as a continuous effort by the government and investors to uncover the Desk's criminal spoofing conspiracy. ¶¶151, 173.

Finally, the Executive Defendants fail to offer any concrete opposing inference of scienter other than to weakly suggest that they were mere victims of the Desk's fraudulent scheme. *See* Def. Mem. at 21-32. But this relies on too narrow a reading of the SAC and fails, as *Tellabs* instructs, to take a collective view of Plaintiffs' scienter allegations. *See Lea v. TAL Educ. Grp.*, 837 Fed. App'x 20, 24-25 (2d Cir. 2020) (reversing the district court's dismissal on scienter grounds because "scienter allegations 'need not be irrefutable' or 'even the most plausible of competing inferences' to

---

16    Defendants incorrectly argue that the *Shak* Litigation did not involve spoofing (Def. Mem. at 30 n.14) – the DOJ filed a letter in the *Shak* Litigation after Nowak and Smith were indicted to alert Judge Engelmayer that the SI recounted an electronic chat that specifically discussed spoofing the *Shak* Litigation plaintiff. ¶173. That communication was no doubt reviewed and produced by JPM as part of the 2008 CFTC Investigation and in the *Shak* Litigation. ¶¶161, 166.

- 42 -

survive a motion to dismiss[.]"). At best, the Executive Defendants' opposing inference of scienter is no more plausible than Plaintiffs', which warrants a finding in Plaintiffs' favor. *See Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 216 (2d Cir. 2020).

### 3.    The SAC Adequately Alleges Corporate Scienter for JPM

The scienter of the Executive Defendants and the Trader Defendants is imputed to JPM. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant"); *see also Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (same).   Recognizing as much, Defendants do not dispute that the scienter of the Executive Defendants or Trader Defendants can be imputed to JPM for the alleged misstatements and omissions respectively made by these defendants. *See* Def. Mem. at 21-32, 40.

Should the Court find that scienter for the Executive Defendants in making the 2015 to 2019 Forms 10-K misstatements and omissions has not been adequately alleged, however, Plaintiffs nonetheless still allege JPM's scienter through the Trader Defendants. *See Dynex*, 531 F.3d at 195-96 (finding that plaintiffs may "raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant"). "There is no formulaic method or seniority prerequisite . . . scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009). "The individual making an alleged misstatement and the one with scienter do not have to be one and the same." *Id.* at 516. Thus, the Trader Defendants' scienter – which JPM has conceded in the SOF (¶¶123-128) – is imputed to JPM for these misstatements and omissions.

At the very least, the scienter of Nowak, the supervisor of the Desk who was the ringleader of the criminal spoofing conspiracy and who JPM admits was an agent of the Company (¶¶37, 92, 128, 169), supports a finding of corporate scienter against JPM for the 2015 to 2019 Forms 10-K

- 43 -

misstatements and omissions. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 281 n.10 (S.D.N.Y. 2012) ("the scienter reflected in Goldman's Mortgage Department Head's statements can be attributed to Goldman"); *see also Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (imputing knowledge of "assistant vice president" to company); *Citigroup*, 753 F. Supp. 2d at 237 (finding corporate scienter based upon the knowledge of "a Citigroup credit strategist").

Even as government regulators were actively investigating the Desk for market manipulation in the precious metals markets (¶¶145-151), JPM held out Nowak as the Company's most knowledgeable source of information about the Desk's trading strategy and practices. Specifically, in 2017 and 2018, Nowak was deposed as JPM's designated Rule 30(b)(6) witness and as a fact witness and was proffered by the Company as a non-retained expert witness. ¶¶167-169. Indeed, the March 1, 2018 Disclosure of Non-Retained Expert Witness Not Required to Provide Written Report filed in the *Shak* Litigation – **signed by the same attorneys representing JPM here** – describes Nowak as "an employee of JP Morgan Chase & Co." – **not of the Bank**. Pl. Ex. 5 at 2. Thus, Nowak is the only plausible source of JPM's misstatements in the 2015 to 2019 Forms 10-K regarding derivatives for, and valuations of, precious metals. ¶¶167-169.

