# EXHIBIT 7



# EMPLOYMENT TRIBUNALS

| | |
|---|---|
| **Claimant:** | **Bradley Jones** |
| **Respondent:** | **J P Morgan Securities plc** |
| **Heard at:** | **East London Hearing Centre** |
| **On:** | **13 – 15 April 2021** |
| **Before:** | **Employment Judge S Knight** |

**Representation**

| | |
|---|---|
| Claimant: | Thomas Ogg (11KBW) |
| Respondent: | Simon Devonshire QC (11KBW) |

# JUDGMENT ON LIABILITY

1.    **The Respondent unfairly dismissed the Claimant.**

# REASONS

**Introduction**

*The parties*

1.    The Claimant was employed by the Respondent as a Financial Analyst and Cash Equities Trader. He was deemed to be employed by the Respondent between 19 August 2011 and 31 January 2020. The Respondent is part of JP Morgan Chase & Co, a global financial services firm.

**1** of **33**

### The claims

2.  The Claimant was dismissed for alleged gross misconduct. This related to a series of trades on 6 January 2016. At around 15:00 that day, the Claimant entered and deleted in quick succession two sell orders ("**the 2016 Sell Orders**") for shares in Logitech International ("**LOGN**").

3.  The Respondent's surveillance systems immediately identified the 2016 Sell Orders as potential market abuse. On 20 January 2016 the Claimant was interviewed by the Respondent's management about the 2016 Sell Orders. No further action was taken against the Claimant at the time.

4.  However, on 9 December 2019 the Claimant was suspended. He was later invited to a disciplinary meeting in respect of the 2016 Sell Orders. On 31 January 2020 the Claimant was summarily dismissed for alleged gross misconduct, because of the 2016 Sell Orders.

5.  The Claimant now claims for unfair dismissal.

6.  On 9 April 2020 ACAS was notified of the Claimant's claim under the early conciliation procedure. On 23 May 2020 ACAS issued the early conciliation certificate. On 18 June 2020 the ET1 Claim Form was presented in time. On or around 24 August 2020 the ET3 Response Form was sent to the Tribunal.

### The issues

7.  Before the hearing, the parties agreed to a list of issues. It appears at Annex 1 to these Reasons.

## Procedure, documents, and evidence heard

### Procedure

8.  This has been a remote hearing which has been consented to by the parties. The form of remote hearing was "***V: video whether partly (someone physically in a hearing centre) or fully (all remote)***". A face-to-face hearing was not held because it was not practicable due to the COVID-19 pandemic and no-one requested the same.

9.  All participants attended the hearing through Cloud Video Platform.

10.  At the start of the hearing I checked whether any reasonable adjustments were required. Those in attendance confirmed that none were required.

### Documents

11.  I was provided with an agreed Hearing Bundle comprising 608 pages. In addition, the parties both provided helpful written opening submissions.

12.  Witness statements from the Claimant, Benjamin Tappin (a colleague of the Claimant), Charles Bristow (investigating and disciplining officer), Trevor Mullin (a senior member of staff responsible for compliance issues), and Pranav Thakur

(appeal officer) were provided in a separate bundle.

### Evidence

13. At the hearing I heard evidence under affirmation from all of the witnesses. Mr Tappin gave evidence under a witness order dated 13 February 2021. Each of the witnesses who gave oral evidence adopted their witness statements and added to them.

### Closing submissions

14. Both parties made helpful oral closing submissions.

15. After the conclusion of the hearing, I was separately provided with detailed closing submissions by both parties, and reply submissions on the law only by the Respondent.

## Findings of fact

16. In assessing the evidence in this case I have borne in mind submissions made by the parties as to the reliability of individual witnesses. I have also borne in mind their submissions as to the overall approach I should take to assessing credibility and reliability, including by reference to the approach set out by Leggatt J in _Gestmin SGSP SA v Credit Suisse (UK) Ltd_ [2013] EWHC 3560 (Comm) (15 November 2013).

17. The Respondent had initially asked for some of the evidence of Mr Tappin to be excluded on the ground that it was expert evidence. At the hearing Mr Devonshire QC on behalf of the Respondent accepted that the evidence was admissible, but said that limited or no weight ought to be given to it. The evidence related principally to Mr Tappin's commentary on, and interpretation of, the Claimant's activities. Ultimately, in reaching my findings of fact, I have not needed to have regard to this part of Mr Tappin's evidence. However, Mr Tappin's evidence was useful insofar as it shed further light on the background of how the Respondent's business worked.

### The business in which the Respondent operates

18. The Respondent operates in multiple trading markets, including cash equities, foreign exchange, and precious metals. Like in all trading markets, the price of cash equities responds to fluctuations in supply and demand. If there is a preponderance of selling interest in a particular stock, at prices which buyers are willing to pay, then the stock's price will tend to go down (because there is more perceived supply at prices which can lead to trades taking place than there is perceived demand). Conversely, if there is a preponderance of buying interest in a particular stock, at prices which sellers are willing to accept, then the stock's price will tend to go up (because there is more perceived demand at prices which can lead to trades taking place than there is perceived supply).

19. It would be wrong to say that _solely_ because there are more sellers than buyers in respect of a commodity in a market, the price of the commodity will go down. Equally, it would be wrong to say that _solely_ because a larger volume of a

commodity is being offered for sale than the volume that buyers are bidding to purchase, the price of the commodity will go down. Prices have to be acceptable to both sides of the market for trades to be made, and the market to then "move" up or down.

20. The "share price" of a stock represents the price at which the most recent transaction for the share in question was executed. It is not necessarily the price at which a market participant will be able to buy or sell that stock on the market in the future. Lying behind the "share price" is a complex marketplace in which buyers and sellers are interacting as to the price and quantity of the next transaction.

21. The Respondent's business essentially involves buying stocks for the lowest price it can and selling them at the highest price it can, in order to profit from the difference in prices. It does this both for itself, and for its clients.

22. Many cash equities are automatically tracked and traded using computer algorithms (sometimes called "**algos**"), which operate at extremely high speeds. The speeds are measured in fractions of a second known as "microticks". The algorithms read and respond to apparent fluctuations in buying and selling interest in the market. However, there remains the possibility for human traders to use their experience and advanced technology to profit from the market.

23. There are many exchanges on which trading takes place. A stock, such as LOGN, may be traded on many exchanges. However, it will also have a primary exchange. For LOGN, the primary exchange was the Swiss Stock Exchange ("**SWX**"). The prices on each exchange will be the same except for differences lasting fractions of a second. If the prices were different, then high-speed automated trading algorithms would buy stock at the lower price on one exchange, and sell the stock at the higher price on another exchange. What is more likely to differ between exchanges is *liquidity,* i.e. the amount being traded on a particular exchange at a particular time. If an exchange has high liquidity then (depending on the price sought by a market participant) it should be easier for a market participant to complete an order on that exchange than on an exchange with lower liquidity.

24. There are many participants on each side of any market. Participants place a bid (to buy a set amount of stock at a certain price) or an offer (to sell a set amount of stock at a certain price). Bids and offers will "rest" in the market until a trade occurs, or the bid or offer is withdrawn. A trade will occur when a buyer's bid and a seller's offer match. If there are multiple offers (or bids) at the same price resting in a market, the offer (or bid) placed first in time would be transacted first.

25. A trading desk operates many hours of the day, about 250 days per year. The purpose of the trading desk is to pick up individually very small commissions, measured in pennies or cents. However, when executed millions of times per year, the commissions amount to very significant sums.

26. The trading desk trades in two ways. Firstly, it trades on its own account. Secondly, it receives client orders from its sales traders. The sales traders sit close to the trading desk. The sales traders pass client orders to the trading desk.

There is not always an audit trail for the orders being passed from the sales traders to the trading desk. Many of the orders are passed orally or by telephone. Sometimes the orders are passed by electronic means which are recorded.

27.  When the trading desk trades on the basis of orders from sales traders, there are two types of orders: agency orders, and at risk orders. In agency orders, the Respondent is not at risk. It has received an order from a client but it has not guaranteed a price to the client. As such, any variations in price will impact on the client. In at risk orders, the Respondent's sales traders have guaranteed a price to the client. The Respondent's trading desk will then go to the market to satisfy the client order. The Respondent will try to get a better price on the market than it quoted to the client. If it succeeds in getting a better price then it will make a profit on the trade; if it fails, then it will make a loss on the trade.

28.  Sometimes an order will be a combination of an at risk order and an agency order. For example, in a client order for 100 shares, the sales trader may have guaranteed a price for the first 50 shares (so they would be at risk) but not for the subsequent 50 shares (so they would be on an agency basis, with the client bearing the risk). This approach could minimise the risk for clients.

### The regulatory environment in which the parties operate

29.  At all material times, the Claimant performed a certification function subject to regulation by the Financial Conduct Authority ("**FCA**") and the Prudential Regulation Authority ("**PRA**"). He was a certified person under the FCA's Senior Managers and Certification Regime ("**SMCR**") from the introduction of that regime in March 2016.

30.  The regulatory rules and criminal law have at all material times prohibited an abusive market practice called "spoofing". The parties agree what spoofing means. At no stage has anyone doubted that the regulatory rules and criminal law prohibit spoofing.

31.  Spoofing occurs when a trader places a bid or offer but with the intent to cancel the bid or offer before execution, in order to give the impression that demand or supply of a particular commodity is other than it truly is. The purpose of spoofing may be to cause a change in the price of the particular commodity, which the trader can subsequently use to their advantage by trading at the new price. However, the purpose of spoofing may not be to alter the price at which a commodity is being traded, but merely to increase the liquidity available at the prevailing price.

