**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION<br><br><br>This Document Relates To:<br><br>  ALL ACTIONS. | Case No. 1:20-cv-05124-ENV-RML<br><br>**CLASS ACTION**<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS JPMORGAN CHASE & CO., JAMES DIMON, AND MARIANNE LAKE'S REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR <u>MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

August 31, 2021

# TABLE OF CONTENTS

Page

ARGUMENT .................................................................................................................3

I.   THE OPPOSITION CONFIRMS THAT PLAINTIFFS' SPOOF ORDER CLAIM IS MERITLESS AND SHOULD BE DISMISSED ...........................................................3

    A.   Plaintiffs Fail to Allege That Individual Spoof Orders Are Public "Misstatements" About JPM Actionable Under the Securities Laws......................3

    B.   The SAC Does Not Allege "Scheme Liability".............................................9

II.  THE OPPOSITION DOES NOTHING TO SALVAGE PLAINTIFFS' DEFECTIVE CLAIMS BASED ON JPM'S FORM 10-K DISCLOSURES ...................10

    A.   Plaintiffs Fail to Plead Any Actionable Misstatements or Omissions by the Executive Defendants or JPM in the Form 10-K Disclosures ..............................11

        1.   General Statements About Trading in "Physical Commodities" or "Commodities Derivatives" Are Not Materially False or Misleading .....................................................11

        2.   Plaintiffs Fail to Plead Any "Item 303 Omissions" by JPM......................15

    B.   The SAC Fails to Allege Scienter With Respect to the Form 10-K Disclosures........................................................................................19

        1.   Plaintiffs Fail to Allege Scienter as to the Executive Defendants ................................................................................19

        2.   Plaintiffs Cannot Impute Scienter "Through the Trader Defendants"......................................................................................21

    C.   Plaintiffs Fail to Plead Loss Causation ..................................................23

III. PLAINTIFFS' SECTION 20(A) CLAIM ASSERTED AGAINST THE EXECUTIVE DEFENDANTS FAILS...........................................................................26

IV.  PLAINTIFFS SHOULD NOT BE PERMITTED TO AMEND A THIRD TIME ...........27

CONCLUSION.........................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)......................................................................................4

*Anschutz Corp.* v. *Merrill Lynch & Co.*,
    690 F.3d 98 (2d Cir. 2012)....................................................................................................5

*In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .............................................................. 11, 13-14

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)...................................................................................................26

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................................................14

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
    2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ........................................................................13

*Campo* v. *Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009)....................................................................................21

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)...................................................................................................8

*City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)....................................................................................22

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014).....................................................................................12, 18, 19

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2013 WL 787970 (S.D.N.Y. Mar. 4, 2013) ...........................................................................24

*Diehl* v. *Omega Protein Corp.*,
    339 F. Supp. 3d 153 (S.D.N.Y. 2018)...............................................................................17, 18

*DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)....................................................................................24

*K.D. ex rel. Duncan* v. *White Plains Sch. Dist.*,
    921 F. Supp. 2d 197 (S.D.N.Y. 2013).................................................................................9, 16

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .......................................................................................... 7, 8

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) .................................................................................. 21

*Freudenberg* v. *E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................................................. 14

*Indiana Pub. Ret. Sys.* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) ......................................................................................... 17, 18

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012) .................................................................................. 15

*Jackson* v. *Abernathy*,
    960 F.3d 94 (2d Cir. 2020) .................................................................................................. 23

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ........................................................................................... 7, 8

*Leykin* v. *AT & T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006) .................................................................................. 10

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................................ 4-5

*In re Lions Gate Ent. Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...................................................................................... 17

*Local No. 38 IBEW Pension Fund* v. *Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010) .................................................................................. 19

*Long Miao* v. *Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................................................. 21

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017) .................................................................................. 10

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) .................................................................................. 12

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ...................................................................... 15

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*,
    2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ........................................................................ 4, 6

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
  2008 WL 2324111 (S.D.N.Y. June 4, 2008) ...............................................................26

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020)..........................................................................9

*Nguyen* v. *New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018)......................................................... 24-25, 26

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................................................20

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  2021 WL 3744894 (2d Cir. Aug. 24, 2021)..................................................................12

*In re Pretium Res. Inc. Sec. Litig.*,
  256 F. Supp. 3d 459 (S.D.N.Y. 2017)........................................................................19

*Rocker Mgmt., L.L.C.* v. *Lernout & Hauspie Speech Prod. N.V.*,
  2005 WL 1365772 (D.N.J. June 8, 2005) ..................................................................22

*In re SAIC, Inc. Sec. Litig.*,
  2013 WL 5462289 (S.D.N.Y. Sept. 30, 2013)............................................................17

*Saltz* v. *First Frontier, L.P.*,
  485 F. App'x 461 (2d Cir. 2012) ...............................................................................20

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016).........................................................................12

*Schiro* v. *Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019)................................................................12, 14, 22

*In re ShengdaTech, Inc. Sec. Litig.*,
  2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014).............................................................20

*In re Sibanye Gold Ltd. Sec. Litig.*,
  2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020)..............................................................7

*Silvercreek Mgmt., Inc.* v. *Citigroup, Inc.*,
  248 F. Supp. 3d 428 (S.D.N.Y. 2017).........................................................................23

*Singh* v. *Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)..........................................................................................7

*Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014).........................................................................26

*Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta*,
  552 U.S. 148 (2008)........................................................................................................10

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................................19

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
  2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .........................................................26

*In re Teva Sec. Litig.*,
  512 F. Supp. 3d 321 (D. Conn. 2021)..........................................................................9

*Thomas* v. *Shiloh Indus., Inc.*,
  2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018)...................................................16, 22

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)........................................................................13

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).........................................................15

*In re Yunji Inc., Sec. Litig.*,
  2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021)..........................................................15

*In re Zyprexa Prod. Liab. Litig.*,
  549 F. Supp. 2d 496 (E.D.N.Y. 2008) ........................................................................24

**Rule**

Fed. R. Ev. 201(b)(2) ...........................................................................................................4

Plaintiffs' Opposition ("Opp'n") confirms that this case is a meritless attempt to manufacture securities fraud claims from regulatory resolutions involving spoofing conduct that has nothing to do with any fraud directed at shareholders of JPMorgan Chase & Co. ("JPM").[1] Tellingly, the Opposition devotes more attention to highlighting the seriousness of the underlying spoofing conduct by traders in the precious metals futures market—facts which JPM and the Executive Defendants do not dispute—than it does to defending the flawed logic behind Plaintiffs' attenuated and implausible theory of securities fraud.  Across 55 pages, the Opposition fails to demonstrate (i) that anonymous spoof orders placed by individual traders could give rise to a claim by JPM shareholders under the securities laws; or (ii) that JPM and the Executive Defendants somehow misled JPM shareholders by making generalized statements about commodities trading without disclosing well-concealed spoofing conduct on the precious metals desk ("Desk") at JPM's bank subsidiary.

**Plaintiffs' Spoof Order Claim Fails**.  Plaintiffs barely try to defend their theory that traders' anonymous individual "spoof" orders for precious metals futures contracts are somehow material "misstatements" *about JPMorgan Chase & Co.*, one of the world's largest financial institutions.  While that claim was the centerpiece of the SAC, the Opposition relegates it to a secondary claim addressed in a few paragraphs.  Indeed, Plaintiffs effectively concede that spoof orders are not actionable "misstatements" when, in a last ditch pivot, they attempt to switch theories and argue that spoof orders are actionable under a "scheme liability" theory—a theory that is nowhere alleged in the Complaint and makes no sense where, as here, the alleged "scheme" concerned manipulation of precious metals futures contracts, not JPM's stock.