Nonetheless, JPM argues that Nowak's scienter cannot be imputed to JPM for the 2015 to 2019 Forms 10-K misstatements "because Nowak was not even an employee of JPM (he was employed by [the Bank])[.]" Def. Mem. at 32 n.15. But JPM's admission in the *Shak* Litigation recited above belies this argument. Pl. Ex. 5 at 2.[17] In addition, JPM has acknowledge through the

---

[17]     Further, in moving to dismiss Turnbull's complaint on July 16, 2021, which only sued JPM and not the Bank, JPM did not argue that Turnbull sued the wrong entity and instead described the DPA as comprising "the DOJ's investigation of unlawful trading in precious metals future contracts on the JPMorgan Chase & Co. ("JPMorgan") precious metals desk." Pl. Ex. 6 at 1. The statement by JPM's lawyers in the Turnbull litigation is binding on JPM. *See Schering Corp. v. Pfizer Inc.*,

- 44 -

*Shak* Litigation that Nowak was uniquely situated as the single most knowledgeable JPM supervisor regarding precious metals. ¶¶167-169. Even the lone case Defendants cite acknowledges that this is enough for Nowak's scienter to be imputed to JPM. *See Barrett* v. *PJT Partners Inc.*, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (acknowledging that the scienter of management employees "may be attributable to the company if they had direct involvement in the aspect of the business at issue" but finding no scienter because, unlike Nowak, the employee in question was not a manager).

Nor does JPM offer any explanation for how Nowak's scienter cannot be imputed to the Company given that the SOF explains he was an agent of JPM and led the criminal spoofing conspiracy to benefit JPM. ¶¶123-128. Through Nowak, JPM understood exactly what the Desk was doing: carrying out a criminal spoofing conspiracy and taking on undisclosed legal and regulatory risk to allow JPM to illicitly profit. ¶115. Because Nowak undoubtedly acted with fraudulent intent, and because Nowak was the Company's primary source of information regarding precious metals, Nowak's scienter should be imputed to JPM for the 2015 to 2019 Forms 10-K misstatements and omissions. *See, e.g.*, *UA Local 13 Pension Fund v. Sealed Air Corp.*, 2021 U.S. Dist. LEXIS 102894, at *20-*21 (S.D.N.Y. June 1, 2021) (finding that the scienter of an accountant can be imputed to the company even though the accountant did not make the challenged statements).

### E.    The SAC Adequately Alleges Loss Causation

A plaintiff's burden to plead loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). Unlike falsity and scienter, loss causation is governed by Rule 8, requiring only "'a short and plain statement of the claim showing that the pleader is entitled to relief[.]'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This standard is "not meant to impose a great burden upon a plaintiff," and a securities fraud

189 F.3d 218, 238-39 (2d Cir. 1999) (Sotomayor, J.) (holding that prior statements made by a corporation's agent qualified as party admissions under Federal Rule of Evidence 801(d)(2)).

- 45 -

complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be." *Id.* at 347. If there is a question of whether the "loss was caused by an intervening event . . . the chain of causation . . . is a matter of proof at trial and [should not be] decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

A plaintiff may plead loss causation "*either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters*, 750 F.3d at 232-33 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Vivendi*, 838 F.3d at 262.

As explained more fully below, Plaintiffs allege four loss causing events that qualify as either corrective disclosures or materializations of the risk: (i) February 26, 2019, when JPM informed investors through the 2018 Form 10-K that it was cooperating with government investigations into possible criminal practices in the precious metals markets (¶306); (ii) August 20, 2019, when news reports announced that the criminal investigation was focused on the Desk, involved spoofing misconduct that lasted until August 2016, and that Trunz had pleaded guilty and was cooperating with the investigation (¶308); (iii) September 16, 2019, when news reports revealed the DOJ indicted Nowak and Smith for engaging in alleged criminal racketeering activity in violation of RICO by spoofing at JPM (¶310); and (iv) September 23, 2020, when *Bloomberg* reported that JPM was close to paying almost $1 billion in criminal penalties to the DOJ, a record spoofing penalty. ¶312.

Defendants argue that none of these disclosures can serve as loss causing events because of the Edmonds Plea, which became public on November 6, 2018.  Def. Mem. at 32-36; Def. Ex 9. This factual argument cannot be considered on Defendants' motion.  *See Carpenters*, 750 F.3d at 234-35 ("whether the effects of Barclays's willfully false LIBOR representations dissipated before June 2012 is a question of fact that can be answered only upon a more fully developed record").