32.  The "spoofer" does not have to be successful in order to breach the regulatory rule. However, if the spoofer succeeds (or the pattern of trading indicates success) then their activities are more likely to come to the attention of surveillance systems or the relevant authorities.

33.  The Respondent's policy on Market Manipulation in force at the time of the 2016 Sell Orders was introduced on 15 October 2015. It defines spoofing as a category of market manipulation. It defines spoofing as:

"Spoofing – entering and withdrawing orders on an electronic trading system in order to give, or have the effect of giving, a misleading impression."

34. The Respondent's policy on Anti-Fraud, Anti-Manipulation and Other Prohibited Trade Practices in force at the time of the 2016 Sell Orders was introduced on 28 August 2015. In part it states:

"The following factors, among others, may in certain circumstances be indicative of spoofing or layering:

— Frequency and pattern of orders and cancellations submitted

— The size and / or number of orders relative to market conditions, including, but not limited to, at the time the order(s) was placed

— Length of time orders remained active prior to cancellation

— The change in the best offer price, best bid price or last sale price that results from the entry of an order

— Communications which indicate an intent to cancel the bid or offer at the time it is placed

— Behaviour that indicates intent to alter prices, disrupt the market, or create misleading market conditions

— The employee's activity in related markets and

— The ability of the employee to manage the risk should all the bids or offers be filled.

Bids or offers may be cancelled so long as: (i) the cancellation is reasonable given the instrument and market conditions, and (ii) the employee or electronic trading strategy intended to execute a trade when the bid or offer was entered."

35. In view of these policies, it is clear that the Respondent has always taken the position that (i) there is a mental element required in order to be guilty of spoofing; (ii) behaviour which could appear to be spoofing has to be judged according to all the relevant circumstances; and (iii) a trader is entitled to cancel bids or offers if there is a proper reason for doing so.

36. The regulatory rules within which the Respondent operates have not changed since 2016. What has changed is that the Respondent was caught profiting from spoofing. As a result, regulators have less of a light touch. The Respondent feels like it is operating in a different regulatory environment, because it is now being more closely scrutinised by regulators.

37. JP Morgan Chase's business in the United States of America was the subject of a US Department of Justice ("**DOJ**") criminal investigation. As a result of this investigation, in September 2019 several of JP Morgan Chase's precious metals traders were charged with conspiracy and fraud. Those charges arose out of an

alleged massive years-long scheme of market manipulation conducted through spoofing. JP Morgan Chase & Co entered into a Deferred Prosecution Agreement ("**the DPA**") with the DOJ in which the wrongdoing by the precious metals desk was summarised as causing over $200m of loss between March 2008 and August 2016. Additional losses of over $100m were caused by the US Treasuries desk between April 2008 and January 2016. JP Morgan Chase & Co faced fines and surcharges of over $920m. This scandal ("**the Precious Metals Scandal**") caused significant reputational damage to JP Morgan Chase's global business. According to the DPA, the traders involved in the Precious Metals Scandal were blatant in their conduct, which spanned years. They also made contemporaneous written records of their intent to unlawfully manipulate the markets.

38.    Much of the trading activity which was subject to the DOJ investigation took place in London. As a result, the Respondent's relationship with the FCA was damaged by the Precious Metals Scandal.

39.    As a result of the Precious Metals Scandal, the Respondent was at risk of more intrusive monitoring by its regulators (including the FCA) in relation to compliance issues. In particular, there was a risk that an independent compliance monitor could be appointed. The Respondent wished to avoid this.

40.    JP Morgan Chase globally took significant steps to improve their compliance with the regulations which already existed. They hired hundreds of new compliance officers, improved their training, changed their policies, revised their electronic trading surveillance systems, increased their electronic communication surveillance systems, implemented closer supervision of traders, began to take into account employees' commitment to compliance in promotion and compensation decisions, and implemented independent quality assurance testing of spoofing surveillance alerts which produced monthly spoofing alert reports that provided metrics on alerts by trader, desk, supervisor, and region.

41.    Following the Precious Metals Scandal, the Respondent also changed several of its senior staff members. Mr Bristow was placed in charge of the US Treasuries desk. Mr Thakur was placed in charge of the precious metals desk. Each of them was responsible for "cleaning up" their respective areas of work.

### The Claimant's employment by the Respondent

42.    The Claimant first worked for the Respondent in 2010, as an intern. In August 2011 he was then recruited, straight out of university, as an Analyst. He performed well in that role. In January 2014 he was promoted to Associate and began trading for the Respondent alongside two more senior employees.

43.    In each year of his employment with the Respondent the Claimant received positive yearly appraisals. His positive performance was reflected in a further promotion and in his pay. On 1 February 2017 the Claimant was promoted to the position of Vice President. As Vice President he supervised other staff.

44.    In or around February to March 2018 the Claimant informed the Respondent that he intended to resign and take up employment with one of its competitors. The Respondent wished to retain the Claimant, and so it offered him a large

guaranteed bonus to be paid in 2019 and an increased salary. In addition, it offered him the support of a junior employee and gave him responsibility for a trading book. In light of this, the Claimant agreed to remain employed by the Respondent. As a result of the additional support and responsibility that the Respondent provided to the Claimant, his trading activity increased.

45.   It was an obvious finding to be drawn from the evidence presented that the Claimant was a well-liked, respected, and trusted employee of the Respondent.

### How the Claimant conducted his trading for the Respondent

46.   At the time of the 2016 Sell Orders, the Claimant worked on a trading desk with several colleagues. He had an immediate supervisor with him at the time of the 2016 Sell Orders.

47.   Usually, he was managing 10-30 client orders simultaneously. He was also required to trade on a trading account that he managed on behalf of the Respondent, the purpose of which was to generate profit directly for the Respondent ("**proprietary trading**" or "**prop trading**"). Over the course of his employment by the Respondent he completed hundreds of thousands or millions of trades.

48.   From 2016 almost all communications the Claimant had with clients were via the sales trader team.

49.   In front of the Claimant on his desk was a trading screen and a keyboard. The trading screen showed the information that the Claimant needed in order to do his job. On his trading screen it was possible for him to see a breakdown of the liquidity in a stock across different exchanges. However, the Claimant would not commonly do this, and there was no reason to do it. One exchange is as good as another for carrying out trades: what mattered to the Claimant was price.

50.   It was possible for the Claimant to allocate all of his bids or offers to a single exchange, for example the primary exchange for a particular commodity. However, this would be unusual. His usual practice was to use the Respondent's Smart Order Router ("**the SOR**"). The SOR is an algorithm which determines to which exchanges bids and offers should be sent. It gauges the available liquidity in each exchange. It is impossible for a human to do this accurately in real time. It makes little sense for the Claimant not to use the SOR, and instead to pick a single exchange on which to transact. Transacting on a single exchange would artificially and unnecessarily restrict the liquidity available to the Claimant. Bypassing the SOR would also involve additional and usually pointless labour.

51.   The Claimant would tell the SOR how the bid or offer was to be dealt with through keyboard inputs. The SOR can allocate "flags" to each of the bids and offers. The flags would not be seen by the Claimant. However, the SOR would allocate the flags based on how the Claimant had indicated that he wanted the bid or offer to be dealt with. For example, an IOC (Immediate Or Cancel) order may have the FK (Fill and Kill) flag. This flag would mean that the SOR would sweep the market for liquidity, executing as many trades as it could, and then bring the order to an end, having gathered as much of the liquidity as possible, up to a limit set by the

trader.

52. Traders use multiple "trading books" on which they record their trades. The first is the agency book ("**the AGE book**"), which is used when a trader is undertaking transactions for a client on a one-to-one basis. The second is the facilitation book ("**the FACT book**"), which is used when a trader is undertaking transactions for a client that are either at risk or partly at risk and partly filled from the market. The third is the portfolio management book ("**the PM book**"), which is used when a trader is making transactions that are not directly related to current client orders, but are in anticipation of future demand, or are positions arising from previous facilitation that are not expected to be closed within a few days.

53. In the present case, the FACT book used by the Claimant was the TMT FACT book. "TMT" indicates that the FACT book relates to the Telecoms, Media, and Technology sector.

54. At the time of the 2016 Sell Orders, traders at the Respondent (including the Claimant) treated the different trading books as simply different places to store their positions: they did not necessarily place the trades on the trade book that the descriptions would indicate was the most suitable for the trades.

### *The events surrounding the 2016 Sell Orders*

55. The events of 6 January 2016 took place very quickly. Very precise timings can be made in respect of many of the events because they were recorded contemporaneously by computer systems.

56. At 13:57 a sales trader passed to the Claimant an order to buy 50,000 LOGN shares on behalf of a client on an agency basis ("**the First Client Buy Order**"). LOGN shares are priced in increments of 0.05 CHF.

57. At 13:58:22.210 using the SOR, the Claimant entered a bid for LOGN shares at 14.80 CHF each. The SOR allocated the Claimant's bids to multiple exchanges.

58. At 13:58:22.236 the Claimant successfully bought 19,918 LOGN shares on the SWX at 14.80 CHF each (not on the FACT book). He also bought 30,082 LOGN shares on 3 other exchanges at 14.80 CHF each (not on the FACT book). This covered the entirety of the First Client Buy Order.