---

[1] Capitalized terms have the same meaning ascribed to them in Defendants' opening brief ("Defs' Br.").  Defendants' exhibits ("Ex.") referenced herein are attached to the Declaration of Amanda F. Davidoff, dated June 15, 2021.  All internal quotation marks are omitted.

**Plaintiffs' Form 10-K Disclosures Claim Fails**.  Plaintiffs fare no better with their defective allegations of misstatements or omissions in JPM's Forms 10-K or their weak effort to defend their failure to plead scienter.  Plaintiffs do not dispute that JPM and the Executive Defendants had no free-standing duty to disclose uncharged criminal conduct, and they fail to point to any statements relating to spoofing or precious metals futures trading that could give rise to a duty to disclose spoofing conduct on the precious metals desk at JPMorgan Chase Bank, N.A. ("JPMCB"), a subsidiary of JPM that has no public shareholders and is not a defendant in this case.[2]  Moreover, Plaintiffs cannot plead a strong inference of scienter by alleging a series of "red flags" that the Executive Defendants somehow should have detected, because "should have" allegations are a textbook example of deficient pleading under the PSLRA.

The Opposition further confirms that Plaintiffs' Item 303 omission claim has collapsed completely.  Forced to concede that they cannot plausibly allege that either Executive Defendant had the requisite "actual knowledge" of spoofing conduct, Plaintiffs are left to argue that Nowak, a former precious metals trader and supervisor of the Desk, somehow imputed knowledge of spoofing conduct to the executive management of JPMorgan Chase & Co.  That argument is frivolous.  The SAC does not allege that Nowak was even an *employee* of JPM (he was employed by JPMCB), let alone an *officer* of JPM, and Plaintiffs nowhere allege that Nowak had any role whatsoever in drafting any disclosures on behalf of JPM.

In addition to failing to identify any material misstatement or omission or allege a strong inference of scienter, Plaintiffs also fail to allege loss causation based on so-called "corrective disclosures" made months or years after the spoofing scheme was already revealed to the market

---

[2] While the Opposition defines "Defendants" to include "JPMorgan Chase Bank, N.A." (Opp'n at xi), JPMorgan Chase Bank, N.A. is not a named defendant in this action.

by the Edmonds Plea and the 2018 Class Action.  Because the alleged "corrective disclosures" did

not reveal any hidden material facts, Plaintiffs' claim fails on that basis as well.

## ARGUMENT

**I.     THE OPPOSITION CONFIRMS THAT PLAINTIFFS' SPOOF ORDER CLAIM IS MERITLESS AND SHOULD BE DISMISSED.**

> **A.     Plaintiffs Fail to Allege That Individual Spoof Orders Are Public "Misstatements" About JPM Actionable Under the Securities Laws.**

The SAC alleges that "[e]ach spoofed buy or sell order" for precious metals futures

contracts "made by the Trader Defendants" from "February 23, 2016 until August 2016" was

"itself a materially false and misleading statement" concerning JPM's "actual belief regarding the

value of the precious metals being manipulated[.]"  (SAC ¶¶ 223, 227.)  Defendants' opening brief

demonstrated why alleged misstatements concerning *precious metals* made during the course of

trading precious metals futures contracts, rather than statements about *JPM* made publicly, do not

give rise to a securities fraud claim by JPM shareholders.  (Defs' Br. at 36-41.)  Plaintiffs do not

seriously engage with any of Defendants' arguments.  Instead, they contend that this Court should

ignore indisputable facts about how precious metals futures contracts are traded, and sustain a

securities fraud claim because the DPA contained factual admissions regarding spoofing-related

conduct—conduct that Plaintiffs themselves allege "defraud[ed] *market participants* in the

precious metals futures markets" (SAC  ¶ 4 (emphasis added)), not JPM's shareholders.

*Failure to Allege that Spoof Orders Are Public Statements Attributable to JPM*.

Plaintiffs' spoof order claim fails at the threshold because the SAC does not allege that individual

orders for precious metals futures contracts are public statements attributable to JPM.  (Defs' Br.

at 36-37.)  The SAC acknowledges that precious metals futures contracts are traded on COMEX

and NYMEX—anonymous exchanges that "are owned and operated by the CME"—and that

futures trading occurs through a centralized "electronic trading system called 'Globex' that allows

traders to make buy or sell offers on futures contracts on those exchanges from anywhere in the world." (SAC ¶¶ 102-104, 110.) "An order is 'filled' or 'executed' when a buyer's bid price and a seller's offer price match for a particular futures contract." (*Id.* ¶ 105.) As one court recently observed in addressing spoofing claims concerning precious metals futures, exchange-based trading is "conducted using a visible 'order book' where bids and offers at various price points, or 'levels,' are displayed . . . *but the identity of the entity placing the order is not.*" *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.* ("*In re Merrill*"), 2021 WL 827190, at *2 (S.D.N.Y. Mar. 4, 2021) (emphasis added). The anonymity of orders is further confirmed by the CME's own guidance and filings with the SEC. (*See, e.g.*, Ex. 13 (CME Guide) at 3 ("anonymity of traders and firms is protected electronically in all bids, offers and trades"); Ex. 12 (CME 10-K) at 7 (CME "platforms" "offer . . . fairness, price transparency and anonymity").)

Plaintiffs cannot and do not affirmatively assert that the alleged "spoof" orders for precious metals futures contracts were attributed to any JPMorgan entity when made.[3] Instead, they argue that in a case that centers on exchange-trading of futures contracts, the Court should ignore the reality that such trading is anonymous because (i) "the SAC does not allege" expressly that futures trading is anonymous, and (ii) that fact is somehow not judicially noticeable. (Opp'n at 16-18.)

Plaintiffs are wrong on judicial notice.[4] But the Court need not decide that question. Here,

---

[3] Plaintiffs assert that the "argument that spoof orders are anonymous . . . fails to explain how precious metals investors were able to discern that JPM traders (as opposed to other traders) were spoofing." (Opp'n at 17.) But there is no allegation that "investors" *did* discern this information.

[4] This Court can take judicial notice of the fact that orders placed on CME exchanges are anonymous because that is public information that is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. 201(b)(2). Courts regularly take judicial notice of similar public information regarding how futures contracts are traded. *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 522-23 & nn.26, 32, 35 (S.D.N.Y. 2008) (relying on NYMEX website for factual propositions relating to the structure and market for futures trading); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 720-21 (S.D.N.Y. 2013) (relying on CME

-4-

the issue is not whether extrinsic evidence *contradicts* an allegation Plaintiffs actually made, but rather Plaintiffs' *failure to allege* any public misstatements. Under Rules 8(a) and 9(b) and the PSLRA, it is *Plaintiffs'* burden to plead the elements of a securities fraud claim, including facts to plausibly allege each public misstatement attributable to JPM. The SAC concedes that orders for precious metals futures are placed on CME exchanges, but alleges no facts to plausibly suggest how any of those exchange-based orders were made public or how investors could have connected those orders to JPM. Without those allegations, Plaintiffs fail to state a claim.