Moreover, as Defendants' own description of the Edmonds Plea reveals, it simply memorialized Edmonds' guilty plea (as opposed to any other person or entity) for engaging in spoofing while employed by JPM.  Def. Mem. at 33.  Neither the Edmonds Plea, nor the documents that Defendants have improperly submitted with their motion (Def. Exs. 10, 16-20, 22),[18] disclose that: (i) JPM was cooperating with government investigations into criminal conduct in the precious metals futures market; (ii) any traders on the Desk other than Edmonds were cooperating with the government; (iii) the Desk was the principal focus of the government investigations; (iv) the spoofing misconduct on the Desk amounted to a criminal racketeering conspiracy that warranted RICO charges; or (v) JPM would pay a record, near billion dollar criminal fine to resolve the spoofing misconduct on the Desk.  *Id.*  The news articles merely rehash the contents of the Edmonds Plea (Def. Exs. 16-20, 22) and the barebones complaint filed in the 2018 Class Action contains less than 25 substantive paragraphs, charges only Edmonds by name, and says nothing about RICO charges or JPM's payment of a criminal fine.  *See* Def. Ex. 10.

Even if the Edmonds Plea hints at possible additional culpability beyond Edmonds, the lack of specificity provided therein cannot undermine the subsequent disclosures alleged in the SAC, which revealed new information regarding the scope and magnitude of the Desk's criminal spoofing conspiracy.  *See Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *4 (E.D.N.Y. Mar. 10, 2021)

---

18      *See supra* 15-17.

("the fact that the qui tam action was unsealed a few days before the [short seller report that served as the alleged corrective disclosure] does not defeat the plaintiffs' claims, especially in this procedural posture"); *see also In re Sequans Commc'ns S.A. Sec. Litig.*, 2019 WL 4805072, at *3 (E.D.N.Y. Sept. 30, 2019) (finding loss causation when the company provided the specific financial implications of an inventory return even though the company had earlier disclosed that such a return was imminent, thereby causing its stock price to increase, because "these competing theories raise issues of fact that cannot be resolved on a motion to dismiss").

In other words, because nothing in the Edmonds Plea disclosed to investors the specific information contained in the subsequent loss causing events alleged in the SAC, it is irrelevant to assessing whether the SAC adequately alleges loss causation. *See Carpenters*, 750 F.3d at 234 (finding dismissal was premature where defendants' fact-based loss causation arguments were "inconsistent with the complaint's allegations").

### 1.   The February 26, 2019 Disclosure

On February 26, 2019, the 2018 10-K disclosed to investors that JPM was cooperating with the DOJ and other governmental authorities that were investigating possible criminal trading practices in the precious metals markets. ¶306.  In response, JPM's stock price declined, erasing over $2.6 billion of the Company's market capitalization. ¶307.  This is more than sufficient to allege loss causation. *See, e.g.*, *Bristol Myers*, 586 F. Supp. 2d at 165 ("it is plausible that the announcement of a criminal investigation . . . marked the first in a series of corrective disclosures. . . In essence, the announcement of the investigation was not an isolated event in itself, it was instead the 'tip of the iceberg'— the first in a series of revelations which would ultimately expose the Company's entire fraudulent scheme[.]").

Defendants oppose loss causation for the February 26, 2019 disclosure solely on their mistaken belief that the Edmonds Plea caused "the market [to be] well aware of the DOJ's

investigation into trading practices in precious metals markets." Def. Mem. at 33-34. Even if that were true (and it is not because the Edmonds Plea does not disclose the existence of broader investigation beyond Edmonds (*see supra* 3, 14)),[19] Defendants' argument misses the point because the 2018 Form 10-K discloses that JPM was cooperating with the investigation. Def. Ex. 6 at 280. That new information is not disclosed in the Edmonds Plea, and Defendants do not argue otherwise. Def. Mem. at 33-34; Def. Ex. 9. Indeed, JPM's cooperation was particularly relevant to investors given the Company's prolific recent history of engaging in criminal financial activity. ¶¶57-75. Left with nothing else and citing no authority, Defendants argue that there can be no loss causation because the initial complaint did not allege this event as a corrective disclosure. Def. Mem. at 34. But that pleading was not filed by Plaintiffs – it was an allegation made by a different investor who was not appointed as lead plaintiff (ECF No. 1 at 1) – meaning it has no binding effect upon them.

### 2. The August 20, 2019 Disclosure

On August 20, 2019, news reports disclosed that the DOJ's investigation was focused on the Desk, that Trunz had pleaded guilty to spoofing and was cooperating with the investigation, and that the Desk's spoofing misconduct lasted until August 2016. ¶308. In response, JPM's stock price declined, erasing over $4.4 billion of the Company's market capitalization. ¶309. This adequately pleads loss causation for the August 20, 2019 disclosure. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 290 (S.D.N.Y. 2008) ("It is plausible at [the motion to dismiss] stage . . . to infer that the [second disclosure] conveyed information to the investing public concerning the extent and likelihood of [the alleged scheme] which was not present in the [first disclosure]").