59. At 15:58 the Claimant received a further order to buy 153,230 LOGN shares on behalf of a client ("**the Second Client Buy Order**"). It is unclear whether this was on an agency basis or an at risk basis.

60. At 15:59:12.346 using the SOR, the Claimant entered a bid for LOGN shares at 14.85 CHF each. The SOR allocated his bids to multiple exchanges. It allocated a bid for 5,404 LOGN shares to the SWX.

61. At 15:59:12.371 the Claimant successfully bought 5,404 LOGN shares on the SWX at 14.85 CHF each (on the FACT book). As such, all of the bids the SOR routed to the SWX had been successfully transacted.

62. Having successfully filled his previous bid, at 15:59:29.392 using the SOR the Claimant entered a bid for LOGN shares at 14.85 CHF each. The SOR allocated a bid of 16,024 LOGN shares to the SWX. The Claimant deleted this bid 3 seconds later. No shares were traded.

63. At 16:04:27.206 using the SOR the Claimant entered a bid for LOGN shares at 14.85 CHF each. The SOR allocated a bid of 25,000 LOGN shares to the SWX. Five minutes later, at 16:09:41.818, the Claimant deleted this bid. No shares were traded.

64. At 16:18:09.924 using the SOR the Claimant entered a bid for LOGN shares at 14.85 CHF each. The SOR allocated a bid of 25,000 LOGN shares to the SWX ("**the 16:18 Bid**"). In the following 14 minutes (i.e. up to 16:32:26.983) as a result of this bid resting in the market the Claimant was able to buy a total of 6,203 LOGN shares on the SWX (on the FACT book). The Claimant needed a further 18,797 LOGN shares to fill the 16:18 Bid on the SWX. Plainly, at this point shares were not being offered for sale at the same volume at 14.85 CHF on the SWX as they had been offered at the lower price point of 14.80CHF on the SWX earlier in the afternoon.

65. At 16:33:02.708 using the SOR the Claimant entered an offer to sell LOGN shares at 14.90 CHF ("**the First Sell Order**"). The SOR allocated an offer of 43,488 LOGN shares to the SWX. At this point the SWX was showing offers for approximately 40,000 shares at 14.90 CHF and about 26,000 at the best level on the bid side. The Respondent's case is that the Claimant's actions gave the appearance of increasing the imbalance between selling interest and buying interest across a narrow 0.05 CHF spread. Essentially, after the First Sell Order was placed, a market observer would see many more shares being offered for sale on the SWX at 14.90 CHF than before the First Sell Order was placed.

66. The 16:18 Bid was still resting in the market. At 16:33:02.951 as a result of it resting in the market, the Claimant was able to buy 110 LOGN shares on the SWX at 14.85 CHF (on the FACT book). The Claimant needed a further 18,687 LOGN shares to complete the 16:18 Bid on the SWX.

67. At 16:33:05.587 the Claimant deleted the First Sell Order.

68. At 16:33:10.861 using the SOR the Claimant entered an offer to sell LOGN shares at 14.90 CHF ("**the Second Sell Order**"). The SOR allocated an offer of 85,063 LOGN shares to the SWX. At this point again the SWX was showing offers for approximately 40,000 shares at 14.90 CHF and about 26,000 at the best level on the bid side. The Respondent's case is that the Claimant's actions again gave the appearance of increasing the imbalance between selling interest and buying interest across a narrow 0.05 CHF spread. Essentially, after the Second Sell Order was placed, a market observer would see even more shares being offered for sale at 14.90 CHF than before the Second Sell Order was placed.

69. The 16:18 Bid was still resting in the market. At 16:33:11.686 as a result of it resting in the market, the Claimant was able to buy 494 LOGN shares on the SWX at 14.85 CHF (on the FACT book). He needed a further 18,193 LOGN shares to complete the 16:18 Bid on the SWX.

70. At 16:33:14.328 the Claimant deleted the Second Sell Order.

71. The 16:18 Bid had not been filled any further. At 16:33:15.715 the Claimant deleted the 16:18 Bid (to the extent not already filled).

72. At 16:33:17.820 using the SOR the Claimant entered a bid for LOGN shares at 14.85 CHF each. The SOR allocated a bid of 16,861 LOGN shares to the SWX ("**the 16:33 Bid**"). Within a fraction of a second (i.e. at 16:33:17.844) the Claimant was able to buy the full 16,861 LOGN shares on the SWX (on the FACT book).

73. Between 16:38:30.86 and 17:28:23.612, on 4 occasions using the SOR the Claimant entered bids for LOGN shares at 14.85 CHF each. On each occasion the SOR allocated a bid of 25,000 LOGN shares to the SWX. None of those bids resulted in transactions on the SWX.

74. At 17:28:40.303 using the SOR the Claimant entered a bid for LOGN shares at 14.95 CHF each. The SOR allocated a bid of 30,958 LOGN shares to the SWX. At 17:30:11, in the day's closing auction on the SWX, the Claimant succeeded in purchasing 30,958 LOGN shares on the SWX (not on the FACT book).

75. On the same day, the Claimant sold a block of 50,000 LOGN shares directly to the client. In addition, 57,335 LOGN shares were purchased on the SWX for the client.

76. The Claimant's position is that if he had not engaged in spoofing, then the events surrounding the 2016 Sell Orders might be said to be consistent with the general fast-paced nature of cash equities markets: his position is that these were everyday matters that he may well never commit to memory, like what he had for breakfast or his choice of tie. In contrast to this, if the Claimant had engaged in spoofing, then he may well be expected to remember his actions.

77. The commission on the Second Client Buy Order was somewhere in the region of $237 or 252CHF. The Claimant's daily commission target was in the region of $250,000. This is not commission that the Claimant would be paid, but the Commission which the Claimant had to earn for the Respondent. The commission on the Second Client Buy Order was about one thousandth of the Claimant's daily commission target.

### The 2016 Investigation

78. The Claimant's placing of the 2016 Sell Orders triggered the Respondent's automated surveillance systems. As a result, the Claimant's conduct was the subject of investigation by the Respondent shortly after it took place.

79. On 20 January 2016, the Claimant was invited to a meeting ("**the 2016 Meeting**"). The meeting was with David Nicolas, (Head of Trading), Tony Cawte (a senior employee responsible for compliance in respect of cash equities), and Trevor Mullin (the Respondent's current Co-Head of EMEA Markets Compliance, who was at the time a senior employee responsible for compliance issues).

80. In the course of the 2016 Meeting the Claimant explained that he could not remember the precise reason for the 2016 Sell Orders. Nobody suggested that

this was unusual. The Claimant explained that he may have placed the First Sell Order and the Second Sell Order for reasons such as (i) his trading book being "short" in LOGN shares and his desire to increase his short position by selling more of those shares; or (ii) for price discovery.

81.   Mr Nicolas explained to Mr Cawte and Mr Mullin that both of the Claimant's explanations were consistent with the standard practice for traders on the Claimant's desk. Mr Nicolas agreed with the Claimant that the First Sell Order and Second Sell Order were not large orders in the context of LOGN shares. Mr Nicolas, Mr Cawte, and Mr Mullin agreed that although the Claimant's conduct could have been perceived as spoofing, the conduct was isolated and no other similar activity had been identified in respect of the Claimant, and so the 2016 Sell Orders did not warrant disciplinary action.

82.   The Claimant was reminded of the need to exercise care in respect of his trading activity. The Respondent subsequently organised training for the Claimant and many of his colleagues, at which the staff were informed that much of the activity of traders can be perceived as suspicious if looked at out of context and therefore that it was necessary for them to take notes of situations on which they might be questioned in the future. Mr Nicolas also informed the team that the Respondent intended to implement changes to the IT system used by traders in order to minimise the risks of inadvertent trading activity taking place.

83.   On behalf of the Respondent, Tim Johnston (then the Managing Director of EMEA Cash Equity Trading) subsequently decided, in agreement with the views expressed at the 2016 Meeting by Mr Nicolas, Mr Cawte, and Mr Mullin, that the 2016 Sell Orders did not warrant disciplinary action. On 8 March 2016 he informed the Claimant of this and said it was "*a reminder of the expectations placed on you as a JP Morgan trader and FCA-approved person*". This was not a formal or informal warning, or indeed any form of disciplinary sanction.

84.   By this stage, the Respondent had concluded that the Claimant had not engaged in misconduct. In particular, it had concluded that his pattern of trading as a whole meant that spoofing could be ruled out without proceeding to a disciplinary investigation. Further, it had concluded that the Claimant's intention was not to engage in spoofing.

85.   The Respondent was conscious of its obligations in certifying the Claimant to the FCA, and would not have continued to do so if it had entertained any doubts as to his probity. It did continue to certify the Claimant.

86.   As well as resolving the matter internally with the Claimant, the Respondent considered its regulatory compliance obligations. It is required to notify the FCA through a Suspicious Transaction Report ("**STR**") when it has reasonable grounds to suspect spoofing. On or around 25 February 2016 it concluded that the 2016 Sell Orders were "not suspicious". It therefore decided it had no regulatory obligation to make an STR to the FCA. This was recorded in an email by Claire Foster (Head of EMEA Equities Compliance). This was an important decision for the Respondent, because the Respondent takes seriously its obligation to consider carefully whether an STR is required in any given case, and because the Respondent could be fined by the FCA if it failed to make a STR

in accordance with its obligations.

87. I note at this stage that no evidence was presented that an STR was ever made. If it had been made then Mr Mullin would be likely to know about it, and he did not know of one being made. I find that an STR was not ever made.