Significantly, the SAC does not identify *any* orders for precious metals futures that Plaintiffs allege were "spoofed" during the Class Period other than the single June 22, 2016 order sequence identified by the DOJ in the DPA. (Defs' Br. at 38-39.) Aside from that single example, Plaintiffs argue that they should be relieved of their burden under the PSLRA to identify "each" alleged spoof-order "misstatement" with specificity because the DOJ did not do so in the DPA. (Opp'n at 29-30.) This line of argument effectively concedes the anonymity of spoof orders; if those orders were public and attributable to a particular trader, Plaintiffs would not need the DPA to identify them. And it ignores the threshold burden on a plaintiff seeking to plead a securities fraud claim—to allege each misstatement with particularity. *See Anschutz Corp.* v. *Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012).

Moreover, Plaintiffs fail to explain how spoofing would work in the *absence* of anonymity on the trading platform. As one court explained: "The tactic known as 'spoofing' exploits that lack of transparency. A trader interested in sending false and illegitimate supply and demand signals to the market allegedly can do so by placing an order in the 'order book' at a level where

---

Group website for factual information on how futures contracts are traded), *vacated and remanded sub nom. on other grounds by Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016).

the trader knows it will not be filled and then quickly cancelling it. *Because the identity of the market participants is not known, the trader can preserve its anonymity*," which allows the scheme to work while avoiding detection by other traders. *In re Merrill*, 2021 WL 827190, at *2 (emphasis added). Plaintiffs do not attempt to address this fundamental deficiency in their theory of the case.

***Failure to Allege Any Connection Between Spoof Orders and JPM's Stock****.* Even if futures orders were public and non-anonymous, Plaintiffs fail to allege any relevant connection between those orders and either JPM's stock or investors in JPM's stock. Plaintiffs allege that spoof orders "misrepresented to JPMorgan's investors the Company's genuine belief of the value of precious metals." (SAC ¶ 115 (emphasis added).) But the Opposition does not even try to explain how alleged statements of "belief" about the "value of *precious metals*" have anything to do with the value of *JPM*. This is yet another fatal pleading defect, which Plaintiffs do not address.

***Failure to Allege Materiality****.* Defendants' brief demonstrated that the SAC failed to plead any facts to show that a single trader's order in a specific futures contract on a specific day—which Plaintiffs concede was in the market for no more than "a few seconds" (Opp'n at 30)—would have been material to JPM shareholders even if known by them. (Defs' Br. at 37-38.) Plaintiffs' only response is to argue that spoofing conduct ultimately led to "charge[s]" for the Trader Defendants and a "record criminal fine" for JPM. (Opp'n at 30.) But that is a non-sequitur. Spoofing is improper, but not because it involved any misstatements about JPM to JPM shareholders. Plaintiffs do not even try to argue that any single order was material to JPM investors at the time it was placed. Indeed, no rational investor in JPM's stock—a company with assets valued at $2.49 *trillion* in 2016 (Defs' Mem. at 38)—would attach any importance to a single order to buy or sell a particular commodity futures contract by a single trader. A single order of a few seconds in duration—which Plaintiffs concede concerned "belief[s] regarding the value of the precious

-6-

metals," not the value of JPM (SAC ¶ 227)— is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *In re Sibanye Gold Ltd. Sec. Litig.*, 2020 WL 6582326, at *13 (E.D.N.Y. Nov. 10, 2020).

***Failure to Allege Reliance***.  Defendants' brief highlighted Plaintiffs' failure to allege reliance on spoof orders.  (Defs' Br. at 39-40.)  Plaintiffs do not allege actual reliance by any class plaintiffs, and because there are no plausible facts to show that anonymous futures orders were public and attributed to JPM, Plaintiffs cannot invoke the *Basic* presumption.  Plaintiffs' only response is to argue that "concerns about reliance" should be addressed at the class certification stage.  (Opp'n at 30.)  But reliance is a fundamental element of a securities fraud claim and must be pled to avoid dismissal.  *See Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) ("To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege . . .  reliance.").

***Failure to Allege Scienter***.  Plaintiffs concede that alleged spoofing conduct was aimed at "deceiving other *market participants*" in the precious metals futures markets, not JPM shareholders.  (Opp'n at 33 (emphasis added).)  As Defendants' opening brief demonstrated, this exact type of allegation—the theory that a company was "actively engaged in duping other institutions for the purposes of gaining at the expense of those institutions"—is insufficient to allege an intent "to defraud its own investors." *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009); *see also Kalnit* v. *Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) (scienter lacking because "any intent to defraud [another institution] cannot be conflated with an intent to defraud the shareholders").  Plaintiffs' only effort to avoid this controlling law is to argue that, in *ECA* and *Kalnit*, the "alleged frauds [were] directed at completely separate corporate entities."  (Opp'n at 34.)  But that is Plaintiffs' claim here, too.  The SAC alleges that spoofing-related conduct was aimed at "defraud[ing] *market participants* in the

precious metals futures markets." (SAC ¶ 4 (emphasis added).) As in *ECA* and *Kalnit*, those market participants were "separate corporate entities" (Opp'n at 34) and "any intent to defraud [those other entities] cannot be conflated with an intent to defraud [JPM's] shareholders." *Kalnit*, 264 F.3d at 141. Nor do Plaintiffs explain why, under their theory, the Trader Defendants, who are not alleged to be officers of JPM or involved in its public disclosures, had any incentive or intent to defraud JPM shareholders as opposed to other futures traders.

***Failure to Allege Loss Causation***. Lastly, Defendants' brief showed that Plaintiffs failed to allege loss causation with respect to any spoof order claim. (Defs' Br. at 40-41.) In response, Plaintiffs assert the conclusion that "spoofed orders artificially inflated JPM's stock price until the extent of the criminal spoofing misconduct was revealed in 2019 and 2020." (Opp'n at 52.) But the SAC does not plead a single fact to connect "spoofed orders," which Plaintiffs concede relate only to the "value of precious metals" (SAC ¶ 223), to the value of *JPM* or its stock. Plaintiffs fail to explain how spoof orders lasting "a few seconds" (Opp'n at 30) in 2016 had any impact at all on JPM's stock, let alone that some artificial inflation was "corrected" by disclosures relating to the DOJ's investigation in 2019 and 2020. In any event, the Edmonds Plea, announced in November 2018, disclosed spoofing conduct on the Desk to the market months before the alleged corrective disclosures. (Defs' Br. at 33, 40-41; *see also infra* Part II.C.) Plaintiffs do not even try to address the impact of the Edmonds Plea in connection with their spoof order claim.[5]

Plaintiffs' citation to *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227 (2d Cir. 2014), only illustrates the defect in their theory. In *Carpenters*, plaintiffs alleged

---

[5] Plaintiffs assert in passing that the "spoofing misstatements" are "also alleged to have artificially inflated JPM's stock price *from 2008* until August 2016." (Opp'n at 52 (emphasis added).) To the extent Plaintiffs are asserting claims relating to alleged spoof orders placed before the Class Period begins in February 2016, those claims are unquestionably barred by the five year statute of repose (Defs' Br. at 39 & n.18)—a point Plaintiffs do not dispute.

that false daily LIBOR submissions artificially inflated the bank defendant's stock price because they were "perceived by the market as an indicator of a bank's financial health." *Id.* at 231. That linkage is entirely missing here. Plaintiffs fail to allege any plausible connection between "spoof" orders, which at most reflect "belief[s]" about the "value of precious metals" (SAC ¶ 223), and the value of JPM or the value of JPM's stock.