---

19      *Omnicom* – the only authority Defendants rely upon in contesting this disclosure (Def. Mem. at 34) – analyzed loss causation on a summary judgment motion, not a Rule 12(b)(6) motion, meaning its holding is inapposite. 597 F.3d at 509 ("The district court granted summary judgment on the ground that appellant failed to proffer sufficient *evidence* to show loss causation.").

In response, Defendants argue that this disclosure did not include any new information because the Edmonds Plea revealed "a DOJ investigation into the PM Desk." Def. Mem. at 34. Again, this misstates the Edmonds Plea, which did not disclose any active DOJ investigation into the Desk. *See supra* 3, 14. Moreover, Defendants fail to address that the August 20, 2019 announcement revealed a significant escalation of the DOJ's investigation by securing the cooperation of Trunz – who was substantially more senior than Edmonds on the Desk (¶¶94-95) – in the government's pursuit of more expansive liability against JPM. Def. Mem. at 34-35.

Instead, Defendants argue that Trunz's guilty plea and agreement to cooperate amounted merely to materialization of "known risks," notwithstanding the absence of any mention of Trunz in the Edmonds Plea. Def. Mem. at 35. But the lone authority Defendants cite for this proposition demonstrates why this argument fails for the August 20, 2019 disclosure. *Id.* (citing *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336 (S.D.N.Y. 2014)). *Monroe County* found that loss causation was inadequately alleged because the plaintiff only challenged the last in a series of highly similar disclosures about the risk of a company being nationalized, each of which was accompanied by significant stock decline. *Id.* at 357-58. The *Monroe County* plaintiff was forced to plead loss causation in this unusual manner because the earlier disclosures were foreclosed by the applicable statute of limitations. *Id.* at 351-53. Here, Plaintiffs are not constrained by the statute of limitations in pleading loss causation and Defendants ignore that the August 20, 2019 disclosure is one of several (unlike in *Monroe County*) alleged by Plaintiffs as providing new information regarding Defendants' criminal spoofing conspiracy.

### 3.    The September 16, 2019 Disclosure

On September 16, 2019, the DOJ announced RICO charges against key members of the Desk, including its leader Nowak, revealing new information about the virtually unprecedented severity of the criminal spoofing misconduct on the Desk. ¶310. This led to a stock price decline in

- 50 -

JPM common stock that erased over $3.4 billion of the Company's market capitalization (¶311), which adequately alleges loss causation. *See In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *27 (E.D.N.Y. Sept. 27, 2019) (finding that subsequent disclosures concerning a government lawsuit "sufficiently show[ed] that new information was revealed to the market"); *see also Speakes*, 2018 WL 4572987, at *10 (disclosures that revealed the extent of a specific defendant's involvement in the alleged fraud revealed new information to the market sufficient to allege loss causation).

Citing no case law, Defendants argue that the announcement of RICO charges against Nowak and Smith did not amount to new information. Def. Mem. at 35. Not only does Defendants' own description of the Edmonds Plea belie that argument (*see supra* 46), Defendants ignore the SAC's allegations explaining why RICO charges against an investment bank's trading desk was material to investors. ¶¶134-139.[20] Indeed, federal prosecutors have not filed a single RICO charge against a Wall Street trading desk since the mid-1980s. ¶134. These charges are "more typically found in cases against organized crime entities[,]" and represent "the first time that defendants accused of spoofing electronic derivatives markets have been charged with racketeering." ¶137. Nothing in the Edmonds Plea remotely discloses this information.

### 4.    The September 23, 2020 Disclosure

On September 23, 2020, news reports revealed the full extent of JPM's spoofing liability, *i.e.*, that JPM was about to pay a record, near billion dollar settlement to resolve the criminal spoofing conspiracy on the Desk. ¶312. This disclosure caused over $4.6 billion to be erased from JPM's

---

[20]    Moreover, Defendants' argument that the Edmonds Plea discloses that Nowak would be charged with RICO violations is implausible. Def. Mem. at 35. JPM kept Nowak employed as the head of the Desk until his indictment in September 2019 (¶¶37, 265), falsely indicating to the market during that time that Nowak (and, by proxy, JPM) was not implicated by the criminal investigation into the Desk. Indeed, on March 1, 2018, JPM nominated Nowak to serve as a non-retained expert witness in the *Shak* Litigation (¶169) – hardly the type of maneuver that investors would expect JPM to make for a RICO ringleader.

market capitalization (¶313), sufficiently demonstrating loss causation. *See AP-Fonden v. Goldman Sachs Grp., Inc.*, 2021 WL 2659797, at \*17 (S.D.N.Y. June 28, 2021) ("I cannot say as a matter of law that a couple of Goldman's statements that it faces investigations and potential liability from unnamed governments, combined with news reports that allude obliquely to Goldman's alleged bad acts and problems in Malaysia, sufficiently telegraphed Malaysia's eventual criminal prosecution against Goldman with its $2.7 billion in criminal fines.").