### The introduction of the New Spoofing Policy

88. As Mr Mullin noted in his evidence, following the Precious Metals Scandal the Respondent changed its approach to investigating market conduct issues. It introduced an enhanced standard for whether a trader had breached the Respondent's policies. Under this new enhanced standard, a breach would occur if trading activity was "potentially consistent with spoofing", even if there was no other evidence of inappropriate intent, unless the Respondent was "confident" the trading was *bona fide* ("**the New Spoofing Policy**").

### The Market Conduct Review and its causes

89. As a result of the DOJ investigation, and the Precious Metals Scandal and reputational damage this entailed, in 2019 the Respondent commenced a Market Conduct Review. A major purpose of this was to prove to regulators in both the United States of America and the United Kingdom that the Respondent took its regulatory obligations seriously. Before the start of the Market Conduct Review, there had been no material change to the regulations to which the Respondent was subject.

90. On 3 April 2020 the Respondent produced an Employee Market Conduct Review Report. It said that the Claimant's explanations for the 2016 Sell Orders that he had offered in 2016 were inadequate. However, it noted that at the time of the 2016 Investigation, "*the business determined that the trading activity was not problematic*". It also noted that the Respondent's HR Control Forum had referred the Claimant to a disciplinary process as a result of the Market Conduct Review.

### The disciplinary process

91. On 4 December 2019 Mr Bristow met with Mr Mullin. Mr Mullin told Mr Bristow that the Claimant's actions in relation to the 2016 Sell Orders "*would be treated differently today*".

92. On 9 December 2019 Mr Nicolas wrote to the Claimant to inform the Claimant that the Claimant was suspended.

93. On the same day, shortly after the Claimant was suspended, the Claimant was informed by email that the Respondent had notified the FCA that he was a fit and proper person to perform his role.

94. On 16 December 2019 the Respondent wrote to the Claimant to invite him to a disciplinary hearing on 18 December 2019. The Claimant was informed that this related to the 2016 Sell Orders. The Claimant was told to inform the Respondent if there were any witnesses who he thought should be interviewed. The Claimant asked to be provided with a list of the trades that the Respondent wished to discuss with him. He was not provided with any such list, but was instead

permitted to attend the Respondent's office and read an anonymised copy of the list in the presence of a member of the Respondent's HR team. The Claimant was not allowed to take a copy.

95. On 18 December 2019 the Claimant attended the disciplinary hearing. Mr Bristow was the disciplinary officer. A member of the Respondent's HR team and a notetaker also attended. The Claimant was asked about the 2016 Sell Orders. He said that 4 years after the event he could not recollect why he had acted as he did. Nonetheless, he gave potential explanations for his actions. These potential explanations included that (i) he may have placed the 2016 Sell Orders because he wanted to sell out of a long position; and (ii) the 2016 Sell Orders could have been part of a legitimate "market making" strategy that he subsequently decided was not worth pursuing and therefore abandoned by deleting the 2016 Sell Orders.

96. On 19 December 2019 the Claimant wrote to the Respondent by email setting out his position, including possible explanations for his actions. His possible explanations were: (i) he was looking to short more at higher levels; (ii) erroneous entry of the First Sell Order and the Second Sell Order; (iii) he changed his mind after entering the bids, for example because of new information such as news or price movement; and (iv) there could have been an IT issue. He noted that the 2016 Investigation was thorough and that his innocence was accepted then. In response to Mr Bristow's request to be informed of any witnesses to be interviewed, the Claimant asked for Mr Nicolas to be consulted.

97. Also on 19 December 2019 Mr Bristow spoke to a member of staff from HR to clarify his understanding of some minor matters.

98. Mr Bristow also had informal conversations with Luiz de Salvo (then Head of EMEA Cash Equities) and Jason Sippel (Global Head of Equities) to "sense-check" his understanding of the Claimant's possible explanations for his actions. Although Mr Bristow did not name the Claimant in those discussions, Mr de Salvo and Mr Sippel would have known that Mr Bristow was talking about the Claimant.

99. During the disciplinary process Mr Bristow had available to him the results of the 2016 Investigation. However, he did not re-interview the people involved in the 2016 Investigation.

100. On 8 January 2020 Mr Bristow explained his findings from his investigations to a member of staff from HR.

101. Between 15 January 2020 and 28 January 2020 Mr Bristow exchanged emails with Mr Mullin regarding what flag markers meant.

102. Mr Bristow took the view, which the Claimant shared based on the available evidence, that that the First Client Buy Order was placed on an at risk basis. It later transpired that this was not correct.

103. Mr Bristow did not investigate whether the Claimant's starting position on 6 January 2016 was "long" or "short". Determining this information could in turn have determined whether the Claimant would need to buy or sell shares overall.

104. Neither Mr Bristow nor any of the Respondent's staff recreated the position at the time of the 2016 Sell Orders across all exchanges on which LOGN shares were traded. The Respondent only considered the position on the SWX. It could have recreated the position if it had wanted to, by using its archived data.

105. On 31 January 2020 the Claimant attended a meeting with Mr Bristow. Mr Bristow informed the Claimant that the Claimant was being dismissed for gross misconduct.

106. On 11 March 2020 the Respondent's HR department sent to the Claimant a copy of the minutes of the disciplinary meeting. The Claimant was also informed that he would receive the outcome letter confirming the reasons for his dismissal by the end of that week (i.e. by 13 March 2020).

107. On 13 March 2020 the Claimant received confirmation in writing of his dismissal. The dismissal letter was written as a collaboration between Mr Bristow, a member of the HR team, and the Respondent's lawyers. The dismissal letter set out Mr Bristow's reasoning. The dismissal letter said that the size of the 2016 Sell Order was irrelevant to determining the purpose of the Claimant's actions. It did not deal with why Mr Bristow had rejected the Claimant's possible explanations that the First Sell Order and the Second Sell Order were made by mistake, or that they were part of a market making strategy. It can be inferred from the content of this letter, although it is not made explicit, that the Respondent was alleging that it had concluded that the Claimant engaged in spoofing.

108. There were some factual errors contained within the dismissal letter. The errors were in particular as follows:

   (1)   Mr Bristow said that the First Client Buy Order was at risk, and the Second Client Buy Order was an agency order placed before the First Client Buy Order was filled. The Respondent said this was unusual (the implication being that the Claimant would be likely to remember it). However, the trading data in the Respondent's possession in fact showed that (i) the First Client Buy Order was an agency order and (ii) the First Client Buy Order was filled before the Second Client Buy Order was placed.

   (2)   Mr Bristow said that the Claimant had given a possible explanation for the 2016 Sell Orders as the Claimant wanting "*to sell out of a long position*". He then said that despite this, the Claimant failed to sell to the client. However, firstly, the Claimant did not give this possible explanation. Secondly, the Claimant did sell to the client.

   (3)   In relation to the 2016 Sell Orders Mr Bristow said that the Claimant had "*changed the flag type on the bid such that it would not show any resting size on the bid in the market place*". He said that this was done in order to advance the Claimant's buying interests, i.e. that it was evidence of an intention to engage in spoofing. However, as noted above, the flags are determined by the SOR, not by the Claimant, who would not have seen the flags.

### The Respondent's communications with the FCA

109. On or around 3 February 2020 the Respondent reported to the FCA its actions in relation to the Claimant. It informed the FCA that "*outside of the US precious metals matter*" it was "*undertaking a review more broadly of the CIB Markets businesses globally*" including reconsidering past decisions. It placed the dismissal of the Claimant into that context.

### The appeal process

110. Following receipt of the letter containing reasons for his dismissal, on 26 March 2020 the Claimant appealed against his dismissal. On 20 May 2020 the appeal was heard by Mr Thakur. The appeal was a review of the dismissal decision, and not a rehearing. Mr Thakur did not undertake any further investigation. However, he did speak with Mr Bristow privately in order to learn more about the approach Mr Bristow took. He also spoke privately to Mr Sippel to "sense check" his understanding of the trading activity in question. Mr Sippel expressed support for dismissing the Claimant. The Claimant was not given the opportunity to make representations about what was said privately by Mr Bristow and Mr Sippel to Mr Thakur.

111. On 6 August 2020 the Claimant received a letter stating that his appeal was rejected. Along with the letter the Claimant received the minutes of the appeal meeting. It was fundamental to Mr Thakur's approach to the appeal that he held against the Claimant the fact that the Claimant could not remember the 2016 Sell Orders.

## Relevant law

### Unfair dismissal rights

112. Section 94 of the Employment Rights Act 1996 ("**ERA 1996**") provides that an employee with sufficient qualifying service has the right not to be unfairly dismissed by their employer.

113. Section 98 of the ERA 1996 sets out potentially fair reasons for dismissal:

"(1)  In determining for the purposes of this Part whether the dismissal of an employee is fair or unfair, it is for the employer to show—

(a)  the reason (or, if more than one, the principal reason) for the dismissal, and

(b)  that it is either a reason falling within subsection (2) or some other substantial reason of a kind such as to justify the dismissal of an employee holding the position which the employee held.

(2)  A reason falls within this subsection if it—

[…]

(b)  relates to the conduct of the employee[…]"

### The reason for dismissal

114. In the case of <u>Beatt v Croydon Health Services NHS Trust</u> [2017] EWCA Civ 401; [2017] IRLR 748 (23 May 2017) Lord Justice Underhill stated that the "reason" for a dismissal is the factor or factors operating on the mind of the decision-maker which causes them to take the decision to dismiss or, as it is sometimes put, what "motivates" them to dismiss.