**B.      The SAC Does Not Allege "Scheme Liability."**

Unable to adequately allege that spoof orders are actionable misstatements—the only theory of liability alleged in the Complaint arising from spoof orders—Plaintiffs now claim that, in addition to a "misstatement" claim, the SAC somehow alleges that spoofing gives rise to "scheme liability" pursuant to subsections (a) and (c) of Rule 10b-5. (Opp'n at 31-32.) But the SAC alleges no facts to support that theory, and "Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss." *K.D. ex rel. Duncan* v. *White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013). Courts in this Circuit regularly reject attempts by plaintiffs to transform misstatement claims into claims of scheme liability in order to avoid their pleading burden. *See, e.g.*, *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020) ("[C]ourts have routinely rejected the plaintiff's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"); *In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 337 (D. Conn. 2021) (despite use of the word "scheme," scheme liability not alleged because courts "insist that a plaintiff who intends to bring a Rule 10b-5 claim based on both misstatement and scheme liability must do so clearly and specifically").

Even if Plaintiffs had pleaded scheme liability in the SAC, that theory fails as a matter of law because Plaintiffs do not allege any basis for a "spoofing" scheme directed at defrauding *JPM's shareholders*, as opposed to an alleged scheme aimed at "*market participants* in the

precious metals futures markets." (SAC ¶ 4 (emphasis added).) "To state a claim for scheme liability, a plaintiff must present facts showing "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). For the same reasons that Plaintiffs fail to state a claim on a misstatement theory, these elements are inadequately pled. *Id.* at 517 (for scheme liability, plaintiffs must "state with particularity what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors" in the security).

It is, moreover, black letter law that "[t]he scheme to defraud must coincide with the sale of securities. In other words, the fraud itself must be integral to the purchase and sale of the securities in question." *Id.* at 518; *see also Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta*, 552 U.S. 148, 162 (2008) (Section 10(b) "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way"); *Leykin* v. *AT & T Corp.*, 423 F. Supp. 2d 229, 241-42 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007) (no scheme liability alleged where scheme "involved corporate abuse, misconduct and diversion of assets, but no transactions in the relevant securities"). Here, Plaintiffs allege a "scheme of 'spoofing' to defraud market participants in the precious metals futures markets," but they do not—and could not—allege that such a scheme was "integral" to the purchase or sale of securities. (SAC ¶ 4.) Indeed, they do not even attempt to allege a "scheme" to manipulate JPM's stock. Accordingly, Plaintiffs cannot state a claim for "scheme liability" on that basis.

## II.    THE OPPOSITION DOES NOTHING TO SALVAGE PLAINTIFFS' DEFECTIVE CLAIMS BASED ON JPM'S FORM 10-K DISCLOSURES.

The Opposition also underscores Plaintiffs' failure to plead any actionable misstatements or omissions by the Executive Defendants or JPM in the Form 10-K Disclosures. None of the

disclosures that Plaintiffs challenge—general statements about the trading and valuation of *physical* commodities or commodities derivatives generally (SAC ¶¶ 230-251)—has anything to do with spoofing or the precious metals futures trading at issue in the Resolutions, and Plaintiffs fail to show that any of those statements were false or misleading, or that JPM otherwise had a duty to disclose spoofing conduct.  The Opposition all but concedes that the SAC fails to allege a "strong inference of scienter" on behalf of the Executive Defendants or JPM.  And Plaintiffs fail to plead loss causation where all of the so-called "corrective disclosures"—on cherry picked dates when JPM's stock happened to decline—occurred months or years after spoofing conduct on the Desk was revealed to the market by the Edmonds Plea and the 2018 Class Action.

> **A.** **Plaintiffs Fail to Plead Any Actionable Misstatements or Omissions by the Executive Defendants or JPM in the Form 10-K Disclosures.**

> **1.** **General Statements About Trading in "Physical Commodities" or "Commodities Derivatives" Are Not Materially False or Misleading.**

Plaintiffs assert the conclusion that JPM's 2015-2019 Form 10-K disclosures were "false and misleading because of the criminal spoofing conspiracy by the Desk." (Opp'n at 19.)  But to state a claim, "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.* ("*In re ANZ*"), 2009 WL 4823923, at *7 (S.D.N.Y. Dec. 14, 2009).  Plaintiffs do not come close to meeting that standard.  Plaintiffs do not dispute that none of the challenged statements makes any reference to "spoofing," "precious metals," or "precious metals futures trading"—the subject of the "criminal spoofing conspiracy."  Accordingly, none of the challenged statements could have misled investors on that topic.  Because Plaintiffs "fail[] to match [their] theory of fraud to the public statements made by [JPM]," their claim fails.  *Id.* at *14.

***Statements About Purchases and Sales of <u>Physical</u> Commodities***.  Plaintiffs argue that the benign statement,"[i]n the physical commodity markets, the Firm primarily purchases and sells

-11-

precious and base metals and may hold other commodities inventories under financing and other arrangements with clients"[6] somehow gave rise to a duty to disclose "that the Desk was illegally manipulating those markets through spoofing." (Opp'n at 22.) But in this Circuit, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *see also Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 2021 WL 3744894, at *4 (2d Cir. Aug. 25, 2021) (same). True, a duty to disclose "uncharged, unadjudicated wrongdoing" might arise if other "statements are or become materially misleading in the absence of disclosure." *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580-81 (S.D.N.Y. 2016). But for the duty to disclose uncharged wrongdoing to arise, "there must be a connection between the illegal conduct and the misleading statements 'beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line.'" *Id.* at 581 (quoting *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008)). Put differently, "there must be a 'direct nexus' between the alleged wrongdoing and the company's statements." *Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) ("critical consideration" in "determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions" are "sufficiently connected to defendants' existing disclosures to make those public statements misleading").

Here, the "direct nexus" between the alleged wrongdoing (spoofing in precious metals futures) and the challenged statement is absent. On its face, the challenged statement relates solely

---

[6] The Opposition confirms that Plaintiffs are not alleging that this statement was a "misstatement." (Opp'n at 19-22.) Nor could they. There is absolutely nothing false about this general statement.

-12-

to "the physical commodity markets."  But the SAC does not allege any misconduct at all in the markets for "physical" commodities.[7]  That general statement makes no reference specific to commodity *futures*, let alone *precious metals futures*, the market where spoofing allegedly took place.  Nor does the statement reference spoofing or any other potential market manipulation, or otherwise put at issue profits realized from trading in precious metals futures contracts that may have been impacted by spoofing.[8]  Without any "direct nexus," Plaintiffs' claim fails.

    ***Statement About <u>Commodity</u> Derivatives***.  The Opposition also fails to explain how a single footnote[9] in JPM's 2015 Form 10-K—stating that "[c]ommodity derivatives are frequently used to manage the Firm's risk exposure to its physical commodities inventories"—was false or misleading "because of the criminal spoofing conspiracy."  (Opp'n at 19 (citing SAC ¶ 232).)  On its face, the footnote refers to "[c]ommodity derivatives" generally, encompassing a wide swath of financial instruments, and reflects no facts whatsoever specific to *futures* contracts or *precious metals* futures contracts, where the spoofing conduct occurred.  *See In re ANZ*, 2009 WL 4823923,

---

[7] Plaintiffs assert that "precious metals are encompassed by JPM's usage of the term 'physical commodities'" and that "futures contracts" can be "used to value precious metals" (Opp'n at 21-22), but they do not cite any authority to suggest that stringing these concepts together after the fact demonstrates that any of these statements bore a "direct nexus" to the spoofing conduct in precious metals futures contracts sufficient to give rise to a duty to disclose.