Defendants' only response is to argue that Plaintiffs should have alleged "that the settlement had been entered into previously and its announcement was delayed" (Def. Mem. at 35), but they fail to explain how this relates to loss causation or undermines the disclosures in the September 23, 2020 news reports. Again citing *Monroe County* (*id.* at 36), Defendants are essentially arguing that the Edmonds Plea disclosed this information. *Id.* at 36. But as with Defendants' earlier arguments, this ignores that the Edmonds Plea never remotely disclosed it. *See supra* 3, 14.

\*    \*    \*

Finally, again citing no case law, Defendants argue that there can be no loss causation for the spoofing misstatements. Def. Mem. at 40-41. This misunderstands that these spoofed orders artificially inflated JPM's stock price until the extent of the criminal spoofing misconduct was revealed in 2019 and 2020. ¶¶304-314. Indeed, Defendants entirely overlook the Second Circuit's decision in *Carpenters*, which found that it was inappropriate to resolve on a Rule 12(b)(6) motion whether the artificial inflation caused by allegedly false LIBOR submissions dissipated before the corrective disclosures occurred years later. 750 F.3d at 234. *Carpenters* applies with full force to Defendants' premature loss causation arguments concerning the spoofing misstatements, which are also alleged to have artificially inflated JPM's stock price from 2008 until August 2016 and then dissipated through the four 2019 and 2020 loss causing events detailed in the SAC. *Id.* at 234-35.

- 52 -

### F.       The Executive Defendants and Nowak Are Liable as Control Persons

For control person liability under Section 20(a), "'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters*, 750 F.3d at 236.  Allegations of control are not fraud claims and, therefore, are subject only to Rule 8.  *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 543 (S.D.N.Y. 2016).  "Whether a person is a 'controlling person' [under Section 20(a)] is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).

The Executive Defendants oppose Section 20(a) liability on two grounds.  Def. Mem. at 41-42.  First, the Executive Defendants argue that there is no primary liability under Section 10(b).  *Id.* at 41.  Because, as explained above, the SAC adequately alleges primary claims, this argument fails.  Second, the Executive Defendants argue that they were not "culpable participant[s]" in the fraud.  *Id.* at 41-42.  In so doing, the Executive Defendants gloss over the disagreement within the Second Circuit about whether culpable participation must be pled in a manner akin to scienter.  *See CBS*, 433 F. Supp. 3d at 551 ("a split among district courts in this Circuit persists over whether culpable participation must, like scienter, be pled with particularity[.]").  Here, the argument is academic because the SAC adequately alleges scienter for the Executive Defendants.  *See supra* 34-42.  Even if it did not, because the Executive Defendants reviewed JPM's SEC filings (¶300), they are culpable participants because they "knew or should have known that the primary violator, over whom [they] had control, was engaging in fraudulent conduct." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741-42 (S.D.N.Y. 2015).

In separately contesting Section 20(a) liability, Nowak also raises culpable participation and further contends that the SAC fails to allege Nowak was a controlling person of JPM.  *See* Nowak &

- 53 -

Smith Mem. at 2.  But because JPM has admitted that Nowak was the ringleader of the criminal spoofing conspiracy perpetrated by the Desk (¶289), Nowak cannot seriously contest at this juncture that he was a culpable participant.  *See supra* 25-26, 31, 43.

With respect to his control argument, Nowak overlooks that JPM effectively acknowledged in the *Shak* Litigation that he is a controlling person of the Company.[21]  ¶¶167-169.  Specifically, JPM admits that Nowak was responsible for "supervising" the Desk and "managing risk, overseeing implementation of and compliance with JP Morgan policies and procedures, and various managerial duties associated with his position."  *Id.*  That is more than sufficient to adequately allege Nowak's control over JPM because control person liability may be established by showing that the defendant possessed the power to direct or cause the direction of the primary violator's management and policies.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 239, 257 (S.D.N.Y. 2012) (finding accounting personnel to be control persons because they had "the power to direct or cause the direction of the management and polices" of the company); *see also Scottish*, 524 F. Supp. 2d at 401 (control adequately alleged when the person was involved in the allegedly fraudulent decisions).