### Conduct as a reason for dismissal

115. In the case of <u>British Home Stores v Burchell</u> [1980] I.C.R. 303 (20 July 1978) the Employment Appeal Tribunal set down the test that the Tribunal applies in cases of unfair dismissal by reason of conduct. The burden of proof within the test was later altered by <u>section 6 of the Employment Act 1980</u>. As a result, the test applied by the Tribunal is as follows:

    (1)   The employer must show that it believed the employee to be guilty of misconduct.

    (2)   The Tribunal must determine whether the employer had in mind reasonable grounds upon which to sustain that belief.

    (3)   The Tribunal must determine whether, at the stage at which that belief was formed on those grounds, the Respondent had carried out as much investigation into the matter as was reasonable in the circumstances.

116. This means that the Respondent does not need to have conclusive direct proof of the employee's misconduct: the Respondent only needs to have a genuine and reasonable belief, reasonably tested. Further, there is no requirement to show that the employee was subjectively aware that their conduct would meet with the Respondent's disapproval.

117. In the case of <u>Shrestha v Genesis Housing Association Ltd</u> [2015] EWCA Civ 94; [2015] IRLR 399 (18 February 2015) Lord Justice Richards noted at ¶ 23:

    "To say that each line of defence must be investigated unless it is manifestly false or unarguable is to adopt too narrow an approach and to add an unwarranted gloss to the Burchell test. The investigation should be looked at as a whole when assessing the question of reasonableness. As part of the process of investigation, the employer must of course consider any defences advanced by the employee, but whether and to what extent it is necessary to carry out specific inquiry into them in order to meet the Burchell test will depend on the circumstances as a whole."

118. In considering the case generally, and in the Tribunal's assessment of whether dismissal was a fair sanction in particular, the Tribunal must not simply substitute its judgment for that of the employer in this case. Different reasonable employers acting reasonably may come to different conclusions about whether to dismiss. As Mr Justice Phillips noted when giving the judgment of the EAT in <u>Trust Houses Forte Leisure Ltd v Aquilar</u> [1976] IRLR 251 (1 January 1976):

"It has to be recognised that when the management is confronted with a decision whether or not to dismiss an employee in particular circumstances, there may well be cases where more than one view is possible. There may well be cases where reasonable managements might take either of two decisions: to dismiss, or not to dismiss. It does not necessarily mean, if they decide to dismiss, that they have acted 'unfairly,' because there are plenty of situations in which more than one view is possible."

119. It is therefore not for the Tribunal to ask whether a lesser sanction would have been reasonable in this case. The Tribunal asks itself whether dismissal was reasonable. The question is also not whether the Claimant committed misconduct, but whether the Respondent had a reasonable belief that the Claimant had committed misconduct.

120. It is impermissible for a Tribunal to substitute its own findings of fact for those of the decision-maker (see the case of _London Ambulance Service NHS Trust v Small_ [2009] EWCA Civ 220; [2009] IRLR 563 (17 March 2009) at ¶¶ 40-43). Further, in _Linfood Cash and Carry Ltd v Thomson_ [1989] I.C.R. 518 (10 May 1989) the EAT noted that it is not for the Tribunal to make its own assessment of the credibility of witnesses on the basis of evidence given before it. The relevant question is whether an employer acting reasonably and fairly in the circumstances could properly have accepted the facts and opinions which it did.

### Delay in bringing disciplinary proceedings

121. In the case of _RSPCA v Cruden_ [1986] ICR 205 (5 December 1985) the EAT upheld a decision of an Industrial Tribunal to the effect that a delay in bringing disciplinary proceedings may render a subsequent dismissal unfair, even if the employee has suffered no prejudice as a result of the delay.

122. In the case of _A v B_ [2003] IRLR 405 (14 November 2002) the EAT applied the principle established in _RSPCA v Cruden_. It held at ¶ 67 that where delay has led to some prejudice, such as a failure to take statements which might otherwise have been taken, or because memories have faded, this can amount to "_additional and independent concerns about the investigative process which will support a challenge to the fairness of that process_".

### Reasonableness of the investigation

123. In the case of _Sainsbury's Supermarkets Ltd v Hitt_ [2002] EWCA Civ 1588; [2003] I.C.R. 111 (18 October 2002) Mummery LJ at ¶¶ 29-30 & 34, giving the judgment of the Court of Appeal, stated that it is necessary to apply the objective standards of the reasonable employer to all aspects of the question of whether the employee had been fairly and reasonably dismissed. That includes the reasonableness of the investigation.

124. In the case of _A v B_ [2003] IRLR 405 (14 November 2002) the EAT at ¶ 60 held as follows:

"Employees found to have committed a serious offence of a criminal nature may lose their reputation, their job and even the prospect of securing future

**18** of 33

employment in their chosen field, as in this case. In such circumstances anything less than an even-handed approach to the process of investigation would not be reasonable in all the circumstances."

125. In the case of _Salford Royal NHS Foundation Trust v Roldan_ [2010] EWCA Civ 522; [2010] I.C.R. 1457 (13 May 2010) Elias LJ giving the judgment of the Court of Appeal approved of the judgment in _A v B_ insofar as it referred to the need for employers to take seriously their responsibilities to conduct a fair investigation where the employee's reputation or ability to work in their chosen field could be affected by the disciplinary outcome.

### Some other substantial reason for dismissal

126. As the National Industrial Relations Court held in _RS Components v Irwin_ [1974] 1 All E.R. 41 (26 July 1973), by its very nature, "some other substantial reason" ("**SOSR**") under section 98(1)(b) of the ERA 1996 is not to be construed as meaning a reason that is of the same kind as one of those set out in section 98(2) (e.g. conduct).

127. In the contract of employment there is an implied term of trust and confidence. Breach of the term of trust and confidence may be SOSR. The term of trust and confidence was defined in _Malik v Bank of Credit and Commerce International SA_ [1998] A.C. 20 (12 June 1997) as follows:

"The employer shall not without reasonable and proper cause conduct itself in a manner calculated and likely to destroy or seriously damage the relationship of confidence and trust between employer and employee."

128. In the case of _Leach v Office of Communications_ [2012] EWCA Civ 959; [2012] I.C.R. 1269 (13 July 2012) the Court of Appeal considered the overlap between conduct and SOSR. The Court of Appeal emphasised that "breakdown of trust" is not a mantra that can be mouthed whenever an employer is faced with difficulties in establishing a more conventional conduct reason for dismissal. The invocation of "loss of trust and confidence" is not an automatic solvent of obligations. It is necessary to identify more particularly why the matters relied on are said to have, in effect, made it impossible for the employer to continue to employ the employee. An employer must assess for itself, as far as practicable, the reliability of what it has been told. That assessment must involve a consideration of what alternatives to dismissal were reasonably open to the employer. The Court of Appeal noted that SOSR "_is not a convenient label to stick on any situation, in which the employer feels let down by an employee or which the employer can use as a valid reason for dismissal whenever a conduct reason is not available or appropriate_."

129. In the case of _Governing Body of Tubbenden Primary School v Sylvester_ UKEAT/527/11; [2012] I.C.R. D29 (25 April 2012) the EAT considered circumstances where the SOSR relied upon was a consequence of "conduct". In such cases there is such a clear analogy to a dismissal for conduct itself that it is appropriate that a Tribunal should have regard to the immediate history leading up to the dismissal, which might include "_the suspension; the warnings, or lack of them; the opportunities to recant and the like; the question of the procedure by_

Case Number: 3201630/2020 V

*which the dismissal decision is reached*". Further, "*if it were open to an employer to conclude he had no confidence in an employee, and if a tribunal was as a matter of law precluded from examining how that position came about, it would be open to such an employer, at least if he could establish that the reason was genuine, to dismiss for any reason or none in much the same way as he could have done at common law before legislation introduced the right not to be unfairly dismissed.*"

### *Polkey reductions*

130. Awards for unfair dismissal can be reduced if the Tribunal finds that the employer could have dismissed the employee fairly if a fair procedure had been used. In the case of *Hill v Governing Body of Great Tey Primary School* [2013] I.C.R 691 (29 January 2013) Langstaff J at ¶ 24 giving the judgment of the EAT set out the particular features of a *Polkey* deduction as follows:

"First, the assessment of it is predictive: could the employer fairly have dismissed and, if so, what were the chances that the employer would have done so? The chances may be at the extreme (certainty that it would have dismissed, or certainty it would not) though more usually will fall somewhere on a spectrum between these two extremes. This is to recognise the uncertainties. A tribunal is not called upon to decide the question on balance. It is not answering the question what it would have done if it were the employer: it is assessing the chances of what another person (the actual employer) would have done. Although Ms Darwin at one point in her submissions submitted the question was what a hypothetical fair employer would have done, she accepted on reflection this was not the test: the tribunal has to consider not a hypothetical fair employer, but has to assess the actions of the employer who is before the tribunal, on the assumption that the employer would this time have acted fairly, though it did not do so beforehand."

## Conclusions on liability

### *Potentially fair reason*

131. Between January 2016 and January 2020 the Respondent radically altered its approach to the 2016 Sell Orders. According to the Respondent, in January 2016 they did not merit disciplinary action; in January 2020 they merited summary dismissal.