[8] For these reasons, Plaintiffs' authorities (Opp'n at 23) are inapposite.  *See In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *10 (E.D.N.Y. Apr. 22, 2020) (statements "directly link[ed] increased automation at the fulfillment centers with increases to cost efficiency and suggest these efficiencies are increasing" when "delays" meant they were "in fact doing the opposite"); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (defendant "made numerous statements . . . concerning the sources and significance of [second quarter] revenue" and therefore "put the sources of [that] revenue at issue").

[9] Defendants never argued that "informal" statements in footnotes are "*per se* inactionable." (Opp'n at 20.)  Rather, the placement of this general statement in a footnote to a table directing readers elsewhere for information on "gains/(losses) related to commodity fair value hedges" (Ex. 3 at 221), puts the statement in its proper context.  (*See* Defs' Br. at 16-17.)  For this reason, the cases Plaintiffs cite relating to "informal" statements (Opp'n at 20-21) are irrelevant.

at *14 (dismissing complaint where "practices" at issue were "not the subject of the representations cited in the Complaint").[10]  In any event, there is nothing "false" about this statement, even when considered in light of the "spoofing conspiracy."  Even if some traders were engaged in spoofing as to certain futures transactions, that practice, while improper, is not itself inconsistent with the use of commodities derivatives to manage risk.  Plaintiffs have not alleged any facts to call into question the true statement that the broad range of commodities derivatives traded by JPM subsidiaries are "frequently" used to manage risk exposure.  (SAC ¶ 232.)

Plaintiffs argue that even a "technically correct" or "innocuous" statement "can be actionably misleading" by "failing to disclose illegal conduct."  (Opp'n at 23-24.)  That may be true, but it is irrelevant here.  Like the statement addressed above, this statement about "commodity derivatives" "frequently" being used to manage "risk exposure" to "physical commodities" makes no reference to spoofing, precious metals, futures contracts, or precious metals futures contracts, and thus lacks any "direct nexus" to spoofing-related conduct on the Desk that gives rise to a duty to disclose such conduct.  *Schiro*, 396 F. Supp. 3d at 296.

***Statements About Valuation of <u>Physical</u> Commodities.***  Plaintiffs similarly fail to explain why JPM's general statement in its 2015-2019 Forms 10-K—that "[p]hysical commodities" were "[v]alued using observable market prices or data"—was false or misleading "because of the criminal spoofing conspiracy."  (Opp'n at 19, 21-22.)  Once again, this statement expressly relates to "[p]hysical commodities," not *precious metals* futures contracts or futures contracts at all.  A

---

[10] Plaintiffs' cases (Opp'n at 20) are easily distinguishable.  In each of those cases, the challenged statements were specifically related to the subject of the alleged fraud.  *See Freudenberg* v. *E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 182-84 (S.D.N.Y. 2010) (statement that company held "zero in subprime" loans actionable where subprime loans "constituted substantial portions of [defendant's] portfolio"); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 85-86 (S.D.N.Y. 2017) (statement regarding absence of toxic waste actionable when testing confirmed toxic waste).

-14-

statement about the valuation of physical commodities therefore bears no "direct nexus" to spoofing conduct in futures traded by the Desk, and is "far too generalized and attenuated to implicate [a] duty to disclose" spoofing in that separate market. *Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *18 (S.D.N.Y. Mar. 30, 2021); *see also In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (no duty to disclose where conduct bore "too tenuous a connection to render [the company's] statements regarding its financial success misleading").[11]

### 2. Plaintiffs Fail to Plead Any "Item 303 Omissions" by JPM.

Plaintiffs' Item 303 omission claim should be dismissed out of hand. The Opposition readily concedes (Opp'n at 25-26) that the SAC does not plead that either Executive Defendant had "actual knowledge" of spoofing conduct by individuals on the Desk, which is required to plead an actionable omission under Item 303. *In re Yunji Inc., Sec. Litig.*, 2021 WL 1439715, at *7 (E.D.N.Y. Mar. 31, 2021). Indeed, Plaintiffs go so far as to drop their Item 303 claim against the Executive Defendants completely. (Opp'n at 25 n.10.) That should be the end of the matter. Because Plaintiffs no longer purport to allege that any JPM executive involved with Item 303 disclosures for JPMorgan Chase & Co. had "actual knowledge" of spoofing on JPMCB's precious metals desk, the Item 303 claim must be dismissed.

As a last ditch effort, Plaintiffs argue that Defendant Nowak, a former precious metals trader and former "supervisor" of the precious metals desk at JPMCB, knew about the spoofing conduct and somehow imputed knowledge of spoofing conduct to JPMorgan Chase & Co.'s

---

[11] Again, Plaintiffs' authorities (Opp'n at 21) are distinguishable because plaintiffs there alleged the requisite nexus between the challenged statements and the underlying wrongdoing. *See, e.g., In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *6-7 (S.D.N.Y. Sept. 19, 2017) (defendant's assertions concerning the reasons for growth in a certain market "sufficiently place[d] the reasons for growth in [that market] at issue to make further disclosure necessary").

executive management.  (*Id.* at 25-26.)  That argument is frivolous.  The SAC does not assert any Item 303 claim against Nowak, and Plaintiffs cannot amend their complaint through briefing in response to a motion to dismiss.  *See K.D.*, 921 F. Supp. 2d at 209 n.8.  In any event, Item 303 of Regulation S-K, entitled "*Management*'s Discussion and Analysis of Financial Condition and Results of Operations," imposes a duty to disclose financial trends or uncertainties "likely to have material effects on the registrant's financial condition or results of operations" that are "presently known to *management*."   Mgmts. Discussion & Analysis of Fin. Condition & Results of Operations, SEC Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989) ("Release No. 6835") (emphasis added).[12]  The SAC does not allege that Nowak was even an employee of the registrant, JPMorgan Chase & Co., let alone an *officer*—on the contrary, the DPA attached to the SAC confirms that Nowak was employed by JPMCB.  (*See* Ex. 1 (DPA) at A-1, A-3-4, A-8.)  And Plaintiffs nowhere allege that Nowak had any role *whatsoever* in drafting any disclosures on behalf of JPMorgan Chase & Co.  *See Thomas* v. *Shiloh Indus., Inc.*, 2018 WL 4500867, at *3 (S.D.N.Y. Sept. 19, 2018) (when imputing scienter "Court[s] should consider the individual's relative seniority at the issuing entity and the connection between the executive's role and the fraudulent statements").  Plaintiffs' contention (Opp'n at 25-26) that Nowak was "a member of JPM's management by virtue of his position as the supervisor" of a single trading desk within a subsidiary of one of the largest financial institutions in the world is untenable.  Plaintiffs do not cite a single case that supports their novel contention that knowledge of misconduct by a non-officer employee

---

[12] SEC guidance makes clear that "management" within the context of Item 303 means a company's senior executives and officers.  *See, e.g.*, *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, SEC Release No. 8350 (Dec. 19, 2003) (describing how "a good introduction" in an MD&A disclosure will "provide insight into material opportunities, challenges and risks, such as those presented by known material trends and uncertainties, on which the *company's executives* are most focused for both the short and long term" (emphasis added)).

of a corporate affiliate is sufficient to trigger a duty of disclosure under Item 303.[13]

Plaintiffs' Item 303 claim fails for the additional reason that uncharged spoofing misconduct would not qualify as a "trend" or "uncertainty" required to be disclosed under Item 303. (Defs' Br. at 19.) This case "stands in stark contrast to the type of conduct for which the SEC envisioned Item 303 to compel disclosure," which included things like "'[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.'" *Diehl* v. *Omega Protein Corp.*, 339 F. Supp. 3d 153, 167 (S.D.N.Y. 2018) (quoting Release No. 6835). Because the "underlying illegal conduct at issue here does not directly pertain to [JPM's] operating results or financial condition,"[14] it is not the type of "trend" or "uncertainty" for which Item 303 contemplates disclosure. *Id.*; *see also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016).