### G.       Should Defendants' Motions Be Granted, Leave to Amend Is Warranted

If the Court grants any of Defendants' motions – the first dismissal motions made in this litigation – Plaintiffs respectfully request leave to amend their claims.  Fed. R. Civ. P. 15(a)(2); *see also Loreley*, 797 F.3d at 190 ([w]ithout the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

---

[21]       Notably, JPM's motion to dismiss appears to concede that Nowak is a control person of the Company.  *See* Def. Mem. at 41-42.

Allowing Plaintiffs leave to amend would not be futile because the upcoming criminal trial of Nowak and Smith, currently scheduled to commence on October 18, 2021 (¶279), will likely reveal new information supporting Plaintiffs' allegations. In addition, a recent decision by the Employment Tribunals in the United Kingdom regarding Bradley Jones, a cash equities trader fired by JPM in January 2020 for engaging in alleged spoofing on January 6, 2016 (*see* Pl. Ex. 7 at ¶¶1-4) (the "Jones Decision"), also bolsters Plaintiffs' allegations.[22] The Jones Decision made factual findings that JPM's "surveillance systems immediately identified the [January 6,] 2016 Sell Orders as potential market abuse." *Id.* at ¶¶3, 78. This demonstrates that JPM's compliance function was actively monitoring and identifying potential spoofing by the start of the Class Period. In addition, the Jones Decision found that Jones' alleged spoofing was quickly brought to the attention of JPM's Co-Head of EMEA Markets Compliance in January 2016, who participated in the disciplinary process. *Id.* at ¶¶79-83. This demonstrates that even minor instances of spoofing – Jones' alleged spoofing comprised just two sell orders (*id.* at ¶2) – were escalated to senior managers within JPM before the Class Period. Accordingly, Plaintiffs would incorporate, at the very least, these facts into any amended complaint. *See Reiner*, 2020 WL 7028638, at *6 (permitting leave to amend because "[t]he Court knows of at least one modification to the complaint that Lead Plaintiffs wish to add[.]").

## IV.    CONCLUSION

For all the above reasons, Defendants' motions to dismiss should be denied in their entirety. Should the Court grant any of Defendants' motions, Plaintiffs respectfully request leave to amend.[23]

---

[22]    The Court may take judicial notice of foreign judicial decisions. *See, e.g., Giaguara S.p.A. v. Amiglio*, 257 F. Supp. 2d 529, 532 n.1 (E.D.N.Y. 2003) (noticing a Canadian court decision).

[23]    Because the briefs submitted with Defendants' motions total 49 pages and they are entitled to reply briefs, Plaintiffs have limited this brief to 55 pages. *See* Rule III.C of the Court's Rules.

DATED:  July 30, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID A. ROSENFELD
MICHAEL G. CAPECI
SARAH E. DELANEY

*/s/ Michael G. Capeci*

MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
drosenfeld@rgrdlaw.com
mcapeci@rgrdlaw.com
sdelaney@rgrdlaw.com

*Lead Counsel for Plaintiffs City of Ann Arbor*
*Employees' Retirement System and Michiana*
*Area Electrical Workers' Pension Fund and the*
*Class*

THE ROSEN LAW FIRM, P.A.
JACOB A. GOLDBERG
LEAH HEIFETZ-LI
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone:  215/600-2817
212/202-3827 (fax)
jgoldberg@rosenlegal.com
lheifetz@rosenlegal.com

*Lead Counsel for Plaintiff Julius Pappas and the*
*Class*

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiff City of Ann*
*Arbor Employees' Retirement System*

- 56 -

URDA PROFESSIONAL CORPORATION
RICHARD B. URDA, JR. (928-71)
205 W. Jefferson Blvd., Suite 210
South Bend, IN 46601
Telephone:  574/234-2161
rurdapc@gmail.com

*Additional Counsel for Plaintiff Michiana Area*
*Electrical Workers' Pension Fund*

## CERTIFICATE OF SERVICE

I, Michael G. Capeci, hereby certify that on July 30, 2021, I authorized a true and correct copy of the foregoing document to be served on defense counsel via electronic mail.

*/s/ Michael G. Capeci*
MICHAEL G. CAPECI