132. The Respondent says that the Claimant was dismissed either because of his conduct, or for SOSR. The Respondent says that SOSR was either a breakdown in trust and confidence, or that the Respondent was unable to certify the Claimant as fit and proper to perform his role. In both his opening note and his closing note, Mr Devonshire QC noted that the SOSR ground relates to essentially the same basic beliefs or conclusion as the conduct ground. In the circumstances of this case conduct and SOSR clearly do overlap: it was allegedly the Claimant's conduct which caused the breakdown in trust and confidence, and which led the Respondent to be unable to certify the Claimant.

133. The Claimant alleges that the Respondent changed its approach to the 2016 Sell Orders because it needed to appease regulators following the Precious Metals Scandal: heads needed to roll, whether or not they were the right heads. This is not because the FCA wants to see heads roll, but rather because heads rolling would prove to the FCA that the Respondent was taking its regulatory responsibilities seriously. In contrast, the Respondent says that the Precious Metals Scandal caused it to re-evaluate its past decision-making, and that the change of approach to the 2016 Sell Orders was not for inappropriate reasons.

134. Although the evidence as a whole bears on this question, there are a few points which stand out, as follows:

(1)    The New Spoofing Policy reversed the burden of proof against traders (once trades consistent with spoofing had been shown to have taken place); it had the effect that any significant doubt was resolved against a trader. The Respondent was not able to articulate a convincing reason why, as an organisation, it changed its approach to the 2016 Sell Orders by retrospectively imposing the New Spoofing Policy, including its reversal of the burden of proof; rather, the Respondent merely noted that it did change its approach.

(2)    It was Mr Bristow's evidence that in connection with some of the matters identified by the DOJ investigation, a decision was taken by the Respondent to look back at market conduct matters that had previously been reviewed and to assess whether the outcomes in those cases had been appropriate. There was therefore a direct connection between the DOJ investigation, the Market Conduct Review, and the disciplinary action. (I note here that the legal consequence of this is not that there is some form of but-for causation in play which means that the DOJ investigation was the reason for dismissal: the reason for the dismissal is the factor or factors operating on the mind of the decision-maker which causes them to take the decision to dismiss. This is merely one matter among many which bears on whether the reason for dismissal was that claimed by the Respondent.)

(3)    There had been no material change to the relevant regulations.

(4)    However, the Respondent had a powerful incentive to show to regulators that it was now strict on compliance issues: it wanted to keep regulation as light-touch as possible, and as Mr Mullin noted in evidence, the stronger the Respondent's Corporate Compliance Program, the less need there would be for an independent compliance monitor to be appointed. The appointment of an independent compliance monitor is something the Respondent wanted to avoid. In this regard, it is noteworthy that much of the trading activity which was subject to the DOJ investigation took place in London, and so the Respondent's relationship with the FCA was also damaged by the Precious Metals Scandal. One way to show the regulators that the Respondent was taking tough action against spoofing, and therefore that the appointment of an independent compliance monitor was not necessary, was by dismissing traders for historic allegations of spoofing.

(5)   The managers involved in the disciplining of the Claimant were responsible for cleaning up after the misconduct in the US Treasuries desk (Mr Bristow) and the precious metals desk (Mr Thakur). It was firmly in their personal interests to give an appearance of a strong culture of regulatory compliance.

(6)   No new evidence arose to displace the conclusions of the 2016 Investigation as to the Claimant's intentions, and therefore whether he in fact engaged in spoofing. The only change was in the burden of proof applied once the existence of trades consistent with spoofing had been established.

(7)   The meeting on 4 December 2020 between Mr Bristow and Mr Mullin gave Mr Bristow a strong indication that he should take disciplinary action against the Claimant.

(8)   When the Respondent notified the FCA, about the Claimant's dismissal, it failed to refer to the 2016 Investigation's outcome exonerating the Claimant.

(9)   Mr Mullin's evidence was that through the Claimant's dismissal and by its notification of this to the FCA, the Respondent was successfully able to imply it was tightening its standards of regulatory compliance.

(10)  As set out above, the dismissal letter contained numerous errors and omissions. This is despite it having been carefully crafted in collaboration with the Respondent's HR department and its legal advisors. I have concluded that it was crafted by the Respondent to give the appearance of fairness, no matter what the real reasons for the dismissal were.

135.  In the light of all of the evidence, I am persuaded that the Claimant's explanation for the Respondent's change of approach is more likely to be true than the Respondent's explanation. The Respondent changed its approach to the 2016 Sell Orders because of its desire to appease its regulators by showing it was "cleaning up its act".

136.  In light of these matters and the circumstances of the case as a whole I conclude that the reason for the dismissal in the mind of Mr Bristow, and accepted by Mr Thakur during the appeal, was not conduct or SOSR, but rather to further the Respondent's desire to appease its regulators.

137.  As such, the dismissal was unfair on the basis that it did not take place for a potentially fair reason.

138.  Despite having reached this conclusion, in case I am wrong about the reason for the dismissal, I have found it helpful to continue to determine the other matters in the list of issues.

### Genuine belief in misconduct

139.  Given the reasons for my conclusion in relation to the reason for the Claimant's dismissal, I additionally conclude that neither Mr Bristow nor Mr Thakur had a genuine belief that the Claimant had committed misconduct.

Case Number: 3201630/2020 V

140. If I was wrong to conclude that the Claimant was dismissed for a reason that was not a potentially fair reason, and he in fact was dismissed for reasons of conduct, then I would still conclude that neither Mr Bristow nor Mr Thakur had a genuine belief in misconduct. In particular, a fundamental basis of their claimed views that the Claimant had engaged in misconduct was that the Claimant could not recollect the 2016 Sell Orders or the reasons for them. This was not a genuine belief that the Claimant had committed misconduct. Rather, it was a belief that the Claimant could not prove that he had not committed misconduct. However, Mr Bristow and Mr Thakur have always known that if the Claimant was innocent, then even days after the 2016 Sell Orders the Claimant would not have been able to provide an explanation for the 2016 Sell Orders. A major reason for that was the fact that before the 2016 Sell Orders were placed the Respondent had failed to train the Claimant to take notes of suspicious-looking transactions. Mr Bristow and Mr Thakur knew of these matters due to their review of the material from the 2016 Investigation.

141. As such, even if the reason for dismissal had been the potentially fair reason of conduct, I would nonetheless have found that the Respondent did not have a genuine belief in misconduct. The dismissal would be unfair for this reason.

### Reasonable grounds to sustain the belief

142. I have additionally gone on to consider whether, if the Respondent had actually held a belief that the Claimant had committed misconduct, the grounds for that belief would have been reasonable.

143. As detailed above, despite the Respondent having available to it the correct information, the Respondent's carefully crafted dismissal letter sent in Mr Bristow's name nonetheless made serious factual errors as follows:

(1)   Treating the First Client Buy Order as at risk.

(2)   Treating the First Client Buy Order as unfilled before the Second Client Buy Order was received.

(3)   Viewing the First Client Buy Order and the Second Client Buy Order as unusual and therefore, by implication, memorable.

(4)   Saying that the Claimant said he "*wanted to sell out of a long position*".

(5)   Saying the Claimant failed to sell to the client.

(6)   Failing to note that the Claimant had no material interest in spoofing: as Mr Bristow and Mr Thakur were well aware, if the order was small (as this order was) then the Claimant had no interest in risking his career by spoofing to satisfy the order, and therefore was less likely to have engaged in spoofing.

(7)   Failing to note that unlikely and suspicious-looking things do happen over a long enough time span in a large enough sample size (the sample in this case being all of the Respondent's trades by all of their traders).

**23** of **33**

144. Further, the fundamental position taken by the Respondent (both at the dismissal stage and the appeal stage) was that the Claimant had not been able to explain his actions. However, if the Claimant had not engaged in spoofing, then there was never any prospect of the Claimant having been able to explain his actions, because before the 2016 Sell Orders were placed the Respondent had failed to train the Claimant to take notes of suspicious-looking transactions.

145. For these reasons, neither Mr Bristow nor Mr Thakur had reasonable grounds which a reasonable employer could conclude could sustain any belief in misconduct. As such, the Claimant's dismissal was also unfair on this basis.

### The reasonableness of the investigation

146. Spoofing is serious misconduct. It is a matter which requires reporting to regulators. It is serious criminal conduct which carries potential imprisonment as a sanction. A finding that a person has engaged in spoofing would be ruinous to that person's career in financial services.

147. As a result of the seriousness of the allegations and their potential consequences, the Respondent had a duty to conduct the most careful investigation. However, there were deficiencies in the investigation:

(1) The disciplinary manager was also the investigating officer. This was despite it obviously being practicable to have different people fulfilling the investigative and disciplinary roles, given the Respondent's resources.

(2) Mr Bristow's investigation was limited to (i) a discussion with Mr Mullin on 4 December 2019; (ii) the disciplinary meeting with the Claimant; (iii) speaking to HR and Mr Mullin on 19 December 2019 to clarify his understanding of some matters; (iv) emails with Mr Mullin concerning what flags on orders meant; (v) informal discussions with Mr Sippel and Mr de Salvo; and (vi) reading the result of the 2016 Investigation.

(3) The Respondent did not investigate exculpatory evidence. For example:

(a) The 2016 Investigation, which provided the necessary background to the position in 2020, was so delayed as to be unreasonable, because it deprived the Claimant of the ability to know why he acted as he did in relation to the 2016 Sell Orders.

(b) Mr Bristow did not ascertain whether each of the First Client Buy Order and the Second Client Buy Order were on an at risk or agency basis. This was fundamental to understanding the Claimant's trading pattern, and not doing so misled the Claimant on this issue and limited his ability to defend himself.