Even if Plaintiffs could show that spoofing on JPMCB's precious metals desk "directly pertained" to its corporate parent's operating results or financial condition, "courts have been sensitive about forcing a company to damage its own interests as well as those of its shareholders" by disclosing uncharged conduct. *Diehl*, 339 F. Supp. 3d at 167. In *Pontiac*, for example, the Second Circuit construed Item 503, which imposes a similar requirement to disclose "the most significant factors that make the offering speculative or risky," not to require disclosure of

---

[13] Plaintiffs badly misrepresent the holding in *Indiana Pub. Ret. Sys.* v. *SAIC, Inc*., 818 F.3d 85, 95-96 (2d Cir. 2016). According to Plaintiffs, *SAIC* "held that even if a company's executives are not alleged to have violated Item 303, the company can nonetheless be liable for an Item 303 violation if management has actual knowledge of the omitted information." (Opp'n at 26.) The Court held no such thing; rather, the Court held that the claims could proceed because the CEO, CFO, Group President and Vice President of the registrant had "actual knowledge" of wrongdoing. *See id.*; *In re SAIC, Inc. Sec. Litig.*, 2013 WL 5462289, at *1 n.1 (S.D.N.Y. Sept. 30, 2013).

[14] Plaintiffs point to the "$920 million criminal penalty" paid in connection with the Resolutions (Opp'n at 4), but given that JPM's assets totaled more than two *trillion* during the Class Period (Defs' Br. at 38), Plaintiffs cannot seriously contend that the "penalty" was "likely to have material effects on the registrant's financial condition." Release No. 6835, 1989 WL 1092885, at *4.

-17-

uncharged wrongdoing. *Pontiac*, 752 F.3d at 183-84 (no duty to disclose tax scheme because "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing"). "The reasoning in *City of Pontiac* extends naturally to the disclosure requirements imposed by Item 303," which should not be read "to impose a duty to disclose uncharged, unadjudicated wrongdoing, in particular when that wrongdoing has only, at best, a tangential relationship to the defendant's financial condition and operating results." *Diehl*, 339 F. Supp. 3d at 168.

Plaintiffs' only response is to cite *SAIC* for the proposition that "serious, ongoing criminal and civil investigations" can be an "uncertainty that ha[s] to be disclosed under Item 303." (Opp'n at 27.) But *SAIC* is an outlier that is easily distinguishable. In that case, despite being "aware of the Government's criminal investigation," and despite having actual knowledge through an internal audit of a billing scheme that had defrauded the City of New York of $600 million—facts not present here—the defendant failed to disclose the investigation. *SAIC*, 818 F.3d at 89, 91, 95-96. Unlike here, the defendant in *SAIC* knew that the scheme would result in "loss of revenue from future contracts," which the defendant valued at approximately $2 billion or "twenty percent of [defendant's] yearly revenue," or "debarment from other government contracts altogether." *Id.* at 95-96. The investigation in *SAIC*, therefore, went to the very heart of the matters that Item 303 requires to be disclosed: the "likely non-renewal of a material contract," which directly impacted revenues. Release No. 6835, 1989 WL 1092885, at *4. Nothing like that is alleged here.[15]

---

[15] Plaintiffs concede that JPM disclosed the "government investigations" into spoofing "in the 2018 and 2019 Forms 10-K," but argue that those disclosures were somehow insufficient under Item 303 because they failed to disclose "the uncertainty caused by the criminal liability," which "did not occur until the final loss causing event alleged in the SAC." (Opp'n at 27.) That allegation fails because Plaintiffs do not even attempt to allege that anyone—and certainly not Nowak—had "actual knowledge" of the outcome of the government's investigation or the amount of any criminal penalty at the time the 2018 and 2019 Form 10-K disclosures were filed.

**B.      The SAC Fails to Allege Scienter With Respect to the Form 10-K Disclosures.**

**1.      Plaintiffs Fail to Allege Scienter as to the Executive Defendants.**

The Opposition fails to explain how Plaintiffs could possibly satisfy the heightened standard for pleading scienter on behalf of the Executive Defendants, which requires them to allege particular facts "giving rise to a *strong* inference" that Dimon and Lake made the challenged Form 10-K disclosures with "an intent to deceive, manipulate, or defraud" JPM shareholders. *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 473 (S.D.N.Y. 2017). This inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

*First*, Plaintiffs concede that their allegations of "prior criminal acts" do not "demonstrate scienter" "in and of themselves." (Opp'n at 39-40 n.12.) That concession renders completely irrelevant at least 20 paragraphs of the SAC, which Plaintiffs inappropriately devoted to cataloging unrelated allegations. (SAC ¶¶ 57-75, 214.)

*Second*, Plaintiffs argue that the Executive Defendants somehow should have known about widespread spoofing conduct on the Desk because of "compliance upgrades" and "reforms," including the "monitoring [of] electronic chats," following the "FX Plea" in 2015. (Opp'n at 35-37.) These "should have" allegations are woefully deficient. *See Pontiac*, 752 F.3d at 187-88 (rejecting "should have" allegations because "poor business judgment" does not show scienter). The SAC contains no particularized allegations regarding "what specific contradictory information [Dimon or Lake] received or when they received it." *Local No. 38 IBEW Pension Fund* v. *Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010). For example, relying on the DPA, Plaintiffs argue that traders on the Desk "repeatedly used the term 'spoof' in [their] electronic chats" (Opp'n at 2, 37), but they fail to allege any facts to suggest that these chats were identified

-19-

by compliance, let alone reviewed by *Dimon* or *Lake*, prior to the challenged disclosures. What is more, the DPA identified only *two* chats in which precious metals traders used the word "spoof," which occurred in 2009 and 2012 (Ex. 1 (DPA) at A-11, A-13), *years* before the compliance "upgrades" that Plaintiffs allege "would have" detected them. (Opp'n at 35-37.)

*Third*, Plaintiffs double down on their flawed argument that the Executive Defendants somehow failed to detect "red flags," including unspecified surveillance alerts and "internal allegations" brought to the attention of unidentified compliance employees, vague allegations in long-stale civil proceedings, a CME investigation of a single trader, and a "2008 CFTC investigation" that did not result in charges. (Opp'n at 36-42.) But it is well-established that, absent factual allegations that a defendant was made "aware" of specific indicia of fraud, "red flags are insufficient to plead the required strong inference" of scienter. *Saltz* v. *First Frontier, L.P.*, 485 F. App'x 461, 464-65 (2d Cir. 2012) (rejecting argument that red flags were "so obvious" that they supported allegation of scienter); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *8 (S.D.N.Y. Aug. 12, 2014) ("Courts in this circuit have held that mere alleged access to information through which a defendant could have discovered red flags is insufficient to plead scienter."). Those allegations are entirely absent here. The Opposition does not identify a single factual allegation that ties any of these "red flags" to Dimon or Lake.[16]

*Last*, Plaintiffs rely heavily on allegations by Turnbull, a former precious metals trader, in a recently filed employment complaint. Among other things, Plaintiffs rely on those untested and