(c) Mr Bristow did not obtain material in Mr Mullin's possession concerning the breakdown of the execution of the client's orders. This was clearly important information concerning the allegation; lack of access to this information could lead a decision-maker into error.

(d) Mr Bristow did not acquire data concerning the Claimant's trading of

LOGN shares on venues other than SWX. Again, lack of access to this information could lead a decision-maker into error.

(e) Mr Bristow did not properly investigate how the Claimant would input information into his trading screen, including how flags would be applied by the SOR.

(f) The Respondent did not reconstruct the Claimant's position at the start of the day, notwithstanding the fact that this could assist the Claimant in understanding his own trading activity. Such a reconstruction would have shed light on whether the Claimant was "long" or "short" and, potentially, why he traded as he did. It was possible for the Respondent to reconstruct this position by recalling data from its archives, but it did not do so.

(g) Mr Bristow did not ascertain information relating to the sales trader's interactions with the client, or the client's buying intentions.

(h) Mr Bristow did not review any of the Claimant's or the sales trader's electronic communications, which could have shed light on the circumstances surrounding the 2016 Sell Orders.

(i) Mr Bristow did not investigate the possibility that the 2016 Sell Orders reflected an order from another client to sell LOGN shares (despite the fact that it is possible for a trader to be on "both sides" of the market).

(j) There was no review of whether prices moved or whether news or headlines were released around the time of the 2016 Sell Orders which might have affected the Claimant's decision-making. This was despite the Claimant drawing attention to these possibilities in his email of 19 December 2019. This was relevant to the question of whether the Claimant simply changed his mind as to the placement of the 2016 Sell Orders.

(k) Mr Bristow did not interview Mr Nicolas. At the time of the 2016 Investigation Mr Nicolas had made comments which assisted in exonerating the Claimant. Mr Bristow not doing this was despite Mr Bristow inviting the Claimant to suggest witnesses who should be interviewed, and the Claimant then on 19 December 2019 suggesting Mr Nicolas be consulted.

(4) The appeal did not remedy any of the investigative failings.

148. Considering these matters in the round, alongside the size and administrative resources of the Respondent, the investigation was not one that a reasonable employer could undertake. These were not minor errors. Rather, they were individually and cumulatively serious failings to comply with the standards with which any reasonable employer of the size and administrative resources of the Respondent would comply.

149. As the investigation was not reasonable, the Claimant's dismissal was also unfair

Case Number: 3201630/2020 V

on this basis.

### The fairness of the procedure

150. The Respondent was obliged to use a fair procedure during the disciplinary process. However, it had serious deficiencies as follows in particular:

(1) The Respondent did not complete its investigations until after the disciplinary hearing, for example, only interviewing Mr de Salvo and Mr Sippel after this. As a result, the Claimant was not given the opportunity to comment on matters which came to Mr Bristow's attention after the disciplinary hearing.

(2) Mr Bristow made findings of fact without giving the Claimant the opportunity to comment on the allegations underlying the findings. For example, the allegation contained within the dismissal letter that the Claimant "*changed the flag type on the bid*" would easily have been disproved by the Claimant if he had been given the opportunity to comment on it. This is because, as noted above, flag types are not determined by the trader, but are assigned by the SOR based on how the trader indicated that they wanted the bid or offer to be dealt with, and are not seen by the trader.

(3) The Claimant was only sent the minutes of each of the disciplinary hearing and the appeal hearing after the outcomes of those hearings had been reached. The effect of this was that the Claimant could not comment on any errors in the minutes before the outcomes were reached. As such, any errors in those minutes would have influenced the decision-makers' final decisions. Further, in any event, the minutes were sent so long after the hearings that the Claimant's recollection would have faded, which limited his ability to comment on the minutes.

151. When considered in the round, the procedure used by the Respondent fell outside of the scope of the procedures that a reasonable employer might have adopted. As such, even if the reason for dismissal had been conduct, the Claimant's dismissal would have been unfair on the basis of the unfairness of the procedure used.

### The band of reasonable responses

152. In deciding whether the decision to dismiss was within the band of reasonable responses, it is not for me to substitute my judgment for that of the Respondent. I do not ask whether I would have dismissed. The band of reasonable responses open to the Respondent is necessarily very wide. The question is whether the decision of the Respondent fell within that very wide band.

153. The Claimant says that dismissal was not within the band of reasonable responses for three principal reasons:

(1) The Respondent's retrospective application of the New Spoofing Policy was unfair;

(2) The Respondent adopted an unfairly inconsistent approach to the

Claimant's conduct; and,

(3)   The delay in the Respondent bringing disciplinary proceedings was unfair.

154. For the following reasons, I have concluded that it was unfair to retrospectively apply the New Spoofing Policy to the Claimant:

(1)   The Claimant says that in order for it to be fair to resolve all significant doubt against an employee (as the New Spoofing Policy does), that approach must be matched by the most thorough of investigations. I agree. As I have held above, the investigation was not thorough.

(2)   It was particularly unfair to apply the New Spoofing Policy to the Claimant, with its refusal to give to traders the benefit of the doubt, when the instruction and training to write down the details of suspicious-looking trades was only given after the 2016 Investigation, and therefore after the Claimant had forgotten about the details of the 2016 Sell Orders, as the Respondent accepted in the 2016 Investigation. A trader would need contemporaneous notes to explain suspicious-looking transactions and to defend themselves under a reverse burden of proof.

(3)   For these reasons, the application of the New Spoofing Policy to the Claimant was unfair.

155. For the following reasons, I have concluded that the Respondent adopted an inconsistent approach to the Claimant's conduct and that the Respondent acted unreasonably:

(1)   The Claimant says that exonerating the Claimant in 2016, then finding him culpable 4 years later, was inconsistent. The inconsistency arises from a change in the burden and standard of proof that the Respondent applied. That change, and its application to the case in the present circumstances, was not fair. On the one hand the position in 2016 was that the Claimant's conduct was not even suspicious and did not warrant formal disciplinary action; that position was repeated in 2017, 2018, and around 9 December 2019 (the day of the Claimant's suspension), when the Claimant was certified to the FCA by the Respondent as fit and proper. On the other hand, the position in January 2020 was that the Claimant's conduct merited summary dismissal. That is a glaring inconsistency.

(2)   I bear in mind that decisions in disciplinary matters are not subject to a doctrine of *res judicata* or issue estoppel. However, in the present circumstances, the exact same pattern of facts was considered contemporaneously, and allegations not proceeded with, but was reconsidered 4 years later when the Claimant would always have less of an ability to recall what he was doing at the time, and with a reversed burden of proof that made it inevitable that the Claimant would be found to have engaged in spoofing under the New Spoofing Policy. This was manifestly unfair.

156. For the following reasons in particular I have concluded that the delay in the

Respondent bringing disciplinary proceedings was unfair:

(1)    The Claimant had little prospect of remembering the 2016 Sell Orders at the time of the 2016 Investigation. At that time his possible explanations were accepted. However, to revive the allegations 3 years later ensured that the Claimant would have no way to defend himself by giving full explanations for his actions. To then decide that the doubt that would inevitably remain in the Claimant's case must then be held against him was unreasonable.

(2)    The lapse of time affected potential witnesses' memories as well. If an investigation had taken place in 2016 then the Respondent and Claimant could have interviewed sales traders who dealt with the First Client Buy Order and the Second Client Buy Order, or the senior trader on the desk. By 2020 this was impossible. Indeed, under cross-examination at the hearing, Mr Thakur accepted this precise point.

(3)    Data available in 2016, such as the Claimant's starting position, was not so easily available in 2019.

(4)    The Respondent has no good reason for its delay. If it had been fair for the Claimant to be dismissed, then there was no reason to wait until 2020 to do this. It could have been done in 2016. The Respondent's unilateral decision to change its own rules did not create a reason to delay bringing disciplinary proceedings.

157.    For all of these reasons individually and collectively, I conclude that dismissal fell outside the band of reasonable responses which a reasonable employer might have adopted.

### *Whether there was a breakdown of trust and confidence, or the Claimant's conduct would have resulted in the Respondent being unable to certify him as fit and proper to perform his role*

158.    The Respondent in its ET3 Response Form pleaded reliance on SOSR. However, the Respondent accepted in its written closing submissions that in reality in this case both "conduct" and "SOSR" are labels applied to the same basic belief or conclusion, that the Claimant had engaged in spoofing, and that this furnished the reason for the Claimant's dismissal. The Respondent did not advance further arguments at the hearing or in writing as to SOSR.

159.    As I have set out above, the reason for dismissal was not SOSR, whether relating to a breakdown of trust and confidence or an inability to certify the Claimant. Nor was there a genuine belief that the Claimant had committed misconduct which could lead to a breach of the obligation of trust and confidence or the Respondent being unable to certify the Claimant as fit and proper to perform his role.

160.    In any event, as the Respondent appears to accept, and as I would have decided anyway, the suggestion that there was SOSR covers the same ground as conduct in the present case. If the reason for dismissal related to the 2016 Sell Orders, and if there was a genuine belief that the Claimant had misconducted himself in relation to the 2016 Sell Orders, then applying the judgment in *RS Components*

*v Irwin* this would be a dismissal for the substantial reason of conduct, not for SOSR. As such, the Respondent would not be entitled to rely on SOSR as a reason for dismissal.