---

[16] Relying on *Novak* v. *Kasaks*, 216 F.3d 300 (2d Cir. 2000), Plaintiffs argue that allegations that a defendant "had the access and capability to uncover th[e] illicit scheme" will "establish scienter." (Opp'n at 35.) But the example *Novak* gives to support that proposition proves Defendants' point. There, the "obviously evasive and suspicious statements" were "*made to*" the defendant. *Id.* at 309 (emphasis added). Here, in contrast, Plaintiffs do not allege that any statements or other evidence of spoofing were "*made to*" or shared with Dimon or Lake.

unverified allegations to argue that unidentified individuals at "JPM" (i) "actively monitor[ed]" chats at unspecified times, (ii) "investigated" unidentified "traders on the Desk for spoofing," and (iii) "knew about the CME investigation into Smith." (Opp'n at 37-38.) Plaintiffs also allege that Turnbull "reported to his manager that he believed Smith was spoofing." (*Id.* at 38.) None of this information comes close to demonstrating that *Dimon* or *Lake* were alerted to evidence of widespread spoofing conduct, or that they made Form 10-K disclosures with the intent to defraud JPM's shareholders. Plaintiffs argue that Turnbull's allegations "serve essentially the same function as confidential witness allegations that are routinely relied upon in finding recklessness for senior executives." (Opp'n at 41.) But Turnbull nowhere alleges that he ever had *any* contact with Dimon or Lake, or was ever in a position to know what information Dimon or Lake received or did not receive, whether about spoofing or any other topic. "[C]ourts generally have not credited the statements of [confidential witnesses] . . . whose descriptions do not suggest that they had been in position to know the facts attributed to them." *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 (S.D.N.Y. 2020); *see also Campo* v. *Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (discounting statements of confidential witnesses who had no contact with the defendants); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (rejecting witness where "Plaintiffs do not allege any facts indicating that [witness] was in a position to have knowledge regarding communications with Elan senior management"). Turnbull's vague allegations therefore fail to raise any inference that either Executive Defendant acted with scienter.

### 2.    Plaintiffs Cannot Impute Scienter "Through the Trader Defendants."

Effectively conceding that the SAC fails to allege scienter as to the Executive Defendants, Plaintiffs switch gears yet again and argue instead that scienter for the alleged misstatements and omissions in JPM's Forms 10-K can be imputed to JPM "through the Trader Defendants" who engaged in spoofing conduct on the Desk. (Opp'n at 43-45.) That argument is easily disposed of.

-21-

"[C]ourts have generally held that the scienter of a corporation's executive-level employees and corporate officers may be attributed to the corporation." *Thomas*, 2018 WL 4500867, at \*3. That is so because only "a sufficiently senior director or officer" would have "oversight over the public-facing misrepresentation" and the ability to "intervene" to correct that misrepresentation. *City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020). In some circumstances, "senior managers one level removed from the executive level" also suffice. *Thomas*, 2018 WL 4500867, at \*3. Here, however, Plaintiffs do not allege that any of the Trader Defendants were executives, officers, or senior managers of JPM. Indeed, Plaintiffs do not even allege that any of the Trader Defendants were employed by JPM.[17] On the contrary, documents attached to the SAC confirm that Nowak, Smith and Trunz were employed by JPMCB, a corporate subsidiary. (*See* Ex. 1 (DPA) at A-1, A-3-4, A-8; Ex. 2 (CFTC Order) at 3 (precious metals traders "traded on behalf of JPMCB").)[18] Although there are limited circumstances in which "the scienter of an *officer* of a subsidiary" may be attributed to "the subsidiary's parent corporation," *Schiro*, 396 F. Supp. 3d at 301-02 (emphasis added), Plaintiffs do not allege that any

---

[17] The SAC variously asserts that Nowak, Smith and Trunz worked on the Desk at "JPMorgan" or the "Company," but the SAC defines those terms to "incorporate all JPMorgan subsidiaries" including "JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC." (SAC ¶ 34.) Plaintiffs' improper group pleading is insufficient to plead the employing entity of any Defendant. *See, e.g.*, *Rocker Mgmt., L.L.C.* v. *Lernout & Hauspie Speech Prod. N.V.*, 2005 WL 1365772, at \*8 (D.N.J. June 8, 2005) (concluding that "[t]he lumping together of KPMG offices under one 'KPMG' reference offends the particularity requirements embodied in Rule 9(b) and the PSLRA").

[18] The Opposition points to irrelevant extrinsic evidence in an attempt to contradict the DPA attached to the SAC, including a March 2018 expert disclosure in another litigation, which, as a shorthand, referred to Nowak as "an employee" of JPM. (Opp'n at 44.) This document adds nothing: it does not support Plaintiffs' incorrect and conclusory statement that Nowak is "the only plausible source of JPM's misstatements" regarding "derivatives for, and valuations of, precious metals" (*id.*), and per Plaintiffs' own arguments (*id.* at 16-18), is not judicially noticeable.

of the Trader Defendants, including Nowak, were officers of JPMCB.[19]

In any event, regardless of the employment status of the Trader Defendants, Plaintiffs cannot possibly impute their "scienter" to JPM with respect to the challenged disclosures because Plaintiffs do not allege that Nowak, Smith or Trunz were ever involved in any way with JPM's Form 10-K disclosures.  "[U]nder Second Circuit precedent, it is not enough to *separately* allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two." *Silvercreek Mgmt., Inc.* v. *Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017); *see also Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (declining to impute scienter to company where complaint "set[] forth allegations that three employees knew of problems with the MicroCool gown," but "provide[d] no connective tissue between those employees and the alleged misstatements").  Here, the SAC does not contain a single allegation that Nowak, Smith or Trunz ever drafted, reviewed or provided any input whatsoever into JPM's 10-K disclosures.  Therefore the required "connective tissue" between the Trader Defendants and the alleged misstatements in JPM's Forms 10-K is absent.

### C.   Plaintiffs Fail to Plead Loss Causation.

Defendants' opening brief showed that, by the time JPM announced the Resolutions in September 2020, spoofing conduct on the precious metals desk had long been public knowledge. (Defs' Br. at 32-36.)  As Plaintiffs concede (Opp'n at 47), on November 6, 2018 (two years before the Resolutions and months prior to the first of four alleged corrective disclosures), the DOJ announced that Edmonds, a former precious metals trader, had pleaded guilty to spoofing.  (*See* Ex. 9 (Edmonds Plea) at 10-11.)  Beyond mere "hint[ing] at possible additional culpability" (Opp'n

---

[19] Plaintiffs assert that Nowak (i) was a "supervisor" of the Desk, (ii) was "most knowledgeable" about "the Desk's trading strategy and practices," and (iii) had "managerial duties."  (Opp'n at 26, 43-44.)  None of that even suggests that Nowak was an officer of JPMCB, let alone JPM.

at 47), the Edmonds Plea disclosed the scope of the spoofing scheme on the Desk in remarkable detail, revealing that: "[f]rom no later than 2009 until *no earlier* than 2015," Edmonds "conspired with *other precious metals traders* at the Bank" to engage in spoofing, that Edmonds "learned this deceptive trading strategy from *more senior traders* at the Bank," and that Edmonds "personally deployed this strategy hundreds of times *with the knowledge and consent of his immediate supervisors*." (Ex. 9 at 10 (emphasis added).)[20]

In response, Plaintiffs argue that the Court should not consider the Edmonds Plea because the impact of that disclosure is a "factual argument" inappropriate for resolution on a motion to dismiss. (Opp'n at 47.) Plaintiffs are wrong.[21] When assessing loss causation on a motion to dismiss, courts regularly consider information made known to the market prior to any purported corrective disclosures. *See, e.g.*, *In re CRM Holdings, Ltd. Sec. Litig.*, 2013 WL 787970, at *6 (S.D.N.Y. Mar. 4, 2013) (dismissing complaint for failure to allege loss causation where public information disclosed in prospectus was disclosed "well before the April 2008 date when Plaintiffs allege that the truth began to emerge"). Here, the Edmonds Plea "let the cat out of the bag" regarding the spoofing scheme, such that "[s]ubsequent reports"—including those on four dates selected by Plaintiffs when JPM's stock price happened to decline—"merely confirmed what the market already knew. Therefore, these later reports were not corrective disclosures." *DoubleLine Capital LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 459 (S.D.N.Y. 2018); *see also Nguyen*

---

[20] The next day, on November 7, 2018, plaintiffs filed the 2018 Class Action asserting spoofing claims (Ex. 10), which further revealed the scope of the conduct.

[21] Contrary to the Opposition, this Court may indeed consider each of the "news articles that Defendants submit[ed]" to show that spoofing conduct on the Desk "was publicly disclosed by November 2018." (Opp'n at 18 (citing Exs. 16-20 and 22).) Defendants do not submit these articles for their truth, but to establish what information was made known to the market. *See In re Zyprexa Prod. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("Judicial notice can be taken of prior complaints and legal proceedings, press releases and news articles and published analyst reports in determining what the market knew.").

v. *New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018) (granting motion to dismiss where "risk that materialized was disclosed by Defendants and known by investors").

Plaintiffs struggle to distinguish the facts already made known to the market through the Edmonds Plea from any "new" details later revealed through the so-called "corrective disclosures." Plaintiffs fixate on tidbits of new, immaterial information, all of which are insufficient to plead loss causation. And even if any of those later "disclosures" did reveal "new" material information not previously disclosed by the Edmonds Plea, Plaintiffs "fail[] to demonstrate a causal connection between" any supposedly new information "and the harm actually suffered." *Id.* at 499.

*First*, Plaintiffs argue that JPM's February 26, 2019 disclosure of the government's investigation into precious metals trading revealed new material information "because the Edmonds plea d[id] not disclose the existence of a broader investigation beyond Edmonds." (Opp'n at 49.) Not so. The press release accompanying the Edmonds Plea expressly states that DOJ's "investigation of deceptive trading practices *by others* involved in this scheme is ongoing." (Ex. 15 at 1 (emphasis added).) Plaintiffs further argue that the February 2019 disclosure revealed that "JPM was cooperating with the investigation," which is "new information" "not disclosed in the Edmonds Plea." (Opp'n at 49.) But Plaintiffs do not explain why the fact of JPM's cooperation in a previously-disclosed investigation revealed any facts concealed by any of the alleged misstatements or omissions alleged in the Complaint.

*Second*, Plaintiffs contend that reports of further pleas and charges, including RICO charges, against more "senior" traders in August and September 2019 revealed an "escalation of the DOJ's investigation." (Opp'n at 49-51.) But Plaintiffs ignore that the Edmonds Plea had already disclosed that spoofing involved "other precious metals traders at the Bank," including "more senior traders." (Ex. 9 at 10.) That DOJ's case expanded to include pleas and indictments

-25-

of "more senior traders" is nothing more than the materialization of a known risk that other and more senior traders could be swept into DOJ's ongoing investigation.  Courts routinely dismiss complaints alleging that the "stock price dropped when a disclosed risk . . . materialized." *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *15 (S.D.N.Y. Mar. 26, 2019).[22]

*Last*, Plaintiffs assert that news reports on September 23, 2020 "revealed the full extent of JPM's spoofing liability" and disclosed a "record" fine.  (Opp'n at 51.)  But the settlement of a previously-disclosed DOJ investigation is nothing more than a "risk that materialized [that] was disclosed by Defendants and known by investors." *Nguyen*, 297 F. Supp. 3d at 500.

## III.   PLAINTIFFS' SECTION 20(a) CLAIM ASSERTED AGAINST THE EXECUTIVE DEFENDANTS FAILS.

Plaintiffs do not dispute that if the Court finds they fail to plead a primary violation of Section 10(b), their Section 20(a) claims against the Executive Defendants must also be dismissed. *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  As to culpable participation, Plaintiffs quibble that a minority of district courts have questioned whether "culpable participation must be pled in a manner akin to scienter." (Opp'n at 53.)  But that is beside the point.  Even if culpable participation need not be alleged with the same "particularity" as scienter (a minority view that this Court should not adopt),[23] for the reasons explained *supra*, Plaintiffs still

---

[22] Plaintiffs fail to explain why the specific legal theory the government chose to pursue against an individual trader is material to JPM investors.  Even if the reports of additional pleas and charges did qualify as a "new" information, Plaintiffs fail to allege a connection between that new information and any prior alleged misstatement or omission.  The fact that DOJ levied RICO charges on top of spoofing theories, for example, does not reveal the "falsity" of a statement about how physical commodities are valued or disclose some risk that statement concealed.  *See In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 2008 WL 2324111, at *5 (S.D.N.Y. June 4, 2008).

[23] *See, e.g.*, *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) ("[T]his Court finds more persuasive the line of cases holding that 'culpable participation' is an element of a Section 20(a) claim that must be pleaded with the same particularity as scienter.").

fail to plausibly allege *any* facts to show that Dimon or Lake were culpable participants in any securities violation.[24]

## IV.       PLAINTIFFS SHOULD NOT BE PERMITTED TO AMEND A THIRD TIME.

This is Plaintiffs' third complaint.  Plaintiffs are unable to cure any of the fatal defects that remain and do not point to any new allegations that would render an amendment non-futile.  They express hope that a "criminal trial of Nowak and Smith" might "reveal new information supporting Plaintiffs' allegations." (Opp'n at 55.)  But they do not specify what "new information" they hope to obtain or how that information would support their defective claims.  Plaintiffs also point to a foreign employment decision relating to a former equities trader, Bradley Jones.  (*Id.*)  But Plaintiffs admit that Jones traded "cash equities," not precious metals futures.  Plaintiffs also suggest that the "Jones Decision" demonstrates that "JPM's compliance function" was "monitoring" for spoofing "by the start of the Class Period."  (*Id.*)  But nothing in the Jones Decision suggests that evidence of spoofing was "escalated" to Dimon or Lake, or that evidence of potential spoofing in cash equities would alert anyone to spoofing on the precious metals desk. Accordingly, further amendment would be futile and after three tries, unwarranted.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC in its entirety with prejudice, and without leave to amend.

---

[24] Plaintiffs assert in a footnote that "JPM's motion to dismiss appears to concede that Nowak is a control person" of JPM.  (Opp'n at 54 n.21.)  That is wrong.  JPM made no such concession.  (*See, e.g.*, Defs' Br. at 32 n.15.)

Dated:  August 31, 2021

Respectfully submitted,

/s/ *Robert A. Sacks*
Robert A. Sacks
Amanda F. Davidoff
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants JPMorgan Chase & Co., James Dimon and Marianne Lake*

-28-

## CERTIFICATE OF SERVICE

I hereby certify that, on August 31, 2021, I caused a true and correct copy of the foregoing

document to be served on all counsel of record in the above-referenced action via ECF.

/s/ *Robert A. Sacks*
Robert A. Sacks