### Whether breakdown in trust and confidence or inability to certify the Claimant would be SOSRs

161. If I was wrong about the reason for the dismissal, and the reason was in fact a breakdown in trust and confidence or an inability to certify the Claimant as a fit and proper to perform his role, then I might have concluded that the reason for dismissal amounted to SOSR. However, given the accepted overlap between misconduct and SOSR in this case, it would in practice be impossible to ascertain that there was SOSR outside the lens of the fairness of a dismissal based on conduct. The conclusions I have reached in relation to the unreasonableness of the investigation and the unfairness of the procedure would apply equally to a dismissal for SOSR. There would not be SOSR to dismiss.

## Conclusions on remedy

162. This judgment provides only conclusions on certain principles relevant to remedy. A full remedy hearing will be required.

### Contributory conduct

163. In reaching conclusions in relation to contributory conduct, it has been necessary for me to make findings about what the Claimant in fact did in relation to the 2016 Sell Orders.

164. As noted above, if the Claimant had not engaged in spoofing, then he could not be expected to remember his actions in relation to the 2016 Sell Orders, or his reasons for his actions. The Respondent's staff involved in the disciplinary and appeal process know that this is the case.

165. The Claimant was able to advance his buying interests very shortly after placing and deleting the 2016 Sell Orders. However, it is important to not mistake correlation for causation. There are uncountable variables which could have led to the satisfaction of the Claimant's buying interests. The First Sell Order and the Second Sell Order are two such variables. One matter which tells against the 2016 Sell Orders being the cause of the 16:33 Bid being filled is that after the Second Sell Order was placed and deleted, the 16:18 Bid remained in the market for over a second, and it was not filled. Only the 16:33 Bid, placed a further 2.1 seconds later, was filled. The truth is that the Respondent has always been in the dark about whether other variables existed which created more liquidity in the market. Neither the parties nor the Tribunal had, have, or could have, perfect knowledge of the market.

166. Whether or not the Claimant's actions in fact manipulated the market is of only limited relevance to the question of whether the Claimant's actions were *intended* to manipulate the market, and therefore whether he engaged in spoofing.

167. The commission received by the Respondent for the Second Client Buy Order

was utterly insignificant. It could never have had any material impact on the Claimant or his remuneration.

168.  The Claimant has dedicated his adult life to the financial services sector. This is the only occasion in which the Claimant is alleged to have ever manipulated the market.

169.  In the way it has presented its case in relation to whether the Claimant engaged in spoofing, the Respondent committed a logical and statistical error. It identified that the Claimant did something consistent with manipulating the market. It identified that his actions on this occasion were unlikely to have occurred on this occasion for innocent reasons. It then sought to draw the inference that because his actions on this occasion were unlikely to have occurred on this occasion for innocent reasons, he must be guilty. This fails to factor in two matters: the unlikelihood of the Claimant having engaged in criminal activity on this one and only occasion for no discernible benefit; and the likelihood of a confluence of unlikely events occurring in one or more of its traders' trading careers at one point or another which, if unexplained, would look like spoofing.

170.  The Respondent at all stages failed to consider that it is likely that a confluence of unlikely events at one time will happen over the course of either one person's career or the careers of all of its traders, of whom the Claimant was the unlucky one to whom the unlikely events happened. That is what has happened here. Each of the explanations the Claimant offered well after the event were more likely to be true than that he had engaged in criminal activity in respect of the 2016 Sell Orders which, to the Claimant, were entirely inconsequential.

171.  I do not accept that the Claimant would risk his entire professional future for an insignificant trade, for an insignificant amount of money, which would provide to him no material financial or other benefit, or such a negligible benefit as to be in practice non-existent.

172.  Based on the evidence presented to the Tribunal, I have found that the Claimant did not engage in spoofing.

173.  The Claimant's conduct did not cause or contribute to his dismissal. Nor was it culpable or blameworthy. The 2016 Investigation rightly concluded that the Claimant's conduct did not even require a disciplinary process. The Claimant and other members of the Respondent's staff simply required further training.

***Polkey reduction***

174.  Given the conclusions I have already reached as a whole, no *Polkey* deduction could be possible.

175.  Further, the making of a *Polkey* deduction presupposes that a fair dismissal was possible in 2020. Even if the Claimant's dismissal was only procedurally unfair, in 2020 a fair procedure would have been impossible. The delay made it so. Further, the internal inconsistency in the Respondent's treatment of the Claimant's conduct in 2016 and 2020 would have been unjustifiably unfair. There is no basis on which to make a deduction from any award on the basis that the

Claimant would have been dismissed in any event had a fair procedure been followed.

### The ACAS Code of Practice on Disciplinary and Grievance Procedures

176. The Respondent breached the following passages of the ACAS Code of Practice on Disciplinary and Grievance Procedures:

(1) "**Fairness and transparency are promoted by developing and using rules and procedures for handling disciplinary and grievance situations.**" The Claimant says that the use of the New Spoofing Policy in respect of the 2016 Sell Orders – which were placed over 3 years before the introduction of the New Spoofing Policy – breached this provision. In contrast, the Respondent says that the rules remained the same throughout, so this provision was not breached, as the rules were fair and transparent. I have concluded that the rules were not the same throughout: the reversal of the burden of proof contained within the New Spoofing Policy, and its retrospective application, involved the use of a rule that was unfair and could not be transparent, because it did not exist at the time of the 2016 Sell Orders. As such, this part of the Code has been breached.

(2) "**[W]henever a disciplinary or grievance process is being followed it is important to deal with issues fairly. […] Employers should raise and deal with issues promptly and should not unreasonably delay meetings, decisions or confirmation of those decisions.**" The Claimant says that waiting 4 years to discipline him was unreasonable. In contrast, the Respondent says that the delay of 4 years between the 2016 Sell Orders and the disciplinary outcome should not be treated as a delay for the purpose of this part of the Code, because the disciplinary process was not being followed during the period of delay. Although the Respondent's reliance on the literal wording of the Code is superficially attractive, accepting the Respondent's case on this point would mean that it would be compliant with the Code for an employer to save up disciplinary matters for years and then deploy them at a time convenient to them, rather than airing them fairly and openly as they arise. This would undermine the purpose for which the Code was issued, as set out in section 199(1) of the Trade Union and Labour Relations (Consolidation) Act 1992, "*of promoting the improvement of industrial relations*". As such, this part of the Code has been breached.

(3) "**In misconduct cases, where practicable, different people should carry out the investigation and disciplinary hearing.**" The Claimant says that the Respondent is an immense business in respect of which it was practicable for different people to carry out the investigation and the disciplinary hearing, but that the Respondent nonetheless only used Mr Bristow for both purposes. In contrast, the Respondent says that the investigation actually took place in 2016, and that Mr Bristow only carried out the disciplinary hearing. However, the Respondent's position does not reflect what actually occurred. Mr Bristow carried out a full, if insufficient, investigation in 2019 and 2020, which relied only partly on the 2016

Case Number: 3201630/2020 V

Investigation. He was the investigator and the disciplinary decision-maker. As such, this part of the Code has been breached.

177. Each of these breaches, individually and cumulatively, were unreasonable. In respect of the lack of transparency, it was open to the Respondent to only apply the New Spoofing Policy prospectively: applying it retrospectively was unreasonable. In respect of delay, in 2016 the Respondent could have dealt with the 2016 Sell Orders as a disciplinary matter but chose not to. It had actively turned its attention to the issue. Delaying taking disciplinary action for 4 years was unreasonable. In respect of a failure to separate the roles of investigator and disciplinary decision-maker, given the administrative resources available to the Respondent, the unreasonableness of this failure speaks for itself.

178. Whether any award should be increased as a result of the breaches of the Code, and if so by how much, is a matter to be decided at a hearing.

**Employment Judge S Knight**
**Date: 29 June 2021**

# ANNEX 1: LIST OF ISSUES

1.  Was the Claimant dismissed for a potentially fair reason under section 98 ERA 1996, namely conduct; alternatively some other substantial reason?

2.  If the reason for the Claimant's dismissal was conduct:

    (1)  did the Respondent have a genuine belief that the Claimant was guilty of misconduct, and in particular:

        (a)  that he engaged in inappropriate trading practices in respect of Logitech International equities shares on the Swiss stock exchange on 6 January 2016; and

        (b)  that this constituted a breach of the Respondent's policies and procedures, specifically the Anti-Fraud, Anti-Manipulation and Other Prohibited Trades Practices Policy; Market Abuse (Preventing & Detection) Policy and its Code of Conduct;

    (2)  did the Respondent have reasonable grounds to sustain that belief;

    (3)  did the Respondent carry out such investigation into the matter as was reasonable in the circumstances;

    (4)  did the Respondent conduct a fair procedure;

    (5)  was the decision to dismiss outside the band of reasonable responses?

3.  Alternatively, the Respondent asserts that the Claimant's was for some other substantial reason. In this respect:

    (1)  was the reason for the Claimant's dismissal:

        (a)  a breakdown of trust and confidence between the Claimant and the Respondent and/or;

        (b)  that the Claimant's conduct as set out at 2(1)(a) above "would have resulted in the Respondent being unable to certify him as fit and proper to perform his role"?

    (2)  If these were the reasons for dismissal, did they (or either of them) constitute substantial reasons of a kind as to justify the dismissal of an employee holding the position the Claimant held?

    (3)  If they did, was the Respondent's decision to treat those reasons (or either of them) as sufficient to justify the Claimant's dismissal reasonable in all the circumstances (including as to the procedure adopted by the Respondent)?

**33** of **33